Appeal Nos. 2025-1037, 2025-1091

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

NINGDE AMPEREX TECHNOLOGY LTD.,

*Plaintiff-Cross-Appellant*,

v.

ZHUHAI COSMX BATTERY CO. LTD.,

*Defendant-Appellant*.

*Appeal from the United States District Court for the Eastern District of Texas in Case No. 2:22-CV-00232-JRG, Judge J. Rodney Gilstrap*

## [CORRECTED] NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF OF NINGDE AMPEREX TECHNOLOGY LTD.

Michael D. Powell
mikepowell@quinnemanuel.com
Kevin A. Smith
kevinsmith@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
(415) 875-6600

Katherine Rubschlager
katherine.rubschlager@alston.com
ALSTON & BIRD LLP
55 2nd St., Suite 2100
San Francisco, CA 94105
(415) 243-1000

Kirk T. Bradley
kirk.bradley@alston.com
ALSTON & BIRD LLP
1120 S. Tryon St., Suite 300
Charlotte, NC 28203
(704) 444-1030

Brady Cox
brady.cox@alston.com
ALSTON & BIRD LLP
2200 Ross Ave., Suite 2300
Dallas, TX 75201
(214) 922-3400

*Counsel for Plaintiff-Cross Appellant*

March 28, 2025

# FEDERAL CIRCUIT RULE 32(A)(3) STATEMENT

**U.S. Patent No. 11,329,352, Claim 1:**

1.      A secondary battery, comprising:

a first electrode tab;

a first electrode plate, comprising:

a first current collector; and

a first active substance, disposed on a first surface of the first current collector and a second surface of the first current collector, wherein the second surface is opposite to the first surface;

a first electrode tab receiving groove, defined by an exposed portion of the first surface of the first current collector and the first active substance on a periphery of the first electrode tab receiving groove, the first electrode tab receiving groove receiving the first electrode tab, wherein the first electrode tab is electrically connected with the first current collector through the first electrode tab receiving groove;

a first recess that is opposite to the first electrode tab receiving groove, defined by a corresponding portion of the second surface of the first current collector and the first active substance on a periphery of the first recess;

a first electrode plate notch disposed on a side edge of the first electrode tab receiving groove and extending through the second surface and the first surface of the first current collector; and

the first electrode tab receiving groove is formed by the first current collector and at least two first active substance walls;

wherein the secondary battery is a wound-type secondary battery.

**U.S. Patent No. 10,833,363, Claim 1:**

1.      An electrolyte, comprising a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on a total weight

of the electrolyte, a weight percentage of the dinitrile compound is X and a weight percentage of the trinitrile compound is Y, where X and Y meet conditions represented by Formula (1) and Formula (2):

$$\text{about } 2 \text{ wt \%} \leqslant (X+Y) \leqslant \text{about } 11 \text{ wt \% (1); and}$$

$$\text{about } 0.1 \leqslant (X/Y) \leqslant \text{about } 8 \text{ (2),}$$

wherein, based on the total weight of the electrolyte, a weight percentage of the propyl propionate is Z, where Y and Z meet a condition represented by Formula (3):

$$\text{about } 0.01 \leqslant (Y/Z) \leqslant \text{about } 0.3 \text{ (3).}$$

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   2025-1037, 2025-1091

**Short Case Caption**   Ningde Amperex Technology Ltd. v. Zhuhai CosMx Battery

**Filing Party/Entity**   Ningde Amperex Technology Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/28/2025

Signature: /s/ Kevin A. Smith

Name: Kevin A. Smith

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Ningde Amperex Technology Ltd. | | Amperex Technology Limited; TDK Corp. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Michael Doman | Quincy Lu | Yunzhi Li |
| Sean S. Pak | Yixuan Lu | Lance Yang |
| Nien-Ping Wang | Chunmeng Yang | Adam Wolfson |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**Additional Pages: No. 4 Legal Representatives**

Zhaoxin Yin
David Benjamin Adler
Deron R. Dacus
The Dacus Firm, PC;
Shannon Marie Dacus
Gregory Blake Thompson
Mann, Tindel, Thompson

# TABLE OF CONTENTS

This document redacts material deemed confidential, proprietary, and/or competitive by CosMX and filed under seal by the District Court pursuant to the Protective Order entered in this case. *See* Appx520

**Page**

TABLE OF AUTHORITIES ................................................................................ IV

STATEMENT OF RELATED CASES .................................................................1

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES..........................................................................1

INTRODUCTION .................................................................................................3

STATEMENT OF THE CASE..............................................................................5

    A.    ATL's Asserted Patents...........................................................5

    B.    ATL's Damages Model ............................................................6

    C.    Trial And Verdict ....................................................................8

        1.    Validity Of ATL's Patent Claims ................................9

        2.    CosMX's Sherman Act Claim ...................................11

    D.    Verdict and Post-Trial Proceedings ....................................12

SUMMARY OF ARGUMENT ...........................................................................13

    CosMX's Appeal ................................................................................13

        1.    The District Court Did Not Manifestly Err By Admitting Mr. Ratliff's Expert Damages Testimony..............................13

        2.    The District Court Correctly Rejected CosMX's Extraterritoriality Argument ..........................................15

        3.    The District Court Correctly Instructed The Jury On The "Sham" Exception To *Noerr-Pennington* Antitrust Immunity ......................................................................15

    ATL's Appeal .....................................................................................16

        1.    The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The 11,329,352 Patent Was Not Obvious ......................................................16

i

2. The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The 10,833,363 Patent Is Not Anticipated ..................................................17

STANDARD OF REVIEW ..................................................19

ARGUMENT ..................................................20

I. COSMX'S APPEAL ..................................................20

    A. The District Court Did Not Err By Denying CosMX's Motion For Judgment As A Matter Of Law On Induced Infringement .........20

        1. The District Court Did Not Commit Manifest Error By Admitting Mr. Ratliff's Testimony ..................................................21

            (a) Mr. Ratliff's Testimony Was Reasonable And Based On The Well-Accepted Hypothetical Negotiation Construct ..................................................21

            (b) The District Court Correctly Distinguished Between An *Ex Post* Lost-Profits Analysis And An *Ex Ante* Hypothetical-Negotiation Analysis ..................................24

            (c) Neither *Cyntec* Nor Any Other Decision Required Exclusion Of Mr. Ratliff's Testimony ..................................30

        2. The Trial Record Contains Substantial Other Evidence Of Induced Infringement ..................................................32

        3. If This Court Were To Conclude That The Admission Of Mr. Ratliff's Testimony Was Manifestly Erroneous, The Remedy Would Be A Remand For Further Proceedings ..........34

            (a) The District Court Did Not Find That ATL Waived The Right To Damages Based On Alternate Theories ..................................................35

            (b) ATL Did Not Waive The Right To Damages Based On Alternate Theories ..................................37

    B. The District Court Correctly Denied CosMX's Motion For Judgment As A Matter Of Law On Extraterritoriality ........................38

        1. *Merial Ltd. v. Cipla Ltd*., 681 F.3d 1283 (Fed. Cir. 2012), Is Controlling ..................................................38

        2. *RJR* Did Not Implicitly Overrule *Merial* ..................................39

        3. *RJR* Supports Affirming Induced Infringement Liability ........42

(a) Section 271 Rebuts The Presumption Against Extraterritoriality ...........................................................42

(b) The Focus of Section 271(b) Is Preventing Domestic Infringement ..................................................44

C. The District Court Correctly Instructed The Jury On CosMX's "Sham Litigation" Antitrust Claim .....................................................45

D. This Court May Affirm The Judgment On The Antitrust Claim On The Alternate Ground That ATL's Chinese Patent Assertions Were Not Objectively Baseless.........................................47

II. ATL'S CROSS-APPEAL.........................................................................50

A. The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The '352 Patent Was Not Obvious.................50

1. CosMX Failed To Introduce Clear And Convincing Evidence Of A Motivation To Combine Wang And Deng ......50

2. CosMX Failed To Introduce Clear And Convincing Evidence That Wang And Deng Qualify As Printed Publications .................................................................................56

B. The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The '363 Patent Was Not Anticipated............58

1. CosMX Did Not Introduce Clear And Convincing Evidence That The Samsung S9+ Phone Battery Pre-Dated The '363 Patent's Effective Filing Date.........................59

2. CosMX Did Not Introduce Clear And Convincing Evidence That *Zeng* Was A Printed Publication Or Enabled Claim 1 Of The '363 Patent........................................62

3. CosMX Did Not Introduce Clear And Convincing Evidence That The SW-E7/DP018/DP060 Electrolytes Were Sold Or Offered For Sale Before The '363 Patent's Effective Filing Date ...............................................................65

CONCLUSION................................................................................................68

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS.......................................................................................70

ADDENDUM OF ORDERS AND JUDGMENTS.............................................71

# TABLE OF AUTHORITIES

**Page**

**Cases**

*800 Adept, Inc. v. Murex Secs., Ltd.*,
539 F.3d 1354 (Fed. Cir. 2008) .................................................................45, 47

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014).........................................................................................41

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) .....................................................................65

*In re Antor Media Corp.*,
689 F.3d 1282 (Fed. Cir. 2012) .....................................................................65

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (2014).................................................................................25, 26

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) (plurality opinion) .........................................................24

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016) .....................................................................48, 49

*In re Caveney*,
761 F.2d 671 (Fed. Cir. 1985) .......................................................................66

*Coastal States Mktg., Inc. v. Hunt*,
694 F.2d 1358 (5th Cir. 1983) .......................................................................47

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989) .....................................................................57

*CVD, Inc. v. Raytheon Co.*,
769 F.2d 842 (1st Cir. 1985).....................................................................45, 47

*Cyntec Co., Ltd. v. Chilisin Electronics Corp.*,
84 F.4th 979 (Fed. Cir. 2023) .....................................................3, 7, 30, 35, 36

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*,
524 F.3d 1254 (Fed. Cir. 2008) ...........................................................45, 48, 49

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) ...................................................................38

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
   909 F.3d 398 (Fed. Cir. 2018) .............................................................35, 40

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) ...................................................................35

*Foster v. Ford Motor Co.*,
   621 F.2d 715 (5th Cir. 1980) .......................................................................47

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................................21

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ...............................................................................39, 43

*GlobeRanger Corp. v. Software AG United States of Am., Inc.*,
   836 F.3d 477 (5th Cir. 2016) .......................................................................29

*Golan v. Pingel*,
   310 F.3d 1360 (Fed. Cir. 2002) ...................................................................45

*Group One, Ltd. v. Hallmark Cards, Inc.*,
   254 F.3d 1041 (Fed. Cir. 2001) ...................................................................66

*Guy v. Crown Equip. Corp.*,
   394 F.3d 320 (5th Cir. 2004) .................................................................19, 21

*Handgards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) .................................................................45, 47

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983) ...................................................................25

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .....................................................................19

*Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*,
   545 F.3d 1312 (Fed. Cir. 2008) ...................................................................63

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
331 F.3d 860 (Fed. Cir. 2003), vacated on other grounds, 545 U.S.
193 (2005) ..................................................................................................22

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) ......................................................14, 25, 27, 28

*j2 Glob. Commc'ns, Inc. v. Captaris, Inc.*,
No. 6:08-CV-262, 2009 WL 10672155 (E.D. Tex. Apr. 16, 2009) .............45, 47

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ..................................................................................54

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,
322 F.3d 1335 (Fed. Cir. 2003) ................................................................68

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
572 U.S. 915 (2014) ..................................................................................43

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006) ................................................................32

*Loctite Corp. v. Ultraseal Ltd.*,
781 F.2d 861 (Fed. Cir. 1985) ..................................................................45

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ........................................................26, 27, 32

*Matsushita Elec. Indus. Co., Ltd. v. Samsung Elecs. Co., Ltd.*,
No. 02-336, 2006 WL 1794768 (D.N.J. June 26, 2006) ...................................66

*MCI Communications Corp. v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ............................................................45, 47

*Merial Ltd. v. Cipla Ltd.*,
681 F.3d 1283 (Fed. Cir. 2012) ................................................ 1, 3, 15, 38-42

*Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*,
370 F.3d 1354 (Fed. Cir. 2004) ................................................................32

*Mid-Texas Communications System, Inc. v. AT&T*,
615 F.2d 1372 (5th Cir. 1980) ............................................................46, 47

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
   303 F.3d 1294 (Fed. Cir. 2002) ......................................................66, 67

*Mitek Surgical Prods., Inc. v. Arthrex, Inc.*,
   230 F.3d 1383 (Fed. Cir. 2000) (unpublished) ..................................45

*Moleculon Rsch. Corp. v. CBS, Inc.*,
   793 F.2d 1261 (Fed. Cir. 1986) .......................................................32

*Morrison v. National Australia Bank Ltd.*,
   561 U.S. 247 (2010)..........................................................40, 42, 44

*Nat'l Australia Bank v. United States*,
   452 F.3d 1321 (Fed. Cir. 2006) .......................................................29

*Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*,
   30 F.4th 1339 (Fed. Cir. 2022) ...................................................31, 32

*Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*,
   923 F.3d 1051 (Fed. Cir. 2019) .......................................................50

*O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co.*,
   449 F. App'x 923 (Fed. Cir. 2011) ..................................................33

*Ochoa-Salgado v. Garland*,
   5 F.4th 615 (5th Cir. 2021) ............................................................46

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   843 F.3d 1315 (Fed. Cir. 2016) .......................................................40

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018) .........................................................35

*Power Integrations, Inc. v. Fairchild Semiconductor International,
   Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) .......................................................31

*Pressure Prods. Med. Supplies, Inc. v. Quan Emerteq Corp.*,
   No. 9:06-cv-121, 2008 WL 11449128 (E.D. Tex. May 16, 2008)..............45, 47

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993)........................................................................48, 50

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ...................................................................51

*Promega Corp. v. Life Technologies Corp.*,
875 F.3d 651 (Fed. Cir. 2017) ...............................................................36, 37

*Proportion-Air, Inc. v. Buzmatics, Inc.*,
57 F.3d 1085 (Fed. Cir. 1995) (unpublished) .......................................45

*Richardson v. Tex. Secretary of State*,
978 F.3d 220 (5th Cir. 2020) ...................................................................46

*Riles v. Shell Exploration & Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002) ...............................................................24

*Rite-Hite Corp. v. Kelley Co., Inc.*,
56 F.3d 1538 (Fed. Cir. 1995) (en banc) ...............................................24

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016).............................................15, 39, 40, 41, 42

*Rodriguez v. United States*,
480 U.S. 522 (1987)..................................................................................43

*Samsung Elecs. Co., Ltd. v. Infobridge Pte. Ltd.*,
929 F.3d 1363 (Fed. Cir. 2019) ........................................................17, 56

*Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*,
531 F. Supp. 2d 1084 (N.D. Cal. 2007).................................................33

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003) .................................................................45

*SRI Int'l, Inc. v. Internet Security Systems, Inc.*,
511 F.3d 1186 (Fed. Cir. 2008) ...............................................................57

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ...............................................................24

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
944 F.3d 1344 (Fed. Cir. 2019) ...............................................................43

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) ....................................................36, 37

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) ...........................................................55

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995) ...............................................................25

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades
    Council, AFL-CIO*,
    31 F.3d 800 (9th Cir. 1994) .................................................................48

*Valu Eng'g, Inc. v. Rexnord Corp.*,
    278 F.3d 1268 (Fed. Cir. 2002) ...........................................................41

*Venegas-Hernandez v. Sonolux Records*,
    370 F.3d 183 (1st Cir. 2004)................................................................21

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ............................................................34

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018) ...........................................................41

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988) .............................................................65

*WesternGeco LLC v. ION Geophysical Corp.*,
    585 U.S. 407 (2018)......................................................................42, 44

*Williams v. AgriBank, FCB*,
    972 F.2d 962 (8th Cir. 1992) ...............................................................47

## Statutes

35 U.S.C. § 102(a) ....................................................................................59

35 U.S.C. § 102(a)(1)................................................................................56

35 U.S.C. § 271 ..................................................... 38, 39, 40, 42, 43, 44

Pub. L. No. 103-465, title V, § 533(a), Dec. 8, 1994, 108 Stat. 4988 ....................43

Securities Exchange Act of 1934 § 10(b) .................................................................41

Sherman Antitrus Act.............................................................5, 8, 11, 12, 45

## **Other Authorities**

H.R. 3866, 81st Cong., 1st Sess. Section 271(b) .....................................................44

H.R. 5988, 80th Cong., 2d Sess. .............................................................................44

IPR2023-00585, Paper 12 .......................................................................................53

Federal Rule of Civil Procedure 50 ............................. 13, 53, 55, 56, 58, 60, 64, 66

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Ningde Amperex Technology Ltd. states that no other appeal in or from the same civil action or proceeding in the originating tribunal was previously before this or any other appellate court and no case known to counsel is pending in this or any other tribunal that will directly affect or be directly affected by this court's decision in the pending case.

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Texas had jurisdiction under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331, 1337(a), 1338(a), 1367, and 2201-02. That court entered final judgment on September 3, 2024. Appx537-540. The parties timely appealed, Appx30995-30997, Appx31003-31006, and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

### CosMX's Appeal

1. Did the district court manifestly err by admitting ATL's expert damages testimony on a reasonable royalty for CosMX's induced infringement?

2. Did the district court correctly deny CosMX's motion for judgment as a matter of law on induced infringement based on alleged extraterritoriality where CosMX conceded that *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012), is controlling and CosMX has pointed to no intervening change in the law?

1

3. Did the district court abuse its discretion when instructing the jury that clear and convincing evidence is needed to overcome *Noerr-Pennington* immunity for antitrust claims based on allegedly "sham" patent assertions?

**ATL's Appeal**

1. Did the district court err by denying ATL's motion for judgment as a matter of law that claim 1 of the '352 Patent was not invalid?

2. Did the district court err by denying ATL's motion for judgment as a matter of law that claim 1 of the '363 Patent was not invalid?

**INTRODUCTION**

CosMX's appeal has no merit.  CosMX does not dispute that it willfully and directly infringed U.S. Patent No. 10,964,987 and that the asserted claims of that patent are not invalid.  Instead, it limits its challenge to the methodology employed by ATL's damages expert, Mr. Alan Ratliff, for estimating the number of infringing importations of CosMX battery cells for purposes of induced infringement.  CosMX relies on a superficial resemblance that it believes Mr. Ratliff's opinion bears to a methodology for quantifying lost sales for purposes of lost profits that was rejected in *Cyntec Co., Ltd. v. Chilisin Electronics Corp.*, 84 F.4th 979 (Fed. Cir. 2023).  The district court correctly recognized that Mr. Ratliff's reasonable royalty opinion was fundamentally different from the lost-profits opinion in *Cyntec* and was properly based on a hypothetical negotiation using the only information the parties would have had available as of the date of first infringement and the information they would have expected to have, in practice, during the lifetime of the hypothetical license.

CosMX's secondary arguments fare no better.  CosMX concedes that this Court already rejected the same extraterritoriality challenge to induced infringement liability it advances here in *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012), and subsequent Supreme Court decisions explicitly apply the same standard that governed pre-*Merial*.  There is no basis for this Court to reconsider *Merial*.

With respect to its "sham litigation" antitrust claim, CosMX contends the district court abused its discretion when it instructed the jury that CosMX was required to prove by "clear and convincing evidence" that ATL's Chinese patent demand letter was objectively baseless. But this Court has consistently required that level of proof in numerous decisions. CosMX, nevertheless, contends that Fifth Circuit law applies and that the Fifth Circuit would require proof by only a preponderance of the evidence. But that court has neither adopted that position nor shown any inclination to do so.

This Court should, however, reverse the judgment of invalidity on two ATL patent claims. CosMX did not prove by clear and convincing evidence that claim 1 of the '352 Patent was obvious or that claim 1 of the '363 Patent was anticipated. CosMX relied on multiple prior art references that it either failed to prove antedated or were publicly accessible prior to the patents' effective filing dates, or failed to prove enabled practicing the patented invention.

This Court should, therefore, affirm the judgment that CosMX is liable for induced infringement, affirm the damages award, and affirm the judgment for ATL on CosMX's antitrust claims. The Court should, however, reverse the judgment that claim 1 of the '352 Patent and claim 1 of the '363 Patent are invalid and remand for further proceedings on those patents, including a trial on damages for their infringement.

**STATEMENT OF THE CASE**

This case began when ATL filed a complaint against CosMX alleging infringement of patents related to lithium-ion batteries. CosMX filed counterclaims, alleging (among other things) a violation of the Sherman Antitrust Act based on ATL sending a letter to CosMX informing it of the potential assertion of eight Chinese patents. The case proceeded through trial, resulting in a judgment awarding ATL $3,701,108 in compensatory damages for patent infringement and $1,000,000 in enhanced damages for willful infringement and invalidating two of ATL's patent claims. Appx538-539.

**A. ATL's Asserted Patents**

Although the jury returned a verdict concerning three ATL patents, only two claims from two of those patents were found invalid by the jury: claim 1 of U.S. Patent No. 11,329,352 and claim 1 of U.S. Patent No. 10,833,363.[1] The '352 Patent is directed to wound-type secondary batteries, such as the lithium-ion batteries commonly used in smartphones, tablets, and laptop computers. The novel design of the '352 Patent allowed for placement of the battery tab in the center of the electrode, reducing the distance that current travels, resistance, and heat, thereby permitting faster charging. Appx23684-23685.

---

[1] ATL also asserted infringement of U.S. Patent No. 10,964,987, which the jury found infringed and not invalid. CosMX does not dispute its liability for direct infringement of the '987 Patent or the finding of no invalidity.

The '363 Patent is directed to an electrolyte used in lithium-ion batteries.  The electrolyte serves as the liquid medium within the battery that conducts ions between the electrodes and includes essential additives that facilitate the growth of protective films to prevent the degradation of the electrodes over time.  Appx23630-23632.  The electrolyte of the '363 Patent is optimized for preventing electrode degradation in high voltage batteries.  Appx23632-23634.

## B.     ATL's Damages Model

Both parties make and sell lithium-ion battery cells in China.  After the battery cells are purchased in China, the parties' customers incorporate them into products such as laptop computers, tablets, and smartphones—many of which are then imported into the United States.  Because CosMX produced and sold those battery cells abroad, the majority of its liability stems from induced infringement.

In an effort to obtain information on how many CosMX battery cells were imported into the United States, ATL sought extensive discovery.  CosMX did not track which of its customers' end products its battery cells were incorporated into or to where those products were shipped.  ATL, therefore, served subpoenas on seventeen CosMX customers to see if this information was available.  Appx18032-18033.  Those customers informed ATL that they "did not keep data regarding which of the end products eventually imported into the United States contained a CosMX [lithium-ion battery]."  Appx18033.  Several customers produced documents, but

6

"none contained information identifying the number of end products imported into the United States containing a CosMX [lithium-ion battery]." Appx18033.

Due to the absence of direct evidence of the number of infringing importations, ATL's damages expert, Mr. Ratliff, used the best available circumstantial evidence to estimate the percentage of their CosMX battery cell purchases that each CosMX customer imported into the United States as part of a laptop, tablet, or smartphone. The best data he could locate that correlated to the quantity of infringing importations were the public financial statements of CosMX's customers. Appx24285-24289. These financial statements disclosed—for a majority of CosMX customers—the company-wide percentage of each company's sales attributed to the U.S. versus other regions in the world. Appx24287-24288. Mr. Ratliff relied on these company-wide U.S. revenue percentages to estimate the percentage of each company's CosMX battery cell purchases it imported into the United States. Appx24287-24288. Although CosMX's damages expert disagreed with this methodology, he conceded that he could not identify another viable data source that could shed light on how many of CosMX's customers' U.S. imports contained infringing battery cells or an alternative methodology to make that calculation. Appx18113-18114; Appx24927.

CosMX moved to exclude Mr. Ratliff's royalty base opinion, arguing that it was inconsistent with *Cyntec Co., Ltd. v. Chilisin Electronics Corp.*, 84 F.4th 979

(Fed. Cir. 2023), a case concerning the calculation of the number of lost sales for purposes of a lost-profits calculation. The district court denied the motion, correctly observing that Mr. Ratliff had not performed a lost-profits calculation. Appx133; Appx291. Instead, Mr. Ratliff opined on a reasonable royalty resulting from a hypothetical negotiation for a license to the asserted patents. Appx133-135. As the district court observed, "[l]ost profits happen in the real world; reasonable royalty comes out of a hypothetical negotiation that never took place in the real world. These are completely different constructs." Appx135. "By its very nature, a lost profits calculation requires a higher degree of precision than a reasonable royalty calculation would." Appx133. The district court further noted that, unlike the patentee in *Cyntec*, "ATL attempted to seek out information on the units of CosMX's batteries entering the U.S. through third party discovery requests sent to CosMX's customers, but such information was not available." Appx291. The district court found that there was no evidence that ATL could have reasonably obtained more accurate data. Appx133-134.

## C. Trial And Verdict

The case proceeded to trial, where the parties disputed (in relevant part) the validity of ATL's patent claims, the damages due for infringement, and whether ATL had violated the Sherman Act by sending a letter to CosMX informing it of the potential assertion of eight Chinese patents.

### 1. Validity Of ATL's Patent Claims

CosMX argued that the invention of claim 1 of the '352 Patent would have been obvious in light of two Chinese patent applications, referred to as Wang and Deng (Appx24481-24498; Appx40129-40175), and that claim 1 of the '363 Patent was anticipated by multiple references, including a Chinese patent application referred to as Zeng (Appx24451-24466; Appx40104-40128), the battery from a used Samsung S9+ smartphone (Appx24418-24436), and electrolytes that CosMX had allegedly purchased from a supplier (Appx24438-24451).

In particular, with respect to the '352 Patent, CosMX and its expert contended that a person of ordinary skill in the art would have been motivated to take the "notch" disclosed in Deng and apply it to the battery design disclosed in Wang. Appx24491-24498. The function of Deng's notch was to address the problem of warping and deformation caused by Deng's high-heat resistance welding process. Appx40171; Appx24494. The '352 Patent, however, employed a low-heat, or no-heat, welding method known as "ultrasonic welding." Appx40151-40152; Appx23689-23690; Appx24840. Both the '352 Patent and Wang used a thin aluminum foil, which could not withstand the high heat produced by the resistance welding method used by Deng. Appx25549-25550.

The parties also disputed whether any of the several references that CosMX cited anticipated claim 1 of the '363 Patent. With respect to the used Samsung S9+

smartphone battery, CosMX relied on testing its expert performed on the battery after this litigation began and five years after the battery was originally sold. Appx24417-24418. It was undisputed, however, that a lithium-ion battery's electrolyte composition changes (and degrades) over time and as it is used. Appx24874-24876. CosMX presented no evidence of how many times that battery was used, whether it had ever been replaced, or the battery's electrolyte composition as of the effective filing date of the '363 Patent.

CosMX also contended that claim 1 of the '363 Patent was anticipated by electrolytes it allegedly purchased from its suppliers. CosMX sought to prove that it made these purchases before the patent's effective filing date by introducing email correspondence with its supplier. Appx29485-29486; Appx40322-40325. None of the correspondence, however, reflected an actual sale or offer for sale. Instead, it referred to either plans to purchase an electrolyte at some unspecified future date or the provision of samples. Appx40320; Appx40325.

Zeng, a Chinese patent application, was the final reference that CosMX relied on with respect to the '363 Patent. It was undisputed that Zeng did not explicitly disclose the claimed ratios and equations recited in claim 1. Appx24873-24874. CosMX's expert testified that he derived them by spending a few hours performing calculations based on Zeng's disclosures. Appx24871-24872. He conceded, however, that that those calculations were not found in Zeng and nothing in Zeng

suggested that performing those calculations was "an important thing to do." Appx24873-24874.

The parties also disputed whether the three Chinese patent applications that CosMX relied on with respect to both patents—Deng, Wang, and Zeng—qualified as prior-art printed publications. CosMX was required to prove that those applications would have been publicly accessible to persons of ordinary skill in the art as of the patents' effective filing dates. CosMX attempted to meet that burden through the testimony of a former Chinese Patent Office employee, Wei Liu. Appx24965-24971. Ms. Liu testified that, in the present day, the public can search Chinese patent applications using keywords on a China National Intellectual Property Administration website. Appx24967. But Ms. Liu did not identify when the website was created or when keyword searching was enabled. Nor did she testify that this website was available or searchable at the time of the effective dates of ATL's patents.

### 2. CosMX's Sherman Act Claim

In an effort to prove its Sherman Act claim, CosMX introduced evidence that, on June 21, 2021, ATL sent a letter accusing CosMX of infringing eight Chinese patents. Appx39500-39501. After that letter failed to accomplish its goal of stopping CosMX's infringement, ATL asserted five of those patents in Chinese court. Appx35831-35832. ATL eventually prevailed on one patent assertion and

was awarded 40 million yuan in damages for CosMX's infringement. Appx24987. Despite that favorable judgment, CosMX argued that ATL's letter was anticompetitive, "objectively baseless," and violated the Sherman Act. The only evidence that CosMX presented to support that assertion, however, was the conclusory testimony of its expert that, in his opinion, the assertion of each of ATL's Chinese patents was objectively baseless—without accounting for the fact that CosMX was actually an adjudicated infringer in China. Appx26942-26951.

### D.    Verdict and Post-Trial Proceedings

After hearing all of the evidence and jury instructions, the jury returned a verdict largely in ATL's favor. The jury found that CosMX willfully infringed claim 1 and/or claim 17 of the '987 Patent, claim 1 of the '363 Patent, and claim 1 of the '352 Patent. Appx30156-30158. The jury further found, however, that the two infringed claims of the '363 and '352 Patents were invalid. Appx30157. It awarded ATL $3,701,108 in damages for infringement of the '987 Patent. Appx30159. With respect to CosMX's antitrust counterclaim, the jury found that CosMX had failed to prove by clear and convincing evidence "that ATL's threat of Chinese patent litigation in ATL's June 21, 2021 letter was both objectively baseless *and* an attempt to interfere directly with the business relationships of one or more competitors through the use of the litigation process." Appx30160.

The parties filed competing Rule 50 motions. ATL sought judgment as a matter of law that no reasonable jury could have found that claim 1 of the '363 Patent and claim 1 of the '352 Patent were invalid based on the evidence presented at trial. CosMX moved for judgment as a matter of law that ATL had failed to prove induced infringement based on its contention that the district court should not have admitted Mr. Ratliff's testimony. The district court denied both motions in relevant part (Appx495-535; Appx541-558), and entered a final judgment that claim 1 of the '363 Patent and claim 1 of the '352 Patent were invalid, that CosMX's infringement was willful, and awarding $3,701,108 in compensatory damages and $1,000,000 in enhanced damages for CosMX's willful infringement of the '987 Patent. Appx 538-539.

## SUMMARY OF ARGUMENT

### CosMX's Appeal

**1. The District Court Did Not Manifestly Err By Admitting Mr. Ratliff's Expert Damages Testimony**

With respect to the '987 Patent, CosMX limits its challenge to the admission of ATL's expert testimony quantifying reasonable royalty damages for induced infringement. As the district court correctly concluded, however, CosMX's argument ignores the fundamental differences between determining the number of lost sales for a lost-profits analysis and evaluating the hypothetical negotiation for determining a reasonable royalty. The former is a backward-looking *ex post*

13

calculation, while the latter is a forward-looking *ex ante* analysis based on the perspective of the parties at the time of the hypothetical negotiation.

Critically, it is undisputed that direct evidence of the number of imported battery cells that CosMX's customers imported into the United States was not available to either party. Undoubtedly, the parties to the hypothetical negotiation would not have agreed to calculate royalties based on information they did not have and knew they would not—and could not—have during the lifetime of the hypothetical license. Instead, it is only reasonable to conclude that they would have agreed to base royalties on the best information actually available. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001) (district court properly admitted expert damages testimony based on "the best information at the time for a hypothetical negotiation"). Consistent with that principle, Mr. Ratliff used the best available proxy to estimate the percentage of CosMX's infringing battery cells that were imported into the United States. Admission of this testimony was not error.

Moreover, CosMX's challenges to that proxy go to the weight of Mr. Ratliff's testimony, not its admissibility. This is underscored by the fact that neither CosMX nor its damages expert was able to suggest a more appropriate method for determining the infringing products' importation rate. And to provide even greater confidence in his importation rate, Mr. Ratliff took the extra step of corroborating

14

his estimates by looking to other publicly available data concerning the market for products using lithium-ion batteries.

### 2. The District Court Correctly Rejected CosMX's Extraterritoriality Argument

CosMX's backup challenge to its liability for induced infringement based on extraterritoriality is, as it admits, foreclosed by this Court's precedential ruling in *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012). *Merial* held that "where a foreign party, with the requisite knowledge and intent, employs extraterritorial means to actively induce acts of direct infringement that occur within the United States, such conduct is not categorically exempt from redress under § 271(b)." *Id*. at 1294. CosMX contends that *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), justifies overruling *Merial*, but it ignores that *RJR* applied the same extraterritoriality test as pre-*Merial* cases. CosMX, therefore, has not shown an intervening change in the law that justifies this panel overruling *Merial*. But even under the test articulated in *RJR*, CosMX's liability for induced infringement should be affirmed.

### 3. The District Court Correctly Instructed The Jury On The "Sham" Exception To *Noerr-Pennington* Antitrust Immunity

CosMX's challenge to the jury instructions on its "sham" litigation antitrust counterclaim is misplaced. This Court has consistently required proof by clear and convincing evidence to overcome *Noerr-Pennington* immunity. CosMX asks this

Court to reject those cases, apply Fifth Circuit law, and hold that the Fifth Circuit would adopt a minority position in a circuit split. But the Fifth Circuit has never held that *Noerr-Pennington* immunity can be overcome by a preponderance of the evidence, and all district court decisions within that circuit known to ATL have followed the majority rule requiring proof by clear and convincing evidence. In any event, this Court can affirm on the alternate ground that CosMX failed to introduce substantial evidence that ATL's letter concerning potential Chinese patent litigation (where it later prevailed in part) was objectively baseless.

## ATL's Appeal

**1.     The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The 11,329,352 Patent Was Not Obvious**

CosMX argued that claim 1 of the '352 Patent was obvious based on a combination of Wang and Deng, two Chinese patent applications. CosMX failed, however, to introduce clear and convincing evidence of a motivation to apply Deng's notch to Wang's battery design. Deng taught that the purpose of its notch was to address the problem of deformation caused by Deng's high-heat resistance welding technique. Appx40171; Appx24495; Appx25547-25548. Wang, however, used "no" or "low heat" ultrasonic welding. Appx23689; Appx23840; Appx40151-40152. There was, therefore, no reason for a person of ordinary skill in the art to apply Deng's notch to Wang—indeed, the '352 Patent's notch was intended to solve

16

a completely different problem of sharp burrs on the edge of the electrode. Appx568; Appx23685-23690; Appx25565; Appx25547-25549. ATL's expert testified that it would be "impossible" to "use the resistant-heat welding from Deng in a battery like the [lithium-ion battery] disclosed in Wang" for these reasons. Appx25549-25550.

Further, CosMX failed to prove that Wang or Deng qualify as printed publications or that a person of ordinary skill in the art would have been motivated to combine their teachings. Foreign patent applications, such as Wang and Deng, qualify as prior art only if a person of ordinary skill in the art could have located them with reasonable diligence. *Samsung Elecs. Co., Ltd. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019). The only evidence introduced was that, as of the time of trial, five years after the patent's effective date, the Chinese Patent Office published keyword searchable applications online. Appx24967-24968. The record is devoid of any evidence that this was also the case as of the effective filing date of ATL's patents.

> **2. The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The 10,833,363 Patent Is Not Anticipated**

CosMX's scattershot approach to invalidating claim 1 of the '363 Patent at trial resulted in its failure to meet its burden of proof on any of its several anticipation theories, and the district court, therefore, erred by denying judgment as a matter of law that the claim was not anticipated. CosMX first sought to invalidate claim 1

based on the 2023 test results of the electrolyte composition of a used 2018 Samsung S9+ smartphone battery. It was, however, undisputed that the electrolyte composition of lithium-ion batteries changes over time as they are used. Appx24874-24876. CosMX introduced no evidence of how many times the battery it tested had been used or of what the electrolyte composition of that battery was as of the effective filing date of the '363 Patent.

CosMX also failed to introduce clear and convincing evidence that claim 1 was anticipated by electrolytes that it allegedly purchased from its supplier. CosMX relied on emails that it claimed were sales or offers for sale of those electrolytes. Appx29485-29487; Appx40316-40325. Those emails, however, demonstrate—at most—the provision of samples and discussions of future plans to purchase the electrolytes, not actual sales, or any particular pricing or other terms that are necessary for an "offer for sale."

Finally, judgment as a matter of law with respect to the Zeng Chinese patent application was appropriate for two reasons. First, because Zeng was a Chinese patent application, like the Wang and Deng applications discussed with respect to the '352 Patent, the record is similarly devoid of evidence that Zeng was publicly accessible as of the effective filing date of the '363 Patent. Second, Zeng did not enable a person of ordinary skill in the art to practice claim 1 without undue experimentation. It was undisputed that Zeng did not explicitly disclose the specific

ratios recited in the claim, and that it took CosMX's expert several hours of calculations to allegedly derive the invention from Zeng's teachings, and that Zeng provided no reason to perform such calculations. Appx24871. The only evidence that this level of experimentation was not "undue" was the conclusory opinion of CosMX's expert. Appx24872-24873.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law, evidentiary rulings, and jury instructions under the law of the regional circuit. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010). The Fifth Circuit reviews the denial of motions for judgment as a matter of law *de novo* and jury instructions for an abuse of discretion. *Id*. The Fifth Circuit reviews rulings on the admission of expert testimony for "manifest error," allows the district court "broad discretion" in deciding issues of expert opinion admissibility, and overturns such determinations only when the error is "is plain and indisputable, and . . . amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324-25 (5th Cir. 2004) (citations omitted).

# ARGUMENT

## I.  COSMX'S APPEAL

### A.  The District Court Did Not Err By Denying CosMX's Motion For Judgment As A Matter Of Law On Induced Infringement

CosMX's argument that it is entitled to judgment as a matter of law on induced infringement hinges on its contention that the district court improperly admitted Mr. Ratliff's expert damages testimony.  The district court did not, however, commit manifest error by admitting Mr. Ratliff's testimony, and even if it did, there is substantial evidence in the record of CosMX's induced infringement.

Mr. Ratliff relied on a standard hypothetical negotiation model and the best available evidence to estimate the terms the parties would agree on when determining a reasonable royalty for CosMX's infringement.  CosMX draws an inapt analogy to this Court's case law on calculating lost profits from lost sales, which requires a backward-looking *ex post* analysis.  But Mr. Ratliff's opinion was based on a hypothetical negotiation, which is an *ex ante* analysis based on the information available and the perspective of the parties at the time of first infringement.  Evidence adduced at trial confirmed that direct evidence of the quantity of infringing importations was not available, nor could it have been expected to become available during the lifetime of the hypothetical license.  Mr. Ratliff, therefore, used the best evidence that would have been available to the parties at the time of the hypothetical negotiation to approximate the royalty base for induced infringement.

CosMX's request for entry of judgment in its favor on induced infringement should also be rejected for the independent reason that the record contains substantial evidence that CosMX induced infringement in the United States, regardless of Mr. Ratliff's testimony.  Therefore, even if the Court were to conclude that the admission of Mr. Ratliff's testimony was manifestly erroneous, the remedy would be to remand for further proceedings consistent with this Court's opinion, not for entry of judgment in CosMX's favor.

> **1.    The District Court Did Not Commit Manifest Error By Admitting Mr. Ratliff's Testimony**

Rulings on expert-testimony admissibility are reviewed in the Fifth Circuit for manifest error.  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324-25 (5th Cir. 2004).  "'Manifest error' is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.'"  *Id.* at 325 (quoting *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004)).  Here, Mr. Ratliff used the most precise damages model available.

> (a)    Mr. Ratliff's Testimony Was Reasonable And Based On The Well-Accepted Hypothetical Negotiation Construct

Mr. Ratliff determined a reasonable royalty for CosMX's infringement using a hypothetical negotiation construct and the fifteen *Georgia-Pacific* factors.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); Appx24262; Appx24266-24283.  The *Georgia-Pacific* analysis is, by its

nature, "an exercise in approximation." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003), vacated on other grounds, 545 U.S. 193 (2005).

CosMX takes issue with how Mr. Ratliff calculated the number of infringing importations to include in the royalty base for CosMX's induced infringement. Before trial, ATL sought discovery to determine the number of infringing importations of CosMX's batteries, including discovery into the number of laptops, tablets, computers, and other devices containing infringing battery cells that CosMX's customers imported into the United States. But CosMX did not track that information or even what specific third-party products its batteries were eventually incorporated into. Appx24286. In an attempt to obtain this information, ATL subpoenaed seventeen of CosMX's largest customers. Appx18032-18033. In each instance, the subpoenaed party did not keep data on how many of its imports into the United States contained a CosMX battery cell. Appx18033.[2]

Because direct evidence of the number of infringing imports was unavailable from either CosMX or its customers, Mr. Ratliff estimated the number of infringing importations by looking to the percentage of each CosMX customer's publicly

---

[2] CosMX contends that ATL could have "avoided" the royalty base issue by "su[ing] end customers ... for direct infringement as to any allegedly infringing CosMX products that ... they import into or sell in the United States." CosMX Br. at 7. But that would not avoid the issue because CosMX's customers do not track how many CosMX battery cells they actually import or sell in the United States, as shown by the customers' subpoena responses. Appx18032-18033.

reported revenue that it derives from U.S. sales, or in a few instances where that data was unavailable, the percentage of its revenue attributable to the geographic region containing the United States (e.g., the Americas). Appx24287-24288; Appx24305; Appx14290-14291. From this information, Mr. Ratliff calculated an estimated 45% weighted-average U.S.-importation rate. Appx24288.[3] There was no evidence presented by CosMX suggesting that CosMX's customers imported infringing batteries at a higher or lower rate than the rates calculated by Mr. Ratliff.

Mr. Ratliff corroborated his estimate by determining that 85% of the infringing CosMX batteries were used in laptop computers, five OEMs were responsible for over 80% of the products that had infringing CosMX batteries, and those five companies were more than 80 percent of the U.S. computer market. Appx24286-24287. Thus, Mr. Ratliff's estimated importations for these five customers (80% of total infringing importations) was similar to, and thus corroborated by, their collective U.S. market share for products that could use CosMX infringing batteries.

There is no evidence suggesting that ATL could have obtained direct evidence of the number of infringing importations. For that reason, CosMX's damages expert,

---

[3] For CosMX customers accounting for approximately 5% of the accused product sales, Mr. Ratliff was unable to obtain relevant sales data. Appx24288. For those sales, Mr. Ratliff applied his 45% importation estimate based on CosMX's other customers. Appx24288-24289.

Mr. Schoettelkotte, conceded both that he was "not aware of" an alternate approach and that he could not describe how to "fix" Mr. Ratliff's methodology. Appx18113-18114. Mr. Schoettelkotte did not offer an alternative calculation or methodology for determining the royalty base for indirect infringement. Appx24927. Instead, he relied on Mr. Ratliff's royalty base, with slight, immaterial, modification. Appx24918.

> (b) The District Court Correctly Distinguished Between An *Ex Post* Lost-Profits Analysis And An *Ex Ante* Hypothetical-Negotiation Analysis

CosMX conflates the standard for determining lost profits from lost sales with the standard for determining a reasonable royalty using a hypothetical negotiation. A lost profits analysis is *ex post* and backwards-looking. The patentee must prove, after the infringement has taken place, "what his condition would have been if the infringement had not occurred." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) (plurality opinion). A hypothetical negotiation for a reasonable royalty, by contrast, asks what royalty the parties would have agreed to had they negotiated a license at the time infringement began. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc). This "tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002). This is neither "an exact science," *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed.

Cir. 2015), nor "an after-the-fact assessment," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 518 (Fed. Cir. 1995).[4]

A hypothetical negotiation is based on the information that would have been available to the parties at the time of the negotiation and their expectations of what information would be available during the course of the hypothetical license. *See Interactive Pictures,* 274 F.3d at 1384-85 (district court properly admitted expert damages testimony based on "the best information at the time for a hypothetical negotiation" even though information that post-dated the hypothetical negotiation proved it to be incorrect); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) (explaining that a reasonable royalty is "to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations"). CosMX presented no evidence that the parties to a hypothetical negotiation would require that royalties be calculated based on information they did not have and knew would not likely be available during

---

[4] Another important difference between lost profits and a reasonableroyalty is that the fact finder is obliged to determine what royalty is supported by the record *even if* the evidence presented by the parties is insufficient to prove their royalty calculations, whereas no award of lost profits is justified if the patentee fails to meet its burden of proving them. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327, n.6 (2014).

performance of the hypothetical license.[5] CosMX's argument should be rejected. Mandating the use of data (*i.e.*, direct evidence of the quantity of infringing importations) that the hypothetical negotiators knew would not be available would be anathema to the entire hypothetical negotiation construct.

Not only would such a rule be nonsensical, it would be contrary to this Court's precedent. This Court has "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence. Such a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009). For example, *Lucent* held that a royalty need not be "necessarily limited to the number of times a patented feature is used," *i.e.*, the number of infringing acts.[6] According to *Lucent*, the number of real-world infringing acts could be relevant, not because

---

[5] In some circumstances "the book of wisdom" doctrine may allow a court to rely on evidence that comes to light after the hypothetical negotiation. *Lucent*, 580 F.3d at 1333. But that doctrine is inapplicable here because there is no such evidence available now that can be used to determine the number of infringing imports.

[6] This is also further support of a remand (discussed further below) in the event Mr. Ratliff's importation opinion is excluded since number of CosMX batteries imported to the U.S. is not required in determining a reasonable royalty. Moreover, in the absence of sufficient evidence to support Mr. Ratliff's royalty opinion, "the fact finder is still required to determine what royalty is supported by the record." *Apple*, 757 F.3d at 1327 n.6.

there was a legal requirement that a reasonable royalty be calculated using the actual number of real-world infringing acts, but instead because it "may provide information that the parties would frequently have estimated during the negotiation." *Id*. A hypothetical negotiation need not be based on real-world data about the number of infringing acts because such data can, for example, "be prohibitively expensive" to obtain. *Id*. *Lucent*, therefore, confirms that there is no requirement for a reasonable royalty to be calculated using information the parties to the negotiation knew was unlikely to be available during the course of the hypothetical license.

Similarly, *Interactive Pictures Corp. v. Infinite Pictures, Inc*., 274 F.3d 1371, 1384-85 (Fed. Cir. 2001), held that it was proper for the patentee to use as the royalty base the defendant's projected sales figures that were available at the time of the hypothetical negotiation, even though the defendant's real-world sales fell short of that projection. *Interactive Pictures* emphasized (i) "the negotiation must be hypothesized as of the time infringement began," (ii) a "hypothetical negotiation necessarily involves an element of approximation and uncertainty," and (iii) it was therefore permissible to rely on "estimates of sales revenue" instead of real-world sales figures. *Id*. at 1385 (quotation marks omitted).[7] *Interactive Pictures*, therefore,

---

[7]  CosMX's contention that a royalty base must be "a 'real world' amount that reflects the actual total sales of infringing products in the United States" (CosMX Br. at 35) is, therefore, both incorrect and inaccurate. It is incorrect because

upheld the use of an estimated royalty base in lieu of real-world sales figures, even where (unlike here) real-world sales figures *were* available to the expert. This Court also explicitly rejected the argument (that CosMX essentially reraises here) that a royalty base must be comprised of "an after-the-fact counting of actual sales." *Id*.

Mr. Ratliff's testimony was consistent with these established principles. As demonstrated at trial, CosMX and ATL would not have known exactly how many infringing products would be imported into the United States by CosMX's customers. They would have known, however, that CosMX did not track that information and that it would not have been available for calculating a royalty base during the life of the hypothetical license. In the absence of such data, it would make no sense for the parties to the hypothetical negotiation to require the negotiated royalty be based on direct evidence of the number of infringing importations. Instead, they would seek to identify available evidence that could be used to make a reasonable approximation of the number of infringing importations during the course of the hypothetical license. *See* Appx24642 ("[W]e were looking for information the parties would have had in the real world that they would use to guide their

---

it is contrary to *Interactive Pictures*, and it is inaccurate because Mr. Ratliff's methodology *was* designed to estimate the "real world" number of infringing importations.

decision as to what the royalties would be, and this would have been the same kind of information they would have had.").

CosMX makes much of the fact that its customers also derived revenue from sources that did not include the distribution of infringing batteries, such as advertising. CosMX Br. at 10-11. While such an argument could go to the weight the jury might have given to Mr. Ratliff's testimony, it does not show that the district court manifestly erred by admitting the testimony. Mr. Ratliff's use of each CosMX customer's proportion of companywide revenue derived from U.S. sales was, in the absence of more accurate evidence, a reasonable proxy for the overall infringing importation rate. There is no prohibition on estimating damages based on reasonable proxies, especially in the context of a reasonable royalty, where direct evidence is unavailable. *See GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016) (expert may use "a proxy" to estimate defendant's cost savings from trade secret misappropriation); *Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1326 (Fed. Cir. 2006) (rejecting the assertion that damages may not be "based on estimates" using a proxy). Mr. Ratliff did not include in his royalty base any customer's non-infringing revenue because Mr. Ratliff did not apply either his royalty rate or his importation rate to customer revenue, only to CosMX's own sales of infringing products.

29

(c)  Neither *Cyntec* Nor Any Other Decision Required Exclusion Of Mr. Ratliff's Testimony

CosMX bases its appeal primarily on *Cyntec Co., Ltd. v. Chilisin Electronics Corp.*, 84 F.4th 979 (Fed. Cir. 2023), but that decision does not require exclusion of Mr. Ratliff's testimony.  The expert opinion at issue in *Cyntec* was a lost-profits analysis, not a reasonable royalty based on a hypothetical negotiation.  *Id.* at 990. Although the district court in *Cyntec* admitted the plaintiff's reasonable-royalty and lost-profits opinions—both of which were based on the ***same*** importation estimates—the defendant only appealed the district court's decision related to lost profits.  Appx18074; Appx18078-18096.

*Cyntec* is also distinguishable because the expert damages testimony there suffered from additional deficiencies. The plaintiff's expert was uncertain whether the third-party products even contained the accused product or in what quantity, and the plaintiff failed to serve any discovery to try to obtain that information.  *Cyntec*, 84 F.4th at 990.  Here, in contrast, ATL served subpoenas on seventeen of CosMX's large customers, seeking information relating to the proportion and number of imported devices containing the infringing CosMX products.  Appx18032-18033. None were able to provide the information that CosMX contends is necessary because they did not track it, thus confirming that this information was unavailable from any source and that Mr. Ratliff, therefore, used the best information available. Appx18032-18033.

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), is distinguishable because the errors in the patentee's damages model were different than what CosMX alleges. Power Integrations' expert relied on "manifestly unreliable" data sources to determine infringing sales figures and assumed the infringing power circuit was found in phone chargers, not the phones themselves, but there was no evidence that every phone shipped with a charger. *Id*. at 1373. CosMX does not challenge the reliability of Mr. Ratliff's data sources. Nor did Mr. Ratliff assume that every product manufactured by CosMX's customers infringed. To the contrary, he calculated that only a proportion of CosMX's battery cells were sold in a product that was imported into the United States, and he applied that proportion to a royalty base of CosMX's own revenue.

*Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339 (Fed. Cir. 2022), not only does not support CosMX's position, it refutes it. *Niazi* involved damages for infringement of a claim for a method for implanting a coronary catheter. *Id*. at 1356. *Niazi* affirmed the exclusion of expert damages testimony because the expert: (1) without explanation or justification, calculated a royalty based on the value of the various components of the catheter instead of a royalty based on the use of the patented method; and (2) included in his royalty base products that had not been used to infringe, but instead were merely capable of infringing. *Id*. at 1357. Rather than requiring direct evidence of the number of units in the royalty base, *Niazi*

explained that the expert should have "estimated the amount or percentage of sold devices that were actually used to infringe the claimed method." *Id*.

## 2. The Trial Record Contains Substantial Other Evidence Of Induced Infringement

The record contains substantial evidence of induced infringement, even absent Mr. Ratliff's testimony. As the district court found, "it strains credulity to argue that the CosMX products directly marketed to U.S. customers, certified for the U.S. market, and tailored to each U.S. customer's specific size and power requirements had no actual sales to the U.S." Appx556. That conclusion is correct.

All that is required to affirm the judgment of liability for induced infringement is evidence of a single act of direct infringement, in this case importation, that CosMX induced. *See Lucent*, 580 F.3d at 1317 ("[A] finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period."). Direct evidence of importation is not required. *Metabolite Lab'ys, Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1364-65 (Fed. Cir. 2004) (affirming liability for induced infringement and stating that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence") (quoting *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).

This principle is illustrated by this Court's decision in *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co.*, 449 F. App'x 923 (Fed. Cir. 2011). The defendant in *O2 Micro* manufactured current inverter controllers in Taiwan and sold them to companies in Asia, where third parties incorporated them into LCD products. *Id.* at 925. The defendant appealed a judgment of induced infringement, arguing there was no evidence of third-party importation into the United States. This Court rejected that argument based on evidence that the accused products had been sold in the United States, the defendant knew its products entered the United States as part of LCD monitors, the LCD monitor manufacturers sold products containing the infringing controllers, and the United States was the largest market for LCD monitors worldwide. *Id.* at 929; *see also Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084, 1112-13 (N.D. Cal. 2007).

The record here contains similar evidence that there was at least one infringing importation. A CosMX employee testified that the United States is "definitely [] one of the place[s] that [the infringing products] could end up." Appx23606-23608. Another CosMX employee agreed that, although its sales are directed to pack houses in China, CosMX knew that at least some of its "batteries are going to make it to the United States." Appx24343-24344. CosMX's customers require that CosMX provide a certificate of compliance that allows them to import into the United States. Appx26441-26443; Appx26896-26897. CosMX's damages expert agreed that the

33

purpose of that compliance is "to convince [CosMX] customers . . . to include its lithium-ion products in laptops and smartphones that they will then import and sell into the United States." Appx26896-26897. The jury was told that the "largest market is the U.S. for imports of [lithium ion batteries] by a lot" (Appx24306) and that the "United States is maybe the biggest consuming country" of lithium-ion batteries. Appx26319. CosMX's top customers included companies that routinely sell their products in the United States. Appx23585-23586; Appx24287. The evidence showed that 80% of the infringing CosMX products went to just five companies, which together constitute the majority of the U.S. computer market. Appx24287-24288.

This is more than substantial circumstantial evidence from which a jury could infer that one or more CosMX customers imported at least one infringing product. This Court should, therefore, reject CosMX's argument that the district court was required to enter judgment in its favor on liability for induced infringement.

### 3. If This Court Were To Conclude That The Admission Of Mr. Ratliff's Testimony Was Manifestly Erroneous, The Remedy Would Be A Remand For Further Proceedings

Where this Court concludes that the patentee's expert damages testimony was improperly admitted, the customary remedy is to remand for a new trial on the quantification of damages. *See, e.g., VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1349 (Fed. Cir. 2023) ("The proper relief is a remand for a new trial on the issue of

34

damages.  We see no sound basis, given the nature of the error found or of the other errors alleged, for denying VLSI an opportunity to provide a corrected damages case."); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 904 F.3d 965, 977-80 (Fed. Cir. 2018); *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd*., 909 F.3d 398, 412 (Fed. Cir. 2018).  This is because "ordinarily, the district court must award damages in an amount no less than a reasonable royalty when infringement is found, unless the patent holder has waived the right to damages based on alternate theories."  *Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d 1299, 1312 (Fed. Cir. 2018) (cleaned up).  The same result applies here.

(a)  The District Court Did Not Find That ATL Waived The Right To Damages Based On Alternate Theories

Where the defendant alleges that the patentee waived the right to recover damages on an alternate theory, but the district court did not find such a waiver, this Court remands for a determination by the district court of that issue in the first instance.  *Finjan*, 879 F.3d at 1312 ("We therefore remand to the district court to determine whether Finjan has waived the right to establish reasonable royalty damages under a new theory and whether to order a new trial on damages.").  Even the primary authority that CosMX relies on, *Cyntec*, vacated the damages award and "remanded for proceedings consistent with this opinion."  84 F.4th at 990.  Because

it vacated the damages award and remanded, *Cyntec* stated it "need not reach" the defendant's challenge to the "denial of its motion for JMOL." *Id*. at 987 n.5.

In this case, the district court did not find that ATL waived the right to present an alternative damages theory in the event that this Court determined that Mr. Ratliff's testimony was improperly admitted, and there is no reason for this Court to reach that issue in the first instance. Under this Court's standard practice, if it concludes that the district court manifestly erred by admitting Mr. Ratliff's testimony, the Court should remand for further proceedings consistent with the opinion.

The cases that CosMX relies on—*Promega Corp. v. Life Technologies Corp.*, 875 F.3d 651 (Fed. Cir. 2017), and *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020)—confirm that this Court should not determine in the first instance that a patentee whose evidence of damages is excluded has waived the right to present an alternative theory. In *Promega*, the **district court** denied a new trial on damages because it found that the patentee "had waived any argument that the trial record could support a damages calculation based on an amount other than worldwide sales," 875 F.3d at 657, and the patentee "expressly waived its right to any award based on a reasonable royalty." *Id*. at 660 ("Counsel for Promega: 'Royalties? Don't want them. Wouldn't have taken them. Don't expect them.'"). On appeal, this Court "review[ed] the district court's waiver finding." *Id*. at 661. And in *TecSec* it

was the ***district court*** that decided in the first instance to "reduc[e] the jury's damages award to zero." 978 F.3d at 1291. In neither case did this Court decide the waiver question in the first instance.

(b)    ATL Did Not Waive The Right To Damages Based On Alternate Theories

Even if this Court were to consider the waiver issue in the first instance—it should not—no waiver should be found. The sum total of CosMX's argument that ATL waived its right to seek damages based on an alternative damages theory is its contention that Mr. Ratliff's methodology was inadmissible. The district court in this case disagreed with CosMX, and admitted that testimony. CosMX's position is that, despite the district court's ruling that Mr. Ratliff's testimony was proper, ATL should have attempted to reopen expert discovery, serve an expert report with another damages theory, and introduce that alternative theory at trial. This is the exact opposite of, for example, *Promega*, where the patentee presented "no expert testimony on damages" at all. 875 F.3d at 662. In short, nothing in this Court's case law even remotely suggests that ATL was required to assume the district court's *Daubert* ruling would be reversed on appeal to avoid waiving the right to seek damages based on an alternative damages theory.

**B.** **The District Court Correctly Denied CosMX's Motion For Judgment As A Matter Of Law On Extraterritoriality**

The district court denied CosMX's motion for judgment as a matter of law on indirect infringement based on extraterritoriality because CosMX conceded that its argument was foreclosed by *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012). Appx556. That ruling should be affirmed because *Merial* is still good law and has never been overruled.

**1.** ***Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012), Is Controlling**

*Merial* held that "where a foreign party, with the requisite knowledge and intent, employs extraterritorial means to actively induce acts of direct infringement that occur within the United States, such conduct is not categorically exempt from redress under § 271(b)." *Id*. at 1294; *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305–06 (Fed. Cir. 2006) (en banc in relevant part) (approving of a jury instruction that "Unlike direct infringement, which must take place in the United States, induced infringement does not require any activity by the indirect infringer in this country, so long as the direct infringement occurs here."). Here, CosMX argues that its inducement of infringement should be "categorically exempt from redress."

*Merial* based its holding on the plain language of the Patent Act. The Act contains clear territorial limitations when Congress so intended. For example,

38

Section 271(a) imposes liability on "whoever without authority makes, uses, offers to sell, or sells any patented invention, *within the United States*, or imports *into the United States . . .*" Section 271(c) creates liability for contributory infringement under certain circumstances for "[w]hoever offers to sell or sells *within the United States* or imports *into the United States* a component of a patented" invention. (emphases added).[8]

This language is in contrast with the induced infringement statute, Section 271(b), at issue in this case and in *Merial*, which contains no territorial limitation. It creates liability for "[w]hoever actively induces infringement of a patent." It was this absence of a "territorial proscription" in the inducement statute that persuaded this Court in *Merial* to reject the argument CosMX makes now.[9]

### 2. *RJR* Did Not Implicitly Overrule *Merial*

There is no dispute that *Merial* is directly on point. CosMX argues, nevertheless, that *RJR Nabisco v. European Community*, 579 U.S. 325 (2016),

---

[8] *See also* § 271(e)(1) (creating an exception to liability for infringing acts "within the United States"); § 271(e)(3) (limiting remedies under certain circumstances for acts "within the United States"); § 271(e)(4) (permitting injunctive relief to prevent infringing acts "within the United States"); § 271(g) (liability for importing "into the United States" or selling "within the United States a product" made by a patented process).

[9] Prior to *Merial*, the Supreme Court implicitly reached the same result in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 758 (2011), where the inducing acts occurred in China.

implicitly overruled *Merial,* a position that no decision cited by CosMX or known to ATL has accepted in the nearly ten years since *RJR* was decided. For example, this Court continued to apply *Merial* in *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.,* 909 F.3d 398, 408 (Fed. Cir. 2018), which explained that "liability for induced infringement under § 271(b) can be imposed based on extraterritorial acts, provided that the patentee proves the defendant possessed the requisite knowledge and specific intent to induce direct infringement in the United States." *See also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 843 F.3d 1315, 1333-35, (Fed. Cir. 2016) (affirming liability for induced infringement where the defendant argued that it sold its "chips overseas into a worldwide distribution system with no knowledge of where it chips will ultimately end up"). CosMX does not challenge in this appeal that it possessed the requisite knowledge and intent to induce infringement.

That no known decision has concluded that *RJR* implicitly overruled *Merial* is unsurprising. *RJR* did not purport to establish a new test for extraterritoriality. CosMX argues that *RJR* "***confirmed*** that a U.S. statute is presumed not to reach extraterritorial conduct unless 'the statute gives a clear, affirmative indication that it applies extraterritorially.'" CosMX Br. at 43 (emphasis added and quoting *RJR*, 579 U.S. at 337). The source that *RJR* cited for the presumption that it confirmed was *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 255 (2010), a decision that

40

predates *Merial*. *RJR*, 579 U.S. at 335. Confirmation of that presumption, therefore, could not and did not mark a change in the law that undermines *Merial.*

Nor was the two-step test for extraterritoriality that *RJR* applied new. The Supreme Court explicitly stated it was applying the same two-step test from *Morrison*. *RJR*, 579 U.S. at 337 ("*Morrison* and *Kiobel* reflect a two-step framework for analyzing extraterritoriality issues."):

> In *Morrison*, we addressed the question whether § 10(b) of the Securities Exchange Act of 1934 applies to misrepresentations made in connection with the purchase or sale of securities traded only on foreign exchanges. We first examined whether § 10(b) gives any clear indication of extraterritorial effect, and found that it does not. 561 U.S., at 262–265, 130 S.Ct. 2869. We then engaged in a separate inquiry to determine whether the complaint before us involved a permissible domestic application of § 10(b) because it alleged that some of the relevant misrepresentations were made in the United States.

579 U.S. at 336 (emphasis added). *RJR*, therefore, was an application of the existing *Morrison* test, not an intervening change of law. *Cf. Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1382 (Fed. Cir. 2018) (holding that *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014), "did not alter the governing law of § 101" because it "applied the same two-step framework [the Supreme Court] created in *Mayo*"); *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1275-76 (Fed. Cir. 2002) (Supreme Court decision that "reaffirmed the 'traditional rule'" was not a change in law).

### 3. *RJR* Supports Affirming Induced Infringement Liability

A panel lacks the authority to overrule *Merial*. Nevertheless, even if this Court were to consider this question, the judgment can be affirmed under either step of the two-step *RJR/Morrison* test.

> (a) Section 271 Rebuts The Presumption Against Extraterritoriality

Step one, asks whether the statute's text contains a "clear indication of extraterritorial application." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018) (quoting *Morrison*, 561 U.S. at 255)). "[A]n express statement of extraterritoriality is not essential" to overcome the presumption. *RJR*, 579 U.S. at 340. Instead, "context can be consulted as well" to determine if the presumption has been rebutted. *Id*. (quoting *Morrison*, 561 U.S. at 265). In *RJR*, for example, "Congress ha[d] not expressly said that [the statute] applies to . . . activity in foreign countries." *RJR*, 579 U.S. at 340. The Court, nevertheless, reasoned that "[c]ontext [wa]s dispositive" and rebutted the presumption against extraterritoriality. *Id*.

Section 271(b) contains such an indication. The other forms of infringement in Section 271 are limited to infringing acts ***within the United States***, importation ***into the United States***, or offers to sell an infringing product ***in the United States***. Congress's omission of "within the United States" in Section 271(b), while including comparable language in the surrounding subsections, shows its intent that induced infringement would not be limited to inducement that occur within the United States.

*See, e.g., Rodriguez v. United States*, 480 U.S. 522, 525 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1361 (Fed. Cir. 2019) ("If Congress intended to limit liability under § 271(g) to instances where the patented process was practiced in a manner that would infringe the patent if such practice occurred within the United States—such as it did by requiring a single entity to perform the entire process under § 271(a)—it 'kn[ew] precisely how to do so.'") (quoting *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 923 (2014)).

This conclusion is supported by the 1994 amendment to the Patent Act. Pub. L. No. 103-465, title V, § 533(a), Dec. 8, 1994, 108 Stat. 4988. Before then, Section 271(c) (contributory infringement) did not contain a territorial restriction. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 764-65 (2011) (recognizing the common origin and relationship between §§ 271(b) and (c)). The 1994 amendment limited contributory infringement to sales or offers to sell "within the United States" and "imports into the United States." *Id.* Congress did not, however, amend Section 271(b) to include a territorial limitation for induced infringement.

(b)  The Focus of Section 271(b) Is Preventing Domestic Infringement

Step two asks "whether the case involves a domestic application of the statute" by "identifying the statute's focus and asking whether the conduct relevant to that focus occurred in the United States territory." *WesternGeco*, 585 F.3d at 413 (cleaned up).  "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Id.* at 413-14 (cleaned up and quoting *Morrison*, 561 U.S. at 267).  "If the statutory provision works in tandem with other provisions, it must be assessed in concert with those other provisions." *Id*. at 414.

The overriding purpose of the induced infringement statute is to prevent direct infringement in the United States.  The legislative purpose, as stated in the title of the initial House bill that eventually became Section 271, is "to provide for the protection of patent rights where enforcement against direct infringers is impracticable."  H.R. 5988, 80th Cong., 2d Sess.; *see also* H.R. 3866, 81st Cong., 1st Sess.  Section 271(b), therefore, creates a form of secondary liability to prevent and remedy underlying direct infringement.  The "focus of congressional concern" is, therefore, on preventing and remedying that domestic direct infringement, which is the "object of [Section 271(b)'s] solicitude." *WesternGeco*, 585 U.S. at 414.

## C. The District Court Correctly Instructed The Jury On CosMX's "Sham Litigation" Antitrust Claim

For four decades, this Court has required plaintiffs alleging claims under the Sherman Act based on bad-faith patent enforcement to prove their claims by clear and convincing evidence. *See 800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1372 (Fed. Cir. 2008); *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH,* 524 F.3d 1254, 1263-64 (Fed. Cir. 2008); *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 999 (Fed. Cir. 2003); *Golan v. Pingel*, 310 F.3d 1360, 1371 (Fed. Cir. 2002); *Mitek Surgical Prods., Inc. v. Arthrex, Inc.*, 230 F.3d 1383, 1383 (Fed. Cir. 2000) (unpublished); *Proportion-Air, Inc. v. Buzmatics, Inc.*, 57 F.3d 1085 (Fed. Cir. 1995) (unpublished); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 877 (Fed. Cir. 1985). CosMX cites no decision from this Court imposing a lower standard.

CosMX argues that this Court should apply the Fifth Circuit's standard of proof. But consistent with this Court and the vast majority of other courts that have considered this question,[10] courts in the Fifth Circuit apply the "clear and convincing" standard. *See j2 Glob. Commc'ns, Inc. v. Captaris, Inc.*, No. 6:08-CV-262, 2009 WL 10672155, at *3 (E.D. Tex. Apr. 16, 2009); *Pressure Prods. Med.*

---

[10] *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 848 (1st Cir. 1985); *MCI Communications Corp. v. AT&T Co.*, 708 F.2d 1081, 1155 (7th Cir. 1983); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979).

*Supplies, Inc. v. Quan Emerteq Corp.*, No. 9:06-cv-121, 2008 WL 11449128, at *2 (E.D. Tex. May 16, 2008).

The Fifth Circuit has never adopted a contrary rule. CosMX relies on a footnote in *Mid-Texas Communications System, Inc. v. AT&T*, 615 F.2d 1372 (5th Cir. 1980), but *Mid-Texas* did not decide the issue. The Fifth Circuit considers a legal issue decided only where "(1) a party raises an issue and (2) a panel gives that issue reasoned consideration." *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) (cleaned up). For the issue to be sufficiently raised, it must be challenged by an adverse party. *Richardson v. Tex. Secretary of State*, 978 F.3d 220, 229 n.15 (5th Cir. 2020).

Neither party in *Mid-Texas* argued that a clear and convincing standard was required, and the court did not give the issue reasoned consideration. The plaintiff alleged that Southwestern Bell's conduct during an FCC dispute violated the antitrust laws. The ***defendant***, Southwestern Bell, asked that the jury be instructed on *Noerr-Pennington* immunity under a preponderance of the evidence standard, but the district court declined to give the requested instruction. *Id*. at 1384 n.10. Because it was the defendant that requested application of the preponderance of the evidence standard, neither party argued for the stricter "clear and convincing" standard. The Fifth Circuit, therefore, had no reason to consider and did not consider or decide what the appropriate standard of proof should have been applied.

Nor is there any indication that, were it to consider the issue now, the Fifth Circuit would reject the majority rule. First, CosMX's position is the minority view. *See 800 Adept*, 539 F.3d at 1372; *CVD*, 769 F.2d at 848; *MCI Commc'ns*, 708 F.2d at 1155; *Handgards*, 601 F.2d at 996. Second, district courts in the Fifth Circuit apply a clear and convincing standard. *See, e.g., j2 Glob. Commc'ns*, 2009 WL 10672155, at *3; *Pressure Prods. Med. Supplies*, 2008 WL 11449128, at *2. Third, even *Mid-Texas* emphasized that any exception to *Noerr-Pennington* immunity must be read "narrowly." *Mid-Texas*, 615 F.2d at 1384.[11]

**D.    This Court May Affirm The Judgment On The Antitrust Claim On The Alternate Ground That ATL's Chinese Patent Assertions Were Not Objectively Baseless**

This Court may, in the alternative, affirm on the ground that CosMX failed to introduce substantial evidence in support of its antitrust claim. *See Williams v. AgriBank, FCB*, 972 F.2d 962, 965 (8th Cir. 1992) ("We need not address the Williamses' challenge to the jury instructions because we conclude that FCB was entitled to a directed verdict in its favor."). Because the record is devoid of substantial evidence of an essential element of CosMX's claim, it was not entitled to any instruction at all. *Foster v. Ford Motor Co.*, 621 F.2d 715, 717 (5th Cir. 1980)

---

[11]    That it is Chinese patents at issue does not alter the analysis. *Noerr-Pennington* immunity applies equally to efforts to influence a foreign government. *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1365-67 (5th Cir. 1983).

("The jury should be instructed on a legal theory only if the evidence adduced at trial is sufficient to justify such an instruction.").[12]

To deprive ATL of *Noerr-Pennington* immunity, CosMX was required to prove that ATL's assertion of its Chinese patents was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Immunity requires only that the patentee have "some chance of winning," *id.* at 65, a winning lawsuit is, as a matter of law, not a sham, *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1262 (Fed. Cir. 2008), and a single meritorious claim immunizes a plaintiff's entire case, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 413-14 (3d Cir. 2016) (rejecting a "claim-by-claim" approach and agreeing that "the whole case has to be a sham").[13]

The evidence did not meet this standard. First, it was undisputed that ATL prevailed at trial on one of its Chinese patent assertions and CosMX was ordered to pay 40 million yuan for its infringement (Appx23506; Appx24971; Appx24984;

---

[12] At the close of evidence, the district court erroneously denied ATL's Rule 50(a) motion on this basis. Appx27268-27282.

[13] Some courts have held that a series of lawsuits including meritorious claims may be a sham if there is evidence of "a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). The jury was not instructed on such a theory, and CosMX did not pursue such a theory at trial.

Appx24987), conclusively showing that ATL's claim was not objectively baseless. *See Avaya*, 838 F.3d at 413-14.

Second, the evidence that CosMX submitted on the other patent assertions was insubstantial. That evidence was: (1) CosMX obtained opinion letters that ATL's Chinese patents were either invalid or not infringed (Appx27112-27113; Appx31466-31698); (2) ATL lost on its assertion of some of the patents and had not yet sued on others (Appx26945); and (3) CosMX's expert Mr. Yanxi Liu's conclusory opinion that ATL's demand letter was baseless (Appx26942-26951).

This is insufficient. CosMX's opinion of counsel letters concluded only that the patents were invalid or not infringed. They did not conclude that their assertion was baseless. Appx31466-31698. The testimony of Mr. Liu was only that: (1) ATL did not explain its entire infringement theory in its June 21, 2021 demand letter (Appx26944-26945); (2) ATL ultimately opted not to file a lawsuit on three of the patents identified in the letter (Appx26945);(3) ATL did not ultimately prevail on some of the patents at trial, and (4) Mr. Liu disagreed with the Chinese court's judgment that CosMX infringed one patent (Appx26945). This is insufficient. That a party did not explain its allegations in its demand letter or ultimately did not file suit on all of its claims, while possibly relevant to the subjective baselessness inquiry, are irrelevant to a determination of whether the underlying claim is objectively baseless. *See Dominant Semiconductors*, 524 F.3d at 1263-64. And the

mere fact that ATL did not prevail on some of its patents shows only that it lost on those claims, not that "no reasonable litigant could realistically expect success on the merits." *See Pro. Real Estate*, 508 U.S. at 60.

## II.    ATL'S CROSS-APPEAL

### A.    The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The '352 Patent Was Not Obvious

CosMX argued at trial that claim 1 of the '352 Patent was obvious in view of the combination of two Chinese patent applications referred to as Wang and Deng, Appx24481-24498; Appx40129-40175, and the jury returned a verdict that the claim was invalid, Appx23973.  The district court denied ATL's motion for judgment as a matter of law on validity.  Appx497-507.  That ruling was erroneous for two independent reasons: (1) CosMX failed to introduce clear and convincing evidence of a motivation to combine Wang and Deng; and (2) CosMX failed to prove by clear and convincing evidence that Wang and Deng qualified as "printed publications" as of the effective filing date of the '352 Patent.

#### 1.    CosMX Failed To Introduce Clear And Convincing Evidence Of A Motivation To Combine Wang And Deng

"A party seeking to invalidate a patent based on obviousness must prove 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051,

1059 (Fed. Cir. 2019) (quoting *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)).

The basis of CosMX's invalidity challenge to claim 1 was obviousness in view of the combination of Wang and Deng. CosMX's expert, Dr. Lucht opined that a person of ordinary skill in the art would have been motivated to introduce Deng's notch into Wang's electrode to address the problem of warping caused by the heat from ***Deng's*** resistance welding method. Appx24495-24497. In particular, Deng teaches that when a tab is welded to an electrode via "resistance welding," this leads to "deformation caused by heat and stress accumulation." Appx40171; Appx24494. Thus, "[t]he accumulation of the deformation will lead to serious warping of the tab or wrinkling of the welding area of the electrode," which "is detrimental to electrical performance of the battery." Appx40171. Deng teaches the introduction of a "notch" where the tab is welded to the electrode, causing the "welding area [to be] discontinuous, and heat or deformation is also discontinuous and stops at the notch rather than accumulates into the next section." Appx40171. In other words, Deng teaches the use of a notch "to alleviate or take care of the problem that comes from that thick metal warping when the heat is applied to resistance-weld it." Appx25548-25549. In particular, resistance welding "forms scallops or waves because it's heated so much that the expansion of the edge of the electrode results in waves," and the use of notches allows the electrode to "stay flatter." Appx25549.

CosMX failed to introduce clear and convincing evidence of a motivation to apply the notch in Deng to the teachings in Wang. The resistance welding used in Deng fuses metal by applying high heat to induce melting. Appx25548-25549; Appx24838-24839. Deng requires resistance welding because it is directed to "a flat plate battery" that "uses a very thick nickel current collector." Appx25547. Wang (like the '352 Patent), however, is uses a "delicate" and "thin aluminum foil," with which it would be "impossible" to use Deng's resistance welding method. Appx23689; Appx23874; Appx25549-25550. Wang, therefore, uses a different method of welding known as ultrasonic welding. Appx40151. Instead of heat, ultrasonic welding uses "a horn and an anvil" that press together two pieces of metal and a "very high rate of vibration" using "less heat" ort "no heat," which "can cause the metals to fuse without any melting." Appx23688-23690; Appx24840. It was undisputed that resistance welding could not be used with the aluminum foil as thin as that used by Wang. Appx25549-25550; Appx27212-27213. Thus, it is not plausible that a person of ordinary skill in the art would have looked to the non-analogous flat-plate-battery teachings of Deng to modify the aluminum-foil battery of Wang.[14]

---

[14] CosMX also presented the same Deng-Wang combination in IPR2023-00585. The Board declined to institute, stating that in view of "Wang's use of relatively low-temperature 'ultrasonic welding' . . . we are not persuaded that a person of ordinary skill in the art would have looked to combine Deng's heat-

The district court denied ATL's Rule 50 based solely on Dr. Lucht's conclusory and unsupported testimony that ultrasonic welding "result[s] in warping" and that Deng's notch was designed to reduce warping. Appx24494-24495; Appx501-502. Dr. Lucht's single, conclusory statement does not rise to the level of clear and convincing evidence. His testimony mischaracterizes the teachings in Deng, which does not teach that the purpose of the notch is to accommodate any warping, but rather to prevent "deformation *caused by heat* and stress accumulation" that results in "*serious* warping." Appx40171 (emphases added) ("[T]his welding method easily results in deformation caused by heat and stress accumulation [which] will lead to serious warping of the tab"); Appx40171 ("As a result [of the notch], accumulation of *heat* in the welding is reduced, and accumulation of warping is also reduced.") (emphasis added). Yet Mr. Hruska testified that ultrasonic welding uses "no heat," Dr. Lucht agreed it "uses much less heat" than resistance welding, and both agreed no melting is involved. Appx23689; Appx24840. Further, the purpose of the notch in the '352 Patent has nothing to do with accommodating welding-induced warping. Instead, as the '352 Patent explains, the purpose of the notch is to "remove the burrs formed on the current collector['s] edge," as such burrs could otherwise "pierce the separator to cause internal short circuit." Appx568-569.

---

dissipating notch with Wang's secondary battery in the manner proposed by [CosMX]." IPR2023-00585, Paper 12 at 25-26.

It was CosMX's burden to establish by clear and convincing evidence that Wang's ultrasonic welding causes serious warping to such an extent that a person of ordinary skill in the art would have been motivated to introduce Deng's notch into Wang's battery. Yet the only record evidence of warping caused by ultrasonic welding are "a little dimpled area where the metals are [f]used together," such as seen in the accused product. Appx23689.



Appx33462. CosMX introduced no evidence beyond its own expert's say-so that these tiny deformations caused by ultrasonic welding would have motivated a person of ordinary skill in the art to introduce Deng's notch. Such unsupported, *ipse dixit* testimony is not substantial evidence. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

418 (2007); *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019). As *TQ Delta* noted, "this court's opinions have repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review." 942 F.3d at 1359.

In addition, such a modicum of evidence cannot outweigh the secondary considerations of non-obviousness. ATL introduced evidence of a long-felt need for middle-tabbed electrodes, and the '352 Patent allowed ATL to successfully commercialize such electrodes. Appx25550-25551. CosMX's developed its nearly identical manufacturing process soon after it hired a former ATL engineer, Mr. Peng, who worked on ATL's process and who filed a Chinese patent application with a notched groove after the '352 Patent. Appx25551-25554; Appx31021-31070. Mr. Peng admitted he worked on ATL's notched-electrode process and was then hired by CosMX to work on the same process. Appx23703 ("I worked on the mixing, coating, calendaring, and slitting"). In denying ATL's Rule 50 motion, the district court noted that whether "CosMX hired former ATL employees to steal ATL's intellectual property was one of the most hotly contested issues throughout this case." Appx507. That may be true as a general matter, but with respect to Mr. Peng specifically, CosMX did not present any testimony about his hiring or his work.

The district court also reasoned that ATL "ignor[ed] Dr. Lucht's opposing testimony." Appx507. But Dr. Lucht's testimony was that he disagreed that

"nobody had figured out how to actually do middle tab processing and actually make it work" because Wang had middle-tabbed electrodes.  Appx24482-24483.  Dr. Lucht's testimony does not rebut Mr. Hruska's testimony that ATL was the first to successfully *commercialize* middle-tabbed electrodes because no evidence was presented that Wang was successfully commercialized (and it was undisputed that Wang did not anticipate claim one).  Appx25550-25551.

### 2. CosMX Failed To Introduce Clear And Convincing Evidence That Wang And Deng Qualify As Printed Publications

Wang and Deng are Chinese patent applications.  To qualify as prior art under 35 U.S.C. § 102(a)(1), they must be "printed publications," which requires evidence that the reference was publicly accessible, meaning "persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it."  *Samsung Elecs. Co., Ltd. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (quotation marks omitted).

CosMX did not introduce clear and convincing evidence that Wang or Deng were publicly accessible by the effective filing date of the '352 Patent, August 31, 2015.  In denying ATL's Rule 50 motion, the district court held that the testimony of Ms. Wei Liu was substantial evidence of Wang and Deng's public accessibility.  Appx504-505.  However, Ms. Liu, not a person of ordinary skill in the art, did not testify about Wang and Deng specifically and did not testify about whether they could have been located by ordinary artisans before the effective date in 2015.

56

Instead, she testified generally about how Chinese patent applications can be accessed ***today***. Appx24967-24968. That testimony is not clear and convincing evidence that Wang and Deng were publicly accessible by August 31, 2015.

First, Ms. Liu's testimony was restricted to the present date of her testimony, *i.e.* ***2024***. Appx24967-24968. There was no evidence that, in ***2015***, "the official website of the China National Intellectual Property Administration" was available to the public, that Chinese patent applications were "search[able] by the patent's keywords or the patent number," or that Chinese patent applications were available to the public "[o]n the day of the publishing of the patent" as found "from the document itself."

Second, there was no evidence that the Chinese patent applications that CosMX relied on were "cataloged or indexed ***in a meaningful way***." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989) (emphasis added). *Cronyn* concluded that student theses were not publicly accessible even though they were held in a library and searchable by "the student's name," because such a student's name "bears no relationship to the subject of the student's thesis." *Id.*; *see also SRI Int'l, Inc. v. Internet Security Systems, Inc.*, 511 F.3d 1186 (Fed. Cir. 2008). Similarly, Ms. Liu only testified that Chinese patent applications can be searched "by the patent's keywords or the patent number." Appx24967. An application's patent number clearly "bears no relationship to the subject of" those references. *Cronyn*, 890 F.2d

at 1161.  Nor did Ms. Liu explain what "keywords" could be used to search for the applications CosMX relied on (or even Chinese patent applications in general)—none list any searchable "keywords."  If, for example, searchable "keywords" were limited to the names of the inventors, then that would be insufficient under *Cronyn*.

**B.  The District Court Erred By Denying Judgment As A Matter Of Law That Claim 1 Of The '363 Patent Was Not Anticipated**

CosMX argued at trial that multiple references anticipated claim 1 of the '363 Patent: (1) a Samsung S9+ smartphone battery; (2) a Chinese patent application referred to as Zeng (Appx40104-40128); and (3) the SW-E7/DP018 electrolyte allegedly purchased by CosMX from its supplier.  Appx24417.  The jury returned a verdict of invalidity without specifying which theory it adopted (Appx23973), and the district court denied ATL's Rule 50 motion that no reference anticipated claim 1.  Appx507-524.

That ruling was erroneous.  CosMX failed to introduce clear and convincing evidence that: (1) the used Samsung S9+ battery that it tested in 2023 was in substantially the same condition and electrolyte composition as when it was sold in 2018; (2) Zeng was publicly accessible as of the effective filing date of the '363 Patent or would have enabled a person of ordinary skill in the art to practice claim 1; or (3) the SW-E7/DP018 electrolyte was sold or offered for sale before the effective filing date of the '363 Patent.

**1. CosMX Did Not Introduce Clear And Convincing Evidence That The Samsung S9+ Phone Battery Pre-Dated The '363 Patent's Effective Filing Date**

To anticipate, a prior art reference must pre-date the patent's effective filing date. 35 U.S.C. § 102(a). The effective filing date for the '363 Patent is September 21, 2018. Appx577. The only evidence concerning the electrolyte composition of the Samsung S9+ battery was collected nearly five years after the effective filing date of the '363 Patent. Specifically, CosMX presented testing results on a battery from a Samsung S9+ smartphone performed on September 18, 2023. It argued that these results were sufficient to prove the composition of the battery's electrolytes as they existed at the time of the phone's sale date five years prior, on July 24, 2018. Appx24415; Appx24418.

The record does not contain clear and convincing evidence to support CosMX's contention that the results from a test of a single used Samsung S9+ battery in 2023 accurately reflected the electrolyte composition of Samsung S9+ batteries sold in 2018. It was undisputed that the electrolyte composition of batteries changes over time as they are used. Appx24434. Part of that change occurs due to the formation of a protective film on top of the electrodes, which consumes some of the electrolyte additives. Appx28952; Appx29153; Appx29165-29166. The additives that are consumed to form this film include components such as the dinitrile,

trinitrile, and propyl propionate as claimed in specific ratios in the '363 Patent. Appx29153.

CosMX's expert, Dr. Lucht, agreed that a smartphone battery typically only lasts about 500 to a thousand cycles, after which the electrolyte composition changes. Appx24874-24876; Appx29401. Dr. Lucht was unaware of the origins of the Samsung phone, having bought it used over the Internet. Appx24419. There was no evidence of whether the battery had ever been replaced or how many cycles it went through before testing or how it was stored or treated during those five years. Appx24419; Appx24875. Nor did Dr. Lucht verify the condition of the battery prior to testing, turn the phone on, or ensure it was still functional. Appx24876. CosMX, therefore, failed to introduce clear and convincing evidence that the electrolyte composition of the Samsung S9+ battery it tested in 2023 was substantially the same as when the battery was sold in 2018.

The district court's denial of ATL's Rule 50 motion on whether the Samsung S9+ battery anticipated claim 1 (Appx508-512) was based on several errors. First, the court stated that for a juror to accept ATL's theory that the Samsung S9+ battery had deteriorated to a point where its electrolytes coincidentally practiced claim 1, a juror "would first have to believe that ATL patented—and sued another company for infringing—a *deteriorated* or *dead* battery." Appx510. But that is incorrect. ATL did not sue Samsung (the manufacturer of the S9+ battery) or accuse any dead

60

CosMX battery. Further, the fact that a deteriorated battery's electrolyte ratios could also meet the limitations of claim 1 of the '363 Patent does not suggest that ATL's patent covers only dead or deteriorated batteries.

Second, the court held that CosMX presented substantial evidence that the electrolyte in the Samsung S9+ phone battery was the same when it was tested as when it was sold. Appx510. But the only evidence that CosMX provided on this matter was its expert's opinion that (1) if the electrolyte had significantly deteriorated, there may be some "swelling" or "puff" on the exterior of a battery but, based on a cursory visual test, the Samsung S9+ battery did not show such "swelling" or look "puff[y]"; and (2) that the battery still had some voltage at the time of testing. Appx24427-24428; Appx24434. But CosMX presented no evidence to suggest a material change to the electrolyte composition due *to the consumption of the electrolyte additives to form the protective film* would necessarily—or even likely—result in any visible swelling.

Rather, the key electrolyte additives at the center of the invention (namely dinitriles, trinitriles, and propyl propionate) are consumed to facilitate the growth of a stable protective layer on the electrodes, which helps to inhibit the decay of the electrode material over time. Appx29153. As the battery undergoes further cycling, the electrolyte additives are consumed to maintain that protective film, which results

in "some changes" to the electrolyte composition, including "small changes" to the amounts of the three claimed additives. Appx29401-29402.

There was no testimony that this consumption results in off-gassing at all let alone in the quantity that would be necessary to cause visible swelling. The lack of a visible indication (*i.e.,* swelling or "puffiness") on the outside of the battery, and the fact that a battery may discharge some voltage at the time of testing, does not suggest that the electrolyte composition of the battery at the time of testing was substantially the same as it was at the time of first sale. Appx25504-25505. CosMX, therefore, failed to meet its burden of proving by clear and convincing evidence that the Samsung S9+ battery had not materially changed between its date of sale in 2018 and the testing Dr. Lucht performed in 2023.

### 2. CosMX Did Not Introduce Clear And Convincing Evidence That *Zeng* Was A Printed Publication Or Enabled Claim 1 Of The '363 Patent

The record is devoid of clear and convincing evidence that Zeng anticipated claim 1 of the '363 Patent for two independent reasons. First, like Wang and Deng discussed above with respect to the '352 Patent, Zeng was a Chinese patent application. The evidence that CosMX introduced was not sufficient to support a finding that such an application was publicly accessible as of the December 6, 2018 effective filing date of the '363 Patent for the same reasons discussed, *supra*, with respect to the prior art alleged to invalidate claim 1 of the '352 Patent.

Second, the record lacks clear and convincing evidence that Zeng enabled a person of ordinary skill in the art to arrive at the claimed invention because Zeng does not explicitly teach or suggest the ratios recited in claim 1 (which were the main point of novelty upon which the USPTO granted the patent) or that such ratios would be important. "In order to anticipate a claimed invention, a prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation." *Impax Lab'ys, Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). "Whether a prior art reference is enabling presents a question of law based upon underlying factual findings." *Id*.

Claim 1 requires specific ratios, ranges, and formulas describing the relationship of X, Y, and Z as defined in the claim. Appx598. The PTO issued the '363 Patent over prior art similar to Zeng because "[that art] does not disclose nor render obvious the specific combination of compounds forming the ratios of the instant independent claims" and "the claimed ratios in the instant claims display ***unexpected results*** with respect to DC internal resistance." Appx36921-36922 (emphasis added).

It was undisputed that Zeng does not explicitly teach the claimed ratios and equations recited in claim 1. CosMX's expert, Dr. Lucht, testified that although Zeng does not have "the specific equation," the "ratio of the trinitrile to the propyl propionate," or the "ratio of the dinitrile to trinitrile" recited in claim 1, it was his

63

opinion that "the information is in the Zeng document" to perform the hours of calculations that were necessary and that it was "simple" and "straightforward." Appx24873-24874. He conceded, however, that "Zeng doesn't tell you that that's [i.e., performing the calculations]important to do." Appx24874. When it denied ATL's Rule 50 motion, the district court found only that there was evidence that Zeng "inherently" disclosed the claimed invention, not that it explicitly did so. Appx516-517. Not only did Zeng, at best, only "implicitly" disclose the invention, it failed to teach the unexpected technical benefits brought forth by the claimed ratios, which unexpected results were recognized by the examiner during prosecution. Appx36921-36922 As a result, Dr. Lucht had to perform at least three hours of experiments and calculations to determine Zeng's weight percentage. Appx24871.

The district court's conclusion that this did not show lack of enablement (Appx516-517) was erroneous. It reasoned that ATL failed to prove that the time Dr. Lucht spent performing the calculations to derive the invention from Zeng constituted "undue experimentation." Appx517. But it was CosMX's burden, as the party asserting invalidity, of proving by clear and convincing evidence that Zeng enabled a person of ordinary skill in the art to practice claim 1.[15] CosMX failed to meet that burden. Dr. Lucht did not provide a non-conclusory opinion that Zeng enabled the invention of claim 1. Appx24872-24874. The only evidence the district court cited was Dr. Lucht's bare statement that he did not consider the experimentation he performed to be "considerable." Appx518. Nor did CosMX introduce evidence relevant to the *Wands* enablement factors. *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

### 3. CosMX Did Not Introduce Clear And Convincing Evidence That The SW-E7/DP018/DP060 Electrolytes Were Sold Or Offered For Sale Before The '363 Patent's Effective Filing Date

CosMX argued that claim 1 was anticipated by an electrolyte, allegedly referred to in different places by CosMX as SW-E7, DP018, or DP060, that CosMX

---

[15] While U.S. patent prior art, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003), and prior art publications cited by the PTO during prosecution, *In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012), are presumptively enabled, this presumption is not extended to non-U.S. patent prior art, such as the Zeng reference, relied on during patent infringement litigation.

internally developed and purchased from a vendor before the effective filing date of the '363 Patent. CosMX, however, failed to introduce clear and convincing evidence of a legally effective sale or offer for sale prior to that date.

To qualify as prior art, a "sale" requires "a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought and sold." *In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985). An anticipatory "offer for sale" must "rise[] to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). Merely providing "potential customers with samples of a product, without providing any other terms, is not a commercial offer for sale." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1308 (Fed. Cir. 2002).

The district court denied ATL's Rule 50 motion based on two emails between CosMX and its supplier, which the court held were evidence of actual sales of the electrolytes before the Patent's effective date. Appx523-524. That conclusion was erroneous. First, the district court relied on an email concerning an electrolyte referred to as SW-E7. Appx523-524; Appx24439-24443; Appx40322-40325. That

---

*Matsushita Elec. Indus. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, No. 02-336, 2006 WL 1794768 (D.N.J. June 26, 2006).

email is dated a mere four days before the effective filing date of the '363 Patent, and does not contain any terms such as a purchase amount, purchase price, delivery date, delivery quantity, shipping records, inspection documents, or similar information that would qualify it as an offer for sale. Appx40322-40325. Instead, the email states that "[t]he Purchase Department *will subsequently purchase* the SW-E7 electrolyte from your company" at some unspecified future date. Appx40325 (emphasis added). The email, therefore, is only evidence at most of a plan to purchase the electrolyte sometime in the future, potentially after the effective filing date of the Patent.

Second, the district court relied on an April 17, 2018, email with CosMX's supplier concerning an electrolyte identified only as DP018. Appx523-524; Appx40316-40321. The email asked the supplier to "have 4 bottles using 0.5kg small bottles," and the supplier responded, "Due to unexpected power outage, *the samples* that were originally scheduled to be mailed today cannot be prepared and sent as usual and need to be mailed tomorrow." Appx40320 (emphasis added). That these were samples is confirmed by the fact that the email lacks any terms, such as price, that would ordinarily accompany a sale or offer for sale. The provision of samples is not an anticipatory sale as a matter of law. *Minnesota Min. & Mfg.*, 303 F.3d at 1308.

The district court, nevertheless, erroneously held that these emails were proof of sales based on the testimony of CosMX's director of research and development, Dr. Li. Appx523-524. Dr. Li, however, confirmed that the emails were not "formal binding purchase agreement[s]" in the format that CosMX used. Appx29486. Although Dr. Li testified that email was "a formal way of communication among us" and "a very common way of communication for the R&D department when we purchase electrolytes" (Appx29486), a defendant's "unsupported description of their own sales experience" is insufficient to prove industry practice for purposes of proving an invalidating offer for sale. *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003). The district court, therefore, erred when it held that there was evidence of "contemporaneous purchases" before the Patent's effective date. Appx524.[16]

## CONCLUSION

This Court should affirm the judgment that CosMX is liable for direct and indirect patent infringement and the award of damages, affirm the judgment in ATL's favor on CosMX's antitrust claim, reverse the judgment that claim 1 of the

---

[16] CosMX also introduced purchase orders. Appx34924-34936; Appx25496-25497. But these purchase orders are for a third electrolyte, whose formulation was never presented at trial, was not shown to be anticipatory, and which conceded was a "separate electrolyte[]." Appx30696.

'363 Patent and claim 1 of the '352 Patent are invalid, and remand for a determination of damages for infringement of the '363 and '352 Patents.

DATED: March 28, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By *Michael D. Powell*
Michael D. Powell
mikepowell@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
(415) 875-6600

*Counsel for Ningde Amperex Technology Ltd.*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## Case Nos. 2025-1037, 2025-1091

I certify that the foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally spaced, 14-point font and, according to the word processing program in which it was generated, contains 15,772 words excluding parts of the document exempted by Federal Circuit Rule 32(b)(3).

DATED:  March 28, 2025.       QUINN EMANUEL URQUHART & SULLIVAN, LLP


By *Michael D. Powell*
Michael D. Powell
mikepowell@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
(415) 875-6600

*Counsel for Ningde Amperex Technology Ltd.*

# ADDENDUM OF ORDERS AND JUDGMENTS

**TABLE OF CONTENTS**

Memorandum Opinion and Order (ECF No. 424)……………………Appx495-535
Amended Final Judgment (ECF No. 369)……………………………….Appx537-540
United States Patent No. 11,329,352………………………………….Appx559-575
United States Patent No. 10,833,363………………………………….Appx576-599

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NINGDE AMPEREX TECHNOLOGY LIMITED, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO.  2:22-CV-00232-JRG |
| ZHUHAI COSMX BATTERY CO., LTD., | § § § | |
| *Defendant*. | § § | |

## FINAL JUDGMENT

A jury trial commenced in this case on February 1, 2024.  On February 9, 2024, the jury returned a unanimous verdict (Dkt. No. 345) finding that Defendant Zhuhai CosMX Battery Co. Ltd. ("CosMX") infringed one or more claims asserted by Plaintiff Ningde Amperex Technology Limited ("ATL"), such claims being claims 1 and 17 of U.S. Patent No. 10,964,987 (the "'987 Patent"), claim 1 of U.S. Patent No. 10,833,363 (the "'363 Patent"), and claim 1 of U.S. Patent No. 11,329,352 (the "'352 Patent") (collectively, the "Asserted Claims"); that such infringement was willful; that claims 1 and 17 of the '987 Patent were not invalid; that claim 1 of the '363 Patent was invalid; that claim 1 of the '352 Patent was invalid; that ATL should recover from CosMX $3,701,108.00 for such infringement through the date of trial; that CosMX did not prove that ATL's threat of Chinese patent litigation in ATL's June 21, 2021 letter was both objectively baseless and an attempt to interfere directly with the business relationships of one or more competitors through the use of the litigation process; and that CosMX did not prove that ATL had engaged in anticompetitive conduct in a relevant market.

**Appx491**

On April 11, 2024, ATL and CosMX filed a Joint Notice on Equitable Issues (Dkt. No. 368), stipulating the following regarding their equitable disputes that were to be tried before the Court at a bench trial:

1. CosMX has brought a counterclaim under the California Unfair Competition Law (UCL) Dkt. 123 at 34 (Count Nine), which the Court has determined is an equitable claim to be tried to the Court, not the jury. Dkt. No. 303. As a result of the jury verdict in this case, the Parties agree that the UCL claim is moot, and the Court may enter judgment in favor of ATL as to that claim.

2. CosMX's affirmative defenses of "unclean hands" and "patent misuse" (Dkt. 123 at 9, Seventh Affirmative Defense) can be considered to have been withdrawn.

3. In addition to CosMX's equitable claims and defenses discussed above, ATL has already sought or will be seeking equitable relief, including its requests for enhanced damages and ongoing royalties. The parties agree these issues can be resolved by motion practice.

4. The parties reserve their right to appeal the judgment or to preserve the judgment based on evidence in the record.

(Dkt. No. 365.) Subject to these stipulations, the Parties agreed that a bench trial, to be held after the return of the jury's verdict herein, is not necessary on the equitable issues in this case, and the Court should proceed to enter a Final Judgment in the case based on the jury's verdict. (*Id.*)

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's unanimous verdict, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. CosMX has infringed one or more of the Asserted Claims;

2. CosMX has willfully infringed one or more of the Asserted Claims;

3. Claim 1 of the '363 Patent is invalid;

4. Claim 1 of the '352 Patent is invalid;

2

**Appx492**

5. ATL is hereby awarded compensatory damages for such infringement from and against CosMX, and ATL shall accordingly have and recover from CosMX the sum of $3,701,108.00 U.S. Dollars;

6. ATL's threat of Chinese patent litigation was not both objectively baseless and an attempt to interfere directly with the business relationships of one or more competitors through the use of the litigation process, and accordingly, ATL is not liable for violateing the Sherman Act or the UCL (Cal. Bus. & Prof. Code § 17200);

7. ATL did not engage in anticompetitive conduct in a relevant market;

8. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, ATL is the prevailing party in this case and shall recover its costs from CosMX, and ATL is directed to file its proposed Bill of Costs;

9. Considering the jury's finding of willfulness, and the Court having considered the totality of the circumstances together with the added material benefit of having presided throughout the jury trial and having seen both the same evidence and heard the same arguments as the jury, concludes that enhancement of the compensatory award herein is warranted under 35 U.S.C. § 284. Consequently, the Court enhances the damages award in the amount of $1,000,000.00. ATL shall therefore have and recover from CosMX the additional sum, over and above the compensatory amount set forth above, the sum of $1,000,000.00 U.S. Dollars;

10. Pursuant to 35 U.S.C. § 284 and Supreme Court guidance that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award," the Court awards pre-judgment interest applicable to all sums awarded herein,

**Appx493**

calculated at the 5-year U.S. Treasury Bill rate, compounded quarterly, from the date of infringement through the date of entry of this Judgment; and

11. Pursuant to 28 U.S.C. § 1961, the Court awards post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid.

Any request for relief pursuant to 35 U.S.C. § 285 must be filed as a subsequent motion herein within 28 days of this Judgment.  Having enhanced damages as set forth above, the Court **DENIES AS MOOT** ATL's Motion for Enhanced Damages (Dkt. No. 364). All other relief requested by either party which is now pending before the Court and not specifically awarded herein is **DENIED**.

**So ORDERED and SIGNED this 26th day of April, 2024.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

4

**Appx494**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NINGDE AMPEREX TECHNOLOGY LIMITED, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | CIVIL ACTION NO.  2:22-CV-00232-JRG |
| ZHUHAI COSMX BATTERY CO., LTD., | § § | FILED UNDER SEAL |
| *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Ningde Amperex Technology Limited's ("ATL") Renewed Rule 50(b) Motion for Judgment as a Matter of Law Regarding the Validity of U.S. Patent Nos. 11,329,352 (the "'352 Patent") and 10,833,363 (the "'363 Patent") (the "JMOL Motion") (Dkt. No. 385) and its Motion for a New Trial (Dkt. No. 384). In the motions, ATL argues that the Court should overturn the jury's verdict invalidity findings concerning the '352 Patent and '363 Patent. Alternatively, ATL argues that the Court should grant a new trial on the validity of the '363 Patent. Having considered the motions and the subsequent briefing, the Court is of the opinion that ATL's JMOL Motion and its Motion for a New Trial should be and hereby are **DENIED**.

## I.      BACKGROUND

ATL alleged that Zhuhai CosMX Battery Co., Ltd. ("CosMX") infringed claims 1 and 17 of U.S. Patent No. 10,964,987 (the "'987 Patent"), claim 1 of the '363 Patent, and claim 1 of the '352 Patent. In relevant part, CosMX alleged that the '352 Patent was obvious in light of Chinese patent applications CN 104157914 A ("Wang") and CN 101826609 A ("Deng") and that the '363 Patent was anticipated by any one of (1) a Samsung S9+ phone battery, (2) Chinese patent

**Appx495**

application CN 106099187 A ("Zeng"), (3) the SW-E7 electrolyte, and (4) the DP018 electrolyte. After a jury trial, the jury found all three patents to be infringed, but found that claim 1 of the '363 Patent and claim 1 of the '352 Patent were invalid.

## II.    LEGAL STANDARD

### A.    Judgment as a Matter of Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

### B.    New Trial

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the

2

**Appx496**

record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

## III.   PLAINTIFF'S JMOL REGARDING VALIDITY (DKT. NO. 385)

### A.   The '352 Patent

CosMX alleged at trial that the '352 Patent was obvious in view of Chinese patent applications Wang and Deng. ATL makes five arguments for why it is entitled to JMOL of no invalidity in view of Wang and Deng. The Court addresses each in turn.

#### 1.   Whether Wang and Deng are Analogous Art

According to ATL, Wang and Deng are not "analogous art to the '352 Patent as a matter of law." (Dkt. No. 385 at 3.) "Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). A reference that satisfies *either* of these tests is analogous.

**Appx497**

*Id.* ATL argues that CosMX did not introduce any evidence at trial that could show that Wang and Deng were analogous under either of these tests. (Dkt. No. 385 at 4.)

ATL notes that its expert, Mr. Hruska, explained how Deng and the '352 Patent are not from the same field of endeavor, testifying that the '352 patent is directed to "a wound battery" and has "very thin aluminum foil current collector," but Deng is directed to "a flat plate battery" which "uses very thick nickel current collector" and is therefore "a different design" and "a very different system." Trial Tr. at 1190. Further, Mr. Hruska testified that Deng and the '352 Patent were directed to different problems. Specifically, he testified that "the '352 patent clearly describes using a notch to remove the burrs that exist on the edge of an electrode," but the Deng reference by contrast used a notch "to alleviate the problems of warping that came from high temperature heating during resistance welding." *Id.* at 1191-92. According to Mr. Hruska, this was not an issue for the '352 Patent since it "uses ultrasonic welding" which has "no problem with warping." *Id.*

ATL concedes that Dr. Lucht testified that Deng and the '352 Patent are directed to "connecting an electrode and a tab of a battery" (Trial Tr. at 708), but ATL insists that this "does not constitute substantial evidence in view of the extensive testimony from Mr. Hruska to the contrary." (Dkt. No. 385 at 4.) Further, according to ATL, Dr. Lucht did not provide any testimony that Wang was analogous prior art. (*Id.*)

In response, CosMX first notes that ATL concedes that "Dr. Lucht . . . testified that that Deng and the '352 Patent are directed to 'connecting an electrode and a tab of a battery.'" (Dkt. No. 404 at 2 (quoting Dkt. No. 385 at 4)). CosMX also disagrees that Dr. Lucht "provided no such testimony for Wang." (*Id.* at 3 (quoting Dkt. No. 385 at 4)). Specifically, CosMX argues that the '352 Patent's inventor, Peipei Guo, expressly described the '352 Patent as being directed to an effort "to develop a new winding battery in which we removed the active material in the middle

4

**Appx498**

of the electrode plate," which it achieved through a "middle tab . . . structure," (Trial Tr. at 451:23-25;452:2), and Dr. Lucht testified that this is precisely what Wang does, (Trial Tr. at 698:13-699:11). (Dkt. No. 404 at 2.) CosMX notes that the '352 Patent broadly states that the invention "relates to the field of secondary batteries, in particular to a structure of the secondary battery." (*Id.* (citing JTX-025.0015 and JTX-006)). CosMX further notes that Dr. Lucht opined that "a person of ordinary skill in the art who already knew everything in Wang about how to make an electrode with the things cut out[] would . . . look to Deng . . . for ideas about how to improve that design so you don't get warping." (*Id.*); Trial Tr. at 711:24–712:3.

CosMX argues that ATL's remaining arguments misapply the law. First, it argues that Mr. Hruska's opinions that "Deng [is] a completely different technology than the '352," (Dkt. No. 385 at 4), is irrelevant, because the law on analogous art does not require the reference to be directed to the "same technology." (Dkt. No. 404 at 3.) Second, CosMX argues that Mr. Hruska's testimony is in direct conflict with Dr. Lucht's, and the question of who to believe is a matter squarely for the jury. (*Id.* (citing *Ethicon LLC v. Untuitive Surgical, Inc.*, 2022 WL 1576779, at *3 (Fed. Cir. May 19, 2022))). Third, CosMX contends that the jury is not barred as a matter of law from finding the art to be analogous just because it does not describe the *exact type* of welding at issue. According to CosMX, the issue is whether the art is "reasonably pertinent" to the problem that the patent seeks to address, not whether there is perfect identity between the reference and the patented technology.

The parties' reply and sur-reply briefs do not materially add to these arguments. The Court agrees with CosMX. There was sufficient evidence presented at trial to establish that Wang and Deng are analogous art.

**Appx499**

Although ATL argues in its JMOL Motion that "CosMX did not introduce *any* evidence that . . . Deng [was] analogous," in the very next sentence it points to Dr. Lucht's testimony—some evidence—that both Deng and the '352 Patent are directed to "connecting an electrode and a tab of a battery." (*See* Dkt. No. 385 at 4.) Dr. Lucht specifically testified:

> Q. Okay. And so just to orient us, we're looking at JTX 26. Is this the Deng reference that you're referring to?
>
> A. Yes, this is the Deng reference that I am referring to.
>
> Q. And what does the -- what technical field does Deng relate to?
>
> A. Deng relates to the technical field, or I will say the present invention relates to a method for connecting components inside a battery and, more particularly, to a method for connecting an electrode and a tab of a battery.
>
> Q. Now, connecting an electrode and a tab of a battery, is that the same thing the '352 Patent is concerned with?
>
> A. Yes, it is.

Trial Tr. at 708:13-24. Dr. Lucht then walked the jury through the disclosure of Deng, describing in detail the problem it solved and how Deng related to the '352 Patent. *Id.* at 708-711. Given this testimony, ATL's argument boils down to nothing more than pointing out that Mr. Hruska provided extensive testimony disagreeing with Dr. Lucht. However, the mere disagreement between experts is not a basis for JMOL. If it were, not many jury verdicts in patent cases would survive.

Concerning Wang, Dr. Lucht's testimony (Trial Tr. at 698:13-699:11) supported by the testimony of inventor Peipei Guo (Trial Tr. at 451:23-25;452:2) constitutes substantial evidence that Wang is analogous prior art. Again, the fact that Mr. Hruska disagreed with these witnesses is not a basis for JMOL. The jury was entitled to consider the evidence from both competing experts and choose whom to believe and which testimony to credit. Accordingly, the Court finds that CosMX presented substantial evidence that Wang and Deng are analogous art.

**Appx500**

### 2.       Whether a POSITA Would be Motivated to Combine Wang and Deng

Next, ATL argues that "CosMX did not introduce legally sufficient evidence from which a jury could have concluded that a POSITA would be motivated to combine Wang and Deng. (Dkt. No. 385 at 5.) ATL contends that there was no dispute that Deng's notch was intended to accommodate heat and warping caused by resistance welding. (*Id.*) However, ATL notes that Wang uses ultrasonic welding, not resistance welding. (*Id.*) ATL contends that a battery using ultrasonic welding does not need a notch to prevent heating and warping. (*Id.*) According to ATL, Dr. Luch testified that ultrasonic welding could "result in warping" (Trial Tr. at 710-11), but ATL argues that he "contradicted . . . his own testimony during cross-examination" by admitting that ultrasonic welding caused "no melting" and "uses much less heat" than resistance welding. *Id.* at 771. Since there was no dispute that Deng's notch was to accommodate the melting caused by resistance welding, and since no such melting occurs for Wang's ultrasonic welding, ATL argues that there is "no legally sufficient evidentiary basis for a reasonable jury to find a motivation to combine Wang with Deng." (Dkt. No. 385 at 6.)

In response, CosMX argues that Dr. Lucht directly addressed this point in his testimony. (Dkt. No. 404 at 4 (citing Trial Tr. at 711)). As with the previous issue, CosMX contends that Dr. Lucht and Mr. Hruska disagreed—a fact that Dr. Lucht openly acknowledged—and the decision of who to believe was a job for the jury. (*Id.*)

The Court agrees with CosMX. Dr. Lucht directly addressed ATL's argument concerning a POSITA's motivation to combine Wang and Deng:

> Q. Now, how do you respond to the criticism of Mr. Hruska that actually people wouldn't care about Deng when you're dealing with the lithium-ion batteries that are at issue in this case because they use a type of welding -- ultrasonic welding that actually doesn't use any heat and, therefore, nobody would even look to Deng to even think about putting a notch in? How do you respond to that criticism?
>
> A. I disagree with that opinion.

7

**Appx501**

Q. Why?

A. Well, I disagree because the welding process that -- for the lithium-ion batteries, which frequently uses the ultrasonic welding, still puts a lot of energy into the electrode tab and the current collector during the welding process and can result in warping of the current collector.

Q. And is preventing warping during the welding process something that Deng specifically says the notch will help reduce?

A. Yes.

Q. Where does it say that?

A. It says that about the middle of the paragraph where it first starts being highlighted in yellow where it says, "and accumulation of warping is also reduced."

Trial Tr. at 711:2-23. ATL insists that Dr. Lucht contradicted himself by testifying that ultrasonic welding can cause "warping," but also causes "no melting" and "uses much less heat." (Dkt. No. 413 at 3-4.) The Court sees no contradiction. ATL argues that "[i]t was further undisputed that [a] lack of melting means the metal does not warp," but it only cites Mr. Hruska's testimony to show that this point was "undisputed." The unilateral testimony of one expert does not make an issue undisputed. Dr. Lucht directly disputed Mr. Hruska's opinion in the testimony above. Trial Tr. at 711:2-23. The jury was entitled to consider the competing expert testimony and who to believe concerning the motivation to combine Wang and Deng.

### 3. Whether a POSITA Would have a Reasonable Expectation of Success Combining Wang and Deng

ATL Further argues that "CosMX did not introduce any evidence that a POSITA would have a reasonable expectation of success in combining Wang and Deng. (Dkt. No. 385 at 6.) According to ATL, "CosMX's only evidence of a reasonable expectation of success was Dr. Lucht's conclusory testimony that 'it would be simple and easy to incorporate the notch from Deng into the Wang reference.'" (*Id.* (citing Trial Tr. at 712-713)). ATL argues that this testimony was unsupported and was directly contradicted by the evidence. (*Id.*) According to ATL, "it was

8

**Appx502**

undisputed that Wang and Deng used completely different material and thickness for their current collectors, and that there was no rational basis to conclude that applying Deng's undescribed 'simple' notch to the completely different design in Wang would reasonably be expected to succeed." (*Id.*) In other words, ATL contends that there was no evidence that a POSITA would expect to succeed in applying Deng's method for forming a notch on its thick, nickel current collector to Wang's thin, aluminum or copper foils. (*Id.*)

In response, CosMX argues that Dr. Lucht's testimony was not only "corroborated by" the evidence but was derived from it. (Dkt. No. 404 at 5.) Specifically, Dr. Lucht noted that "as was stated by Deng, it's very simple to include the notch, and so it would be simple and easy to incorporate the notch from Deng into the Wang reference," which would "clearly . . . ha[ve] the benefit of reducing warping." (*Id.* (quoting Trial Tr. at 713:7-9, 11)). CosMX concedes that Dr. Hruska disagreed, but as with the previous issues, it argues that Mr. Hruska's disagreement is not a basis for JMOL.

The Court agrees with CosMX.[1] Dr. Lucht explained to the jury that the reasonable expectation of success was supported by the disclosure in Deng, which described the application of a "notch" to be a simple and easy process. Dr. Hruska may have argued that the differences in materials would make the implementation of Deng's notch difficult to Wang, but Dr. Lucht disagreed with that opinion and testified that such would be simple and easy despite the differences in Wang and Deng. The jury was entitled to credit Dr. Lucht's testimony. Again, ATL does little more than point out that its expert disagreed with CosMX's expert.

---

[1] Although ATL contends that CosMX "did not introduce *any* evidence," it immediately follows this by conceding that "CosMX's only evidence . . . was . . ." making clear that there was indeed *some* evidence. This type of argument, that CosMX presented *no evidence* followed by an immediate concession that *some* evidence was presented is pervasive throughout ATL's post-trial motions and stains the credibility of its arguments. As this Court has often said, lawsuits are a race for credibility—first with the Court and then with the jury.

### 4.      Whether Wang and Deng are Printed Publications

ATL argues that "CosMX failed to introduce evidence that the Wang and Deng qualify as "printed publications." (Dkt. No. 385 at 7.) Wang and Deng are Chinese Patent Applications. ATL contends that CosMX failed to prove that these qualify as "printed publications" because there was no evidence that the references were publicly accessible. (*Id.*) According to ATL, a "line of cases" has recognized that a foreign patent application that was laid open for public inspection does not, by itself, qualify as a printed publication absent additional factors such as whether the application was properly classified, indexed, or abstracted. (*Id.* (citing *In re Wyer*, 655 F.2d 221, 226-27, n.4 (C.C.P.A. 1981))). ATL notes that there was no "expert testimony"[2] that an ordinary artisan could locate Wang or Deng after exercising reasonable diligence. (*Id.*) Rather, ATL argues that Dr. Lucht only testified that Wang and Deng were purportedly "published" prior to the earliest filing date for the '352 Patent, but did nothing to verify that they were publicly accessible. (*Id.*)

In response, CosMX first notes that ATL concedes that Dr. Lucht testified that both Wang and Deng were "published" prior to the earliest filing date for the '352 Patent. (Dkt. No. 404 at 5.) Moreover, CosMX points out that another witness, Wei Liu (a Chinese attorney), also testified that:

- "the Chinese Patent Office publish[es] patent applications";
- "the public [can] search and access patent applications published by the Chinese Patent Office";
- the public can do so "through the official website of the China National Intellectual Property Administration by searching by the patent's keywords or the patent number, among other information";
- she had personal experience doing so;

---

[2] Notably, ATL does not contend that there was no testimony concerning the public accessibility, just that there was no **expert** testimony.

- "a published patent application become[s] available to the public . . . [o]n the day of the publishing of the patent"; and

- one can "tell the publication date from the document itself."

Trial Tr. at 898:11–899:5. CosMX argues that Ms. Liu's testimony constitutes substantial evidence that Chinese patent applications, including Wang and Deng, are publicly accessible. (Dkt. No. 404 at 6.)

In reply, ATL notes that Ms. Liu is "a Chinese attorney," not a POSITA. (Dkt. No. 413 at 4.) Further, ATL argues that her testimony in insufficient to show the public accessibility of Wang and Dang because she only testified about Chinese patent applications generally, and she "never testified that she personally found them" or that "an ordinary skilled artisan could locate those references."

The Court agrees with CosMX. ATL points to a line of cases requiring CosMX to come forward with "additional evidence" demonstrating that its references qualify as printed publications. *See In re Wyer*, 655 F.2d 221, 226–27 and at n.4 (C.C.P.A. 1981). CosMX points to such evidence. For example, Ms. Liu testified that Chinese patent applications are (1) available to the public, (2) able to be searched through publicly accessible search engines, and (3) that the public access begins on the same date as the publishing date on the face of the application. Trial Tr. at 898:11–899:5. It was undisputed that the publishing date on Wang and Deng predated the '352 Patent.

ATL criticizes CosMX for not providing "***expert*** testimony" to this effect and attempts to discount Ms. Liu's factual testimony because she is not a POSITA and did not personally access these particular references. ATL cites no authority that a POSITA must testify to show that a document is publicly accessible, and it does not cite any authority that the testifying witness must have actually accessed a specific reference to prove it is publicly accessible. Here, CosMX

11

**Appx505**

presented evidence that Chinese patent applications are available to the public and are accessible through the Chinese Patent Office's website as of the date on the face of the applications. Dr. Lucht testified that the dates on Wang and Deng predate the '352 Patent. The Court finds a reasonable juror could have found that CosMX met its burden to establish that Wang and Deng qualify as prior art.

### 5.    Secondary Considerations

Finally, ATL argues that that the lack of evidence that the '352 Patent was obvious is supported by ATL's "undisputed evidence of secondary considerations of non-obviousness." (Dkt. No. 385 at 8.) Specifically, ATL contends that (1) "[i]t is ***undisputed*** that the '352 patent met a long-felt need of middle-tabbed electrodes," (2) "[i]t is ***undisputed*** that the notched middle-tabbed electrodes of the '352 Patent were commercially successful," and (3) "it is ***undisputed*** that CosMX copied the '352 Patent when it hired former ATL employee Mr. Peng, developed the Gen2 CTP process that is nearly identical to ATL's MMT process, and filed its own Chinese patent application with a notched groove." (*Id.* at 8) (emphasis added).

In response, CosMX notes that all three of these issues were contested at trial. (Dkt. No. 404 at 6-7.) First, Dr. Lucht expressly disagreed with ATL's contention that before the '352 Patent, "nobody had figured out how to do middle tab processing and actually make it work." Trial Tr. at 698:19-22. Second, CosMX argues that ATL never tied the commercial success to the claimed invention of the '352 Patent. Third, CosMX argues that it "vigorously disputed" that it copied the '352 Patent when it hired Mr. Peng, further developing at trial evidence that ATL never sued any former employee for taking trade secrets (Trial Tr. at 270:11-272:4), that ATL had no actual knowledge of any such misappropriation (*id*. at 271:6-12), and that ATL did not have "sufficient evidence to hold" any "former employees responsible legally" for breach of confidentiality or trade secrets (*id.* at 969:10-970:12).

12

**Appx506**

The Court agrees with CosMX. The contention that CosMX hired former ATL employees to steal ATL's intellectual property was one of the most hotly contested issues throughout this case. If such was "undisputed," as ATL contends, the Court is left to wonder what issues ATL would say were "disputed." All three "undisputed" issues that ATL bases its arguments on were rigorously opposed by CosMX throughout this case. ATL attempts to justify this argument in its reply brief by switching its phrasing to say that CosMX copied ATL's design "based on undisputed *evidence*" that the companies had battery designs that were nearly identical. (Dkt. No. 413 at 5.) As with every issue presented thus far, ATL only cites Mr. Hruska's testimony and ignores Dr. Lucht's opposing testimony. The fact that Mr. Hruska testified to a certain conclusion does not mean that it was undisputed.

Practically all of ATL's arguments concerning the '352 Patent do nothing more than point to Mr. Hruska's testimony and ignore all evidence to the contrary. ATL's arguments that CosMX presented "no evidence" or that certain issues were "undisputed" ignore any evidence that was not presented by ATL itself. The arguments are based entirely on one-sided views of the evidence in a way that cuts against the jury verdict. CosMX has shown that it adduced substantial evidence at trial that claim 1 of the '352 Patent was obvious in view of Wang and Deng. The Court finds that a reasonable juror could have found that claim 1 of the '352 Patent was invalid, and ATL is not entitled to JMOL. ATL's inaccurate briefing only hurts its credibility and its cause before the Court.

### B.    The '363 Patent

At trial, CosMX argued that claim 1 of the '363 Patent was anticipated by the Samsung S9+ phone, the Zeng reference, and the SW-E7 and DP018 electrolytes. Anticipation by any *one* of these four references is sufficient to invalidate the claim. Accordingly, to overcome the jury's

**Appx507**

verdict, ATL must show that no reasonable juror could find that *any* of these four references anticipated the claim. The Court addresses each reference in turn.

### 1.     Samsung S9+ phone

CosMX presented a Samsung S9+ phone as an alleged prior art system. Specifically, CosMX alleged that this phone was sold on July 24, 2018, prior to the priority date of the '363 Patent, and CosMX produced testing reports showing that the phone's battery contained an electrolyte that practices claim 1 of the '363 Patent. The undisputed evidence at trial was that the testing data showed the electrolyte in the Samsung S9+ phone practiced claim 1 of the '363 Patent. The only dispute at trial concerned whether or not the electrolyte in the phone's battery practiced claim 1 ***when it was sold on July 24, 2018***. Although the phone was sold prior to the '363 Patent's critical date, the testing data produced by CosMX post-dated the '363 Patent. Thus, the parties disputed at trial whether the testing data accurately reflected the condition of the electrolyte prior to the patent's priority date.

According to ATL, there was insufficient evidence for a reasonable juror to conclude that the testing data was representative of the composition of the electrolyte prior to the priority date of the '363 Patent. (Dkt. No. 385 at 12.) ATL notes that Dr. Lucht testified that the limited useful life of a lithium ion battery is around three to four years old, yet the testing occurred over five years after the phone was sold. (*Id.* at 13.) Dr. Lucht also testified that a smartphone battery typically lasts about 500 cycles, but he did not perform any testing to determine the number of cycles that the Samsung S9+ phone's battery went through or attempt to turn on the phone. (*Id.*)

Importantly, ATL notes that Dr. Lucht further testified that one of the reasons that a phone battery may stop working is due to changes in the electrolyte composition. (*Id.*) According to ATL, Dr. Lucht failed to perform any testing concerning the state of the battery such as trying to turn the phone on before performing the testing, and thus he could not rule out the possibility that the

14

**Appx508**

electrolyte's composition had changed between the time it was sold and the time it was tested. In other words, ATL argues that it is possible that the phone did not infringe when it was sold, but, sometime after the '363 Patent's priority date, the battery significantly degraded or died in such a way that the electrolyte composition changed and coincidentally began practicing the asserted claim. (*Id.*)

In response, CosMX notes that Dr. Lucht testified that when a phone's battery dies or degrades due to a change in electrolyte composition, then gasses within the battery release causing the battery "to look 'puffy.'" (Dkt. No. 404 at 7-8); Trial Tr. at 643:10-25, 775:5-12. However, according to Dr. Lucht, the battery in the Samsung S9+ phone did not show such signs of battery degradation. Although he never actually turned on the phone, Dr. Lucht testified that numerous visual and testing datapoints indicated that the battery was in good condition when tested. CosMX argues that Dr. Lucht's testimony alone constitutes substantial evidence that the jury was entitled to consider and as a result discredit ATL's "coincidence theory."

The Court agrees with CosMX. ATL does not dispute that the electrolyte in the phone's battery practiced the claim as of the testing date. However, ATL suggests that it is possible that the phone could have "stop[ped] working entirely," due to changes in the electrolyte composition such that the phone's electrolyte "coincidentally" practiced the claims after it had died. Importantly, Dr. Lucht testified that swelling was the result of "***significant*** decomposition of the electrolyte":

> Q. And why would swelling be something they would be looking for?
>
> A. So they would be looking for swelling because the electrolyte, which is inside of the battery, if the electrolyte has significantly decomposed, part of the decomposition process is the generation of gasses. And if there's significant decomposition of the electrolyte, it would generate a significant amount of gas and the battery would puff up.

15

**Appx509**

Trial Tr. at 645:17-25. ATL does not dispute this. In other words, ATL's theory is the electrolyte in the Samsung S9+ battery did not practice the claims when it was sold, but sometime later the battery **_significantly decomposed_** or even **_"stop[ped] working entirely"_** due to changes in electrolyte composition such that the dead or decayed battery practiced the claims coincidentally. For a juror to accept this theory, they would first have to believe that ATL patented—and sued another company for infringing—a **_deteriorated_** or **_dead_** battery. Such a theory stretches credulity.

CosMX presented substantial evidence that the electrolyte in the S9+ phone's battery was the same when it was tested and when it was sold. Specifically, Dr. Lucht testified that there was a visual indicator of electrolyte composition change, the battery looking puffed up or swollen:

Q. And have you actually seen batteries that have degraded and puffed up?

A. Yes, I have.

Q. What do they look like?

A. They look like little balloons or, you know, small pouch balloons.

Trial Tr. at 644:1-8. CosMX showed the jury an image of the S9+ phone's battery, and Dr. Lucht opined that the battery was not "swollen" or "puffed up" in a way that would indicate that the electrolyte had changed since it was sold. Trial Tr. at 643:4-16. Dr. Lucht also presented other evidence from the testing report indicating that the battery was in good condition, such as the voltage of the battery when it was discharged. Trial Tr. at 644:15-24.

ATL's counsel attempted to get Dr. Lucht to admit that the battery looked "puffy" on cross-examination. Dr. Lucht disagreed:

MR. POWELL: Mr. Fisher, zoom into the bottom right there, the right-most image at the bottom.

Q. (BY MR. POWELL) That looks kind of puffy, doesn't it, Doctor Lucht?

A. I disagree.

16

**Appx510**

Q. You'd say that's perfectly smooth like it just came off the factory floor?

A. I do not see that it looks puffy.

Trial Tr. at 775:8-15. However, the jury did not merely have to accept Dr. Lucht's opinion that the battery did not look "puffed up." Dr. Lucht presented evidence that allowed the jury to come to its own conclusion on the state of the battery. On Dr. Lucht's redirect examination, counsel for CosMX showed Dr. Lucht and the jury images of a "puffed up" battery that had changed electrolyte composition and asked Dr. Lucht to compare them to the S9+ phone's battery:

> Q. And do you recall that Mr. Powell asked you some questions about whether or not that battery appeared to be puffed up?
>
> A. Yes.
>
> Q. If I show you a picture of a battery, will you be able to tell me whether or not that is what you would consider to be a puffed-up battery?
>
> A. Yes.
>
> MR. BARNEY: If I could have DDX 1.39, please.
>
> [Images of lithium ion batteries were shown to the witness and the jury.]
>
> Q. (BY MR. BARNEY) Doctor Lucht, on the right-hand side, can you tell me what that is?
>
> A. That's a battery that's puffed up where there's been a significant amount of electrolyte decomposition to generate a significant amount of gas.
>
> Q. And have you seen batteries like that in your work as an expert on lithium-ion batteries?
>
> A. Yes.
>
> Q. The batteries on the left, what are those?
>
> A. Those are batteries that show no swelling and no puffing.
>
> Q. And on the left-hand side, are those -- is that the Samsung battery that was inspected and that is the basis of your opinion in this case?
>
> A. Yes, it is.
>
> Q. In your opinion, does that Samsung battery exhibit any swelling?

17

**Appx511**

A. No.

Q. And what does that tell you about the condition of that battery, Doctor?

A. That tells me that the condition of the battery is good.

Trial Tr. at 815:18-816:21.

The issue before the jury was whether or not the testing data from 2023 accurately reflected the condition of the battery as it was sold in 2018 such that the battery would anticipate claim 1 of the '363 Patent. This issue turned on a subsidiary factual question: did the S9+ phone's battery look "puffed up" or "swollen" in a way that would indicate the electrolyte's composition had changed since it was sold? If the jury thought that the S9+ battery was not swollen, then it would be reasonable for the jury to infer that the electrolyte's composition had not changed since it was sold. At the end of the day, this is quintessential fact-finding, which is squarely within the province of the jury. ATL has not shown that the evidence presented so overwhelmingly favored its conclusions that no reasonable juror could find in CosMX's favor.

As shown above, there is substantial evidence in the record upon which a reasonable juror could find that the composition of the electrolyte had not changed since 2018. Accordingly, a reasonable juror could have found that the Samsung S9+ phone's battery anticipated the '363 Patent. This alone is an adequate basis for denying ATL's JMOL without the need for further analysis as to the other prior art references. However, the Court continues its review.

### 2.    Zeng (CN 106099187 A)

ATL argues that CosMX failed to introduce any clear and convincing evidence that each limitation of claim 1 of the '363 Patent is anticipated by the Zeng application. (Dkt. No. 385 at 9.) Alternatively, ATL argues that CosMX did not show that the reference enabled one of ordinary skill in the art to make the invention without undue experimentation. (*Id.*)

18

**Appx512**

According to ATL, Dr. Lucht conceded that Zeng did not disclose the weight percentage of propyl propionate (as required by claim 1 of the '363 Patent) based on the total weight of the electrolyte. (*Id.* (citing Trial Tr. at 801)). Further, ATL argues that its own expert, Dr. Martin explained that Zeng only disclosed the amount of propyl propionate used to create an initial solution but did not disclose how much of that initial solution was used in the creation of the final electrolyte. (*Id.* (citing Trial Tr. at 1149-51)). Due to this apparent lack of disclosure, ATL notes that Dr. Lucht was forced to perform three hours' worth of experiments and mathematical calculations to arrive at an approximation—the accuracy of which ATL describes as "dubious"— of the weight percentage of propyl propionate in the final electrolyte solution disclosed in Zeng. (*Id.* (citing Trial Tr. at 802)). Accordingly, ATL argues that Zeng fails to meet both the disclosure and the enablement requirements set by the Federal Circuit in *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006).

Additionally, ATL notes that while U.S. patent prior art is presumed to satisfy the enablement requirement, (*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354–55 (Fed. Cir. 2003)), but this presumption is not extended to non-U.S. patent prior art. (Dkt. No. 385 at 10 (citing *Matsushita Elec. Indus. Co., Ltd. v. Samsung Electronics Co., Ltd.*, 2006 WL 1794768 (D.N.J. 2006) (emphasis added))). ATL argues that CosMX did not introduce any evidence that Zeng was an enabling reference. Rather, ATL contends that Dr. Lucht "admitted that Zeng was not an enabling reference because it did not teach any of the ratios and formulas." (*Id.*) ATL notes that Dr. Lucht testified that none of the specific equations from the '363 Patent were found in Zeng, and instead, Zeng disclosed "merely singular points of data which failed to impart upon a person of ordinary skill in the art the importance of observing and measuring the three additives'

19

**Appx513**

weight percentages in the form of specific ratios as compared to one another." (*Id.* at 11); *see* Trial Tr. 804-805.

Finally, ATL argues that Zeng does not qualify as a "printed publication" for the same reasons that the Wang and Deng references do not. Specifically, ATL argues that CosMX failed to adduce evidence that Zeng was publicly accessible. (*Id.*)

In response, CosMX first argues that ATL cites its own expert's disputed testimony to assert that Zeng did not "disclose[] the amount of propyl propionate . . . in the final solution," (*see id.* at 9), but CosMX notes that Dr. Lucht affirmatively "disagree[d]" with Dr. Martin, explaining that "all the information was in the patent for a chemist such as myself to determine that value in a straightforward fashion." (Dkt. No. 404 at 8-9 (quoting Trial Tr. at 803:507)). According to CosMX, Dr. Lucht explained at some length that he "just used the information from [Zeng]," (Trial Tr. at 803:13), "prepar[ed] the baseline electrolyte formulation as described in the Zeng patent," "followed the steps of Zeng exactly," and "add[ed] all of [Zeng's] components in the exact mass ratios that Zeng teaches" (Trial Tr. at 677:6-22). In doing so, Dr. Lucht purportedly determined the amount of propyl propionate in Zeng's solution. (Dkt. No. 404 at 9.) Dr. Lucht further opined that these steps are what "chemists do all the time," just as he "train[s] [his] graduate students and post-docs to do all the time." Trial Tr. at 677:23-678:1, 802:5-12. CosMX argues that this testimony is more than sufficient to support the jury's verdict. According to CosMX, this case is "nothing like *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006), where prior art that disclosed a genus that included "millions" of species was held not to disclose each one of them. (*Id.*) CosMX also argues that despite ATL characterizing the accuracy of Dr. Lucht's calculations as "dubious," the fact that the weight percentage of propyl propionate

20

**Appx514**

in Zeng was the same as the weight percentage of propyl propionate in the claim was never challenged. (*Id.* at n.2.)

CosMX further disagrees that Dr. Lucht "admitted" that the Zeng reference is not enabling. CosMX argues that the evidence, at most, established that Zeng does not include the specific sums, ratios, and formulas in the '363 Patent, but when ATL sought the precise admission that it contends Dr. Lucht made, Dr. Lucht expressly "disagree[d]." (*Id.* at 9 (citing Trial Tr. at 804:13)). CosMX notes that Dr. Lucht explained that although the specific formulas and equations are absent, "the . . . numbers are there, and it's simple to add the two numbers together [to get a sum,]" just as "dividing one number by another [to calculate a ratio] is straightforward." (*Id.* at 10 (quoting Trial Tr. at 804:15-16, 805:5)).

In reply, ATL argues that Dr. Lucht's "three hours of independent expert experimentation and testing to determine the final weight percentage of the propyl propionate" proves that "Zeng did not disclose the total weight percentage within its specification." (Dkt. No. 413 at 7.) ATL argues that this "independent experimentation, by definition, falls outside of Zeng's scope of anticipated disclosure." (*Id.*)

In sur-reply, CosMX argues that there is no support for ATL's contention that Dr. Lucht performed "*independent* expert experimentation and testing." (Dkt. No. 419 at 5.) Rather, CosMX contends that Dr. Lucht followed Zeng's chemical recipe and "use[d] math and simple chemistry" to confirm that the resulting formula's propyl propionate weight percentage was the same as in the claim. (*Id.* (quoting Trial Tr. at 802:8-9)).

The Court agrees with CosMX. First, for the reference to be anticipatory under 35 U.S.C. § 102(b), it must disclose each and every element of the claimed invention explicitly ***or inherently***. *Eli Lilly*, 471 F.3d at 1375. ATL spends much of its brief—as it spent much of its cross-

**Appx515**

examination of Dr. Lucht—arguing that Zeng fails to disclose each and every limitation because it does not *explicitly* include the formulas from the '363 Patent. However, when counsel for ATL attempted to commit Dr. Lucht to a more specific admission regarding the disclosure of Zeng, Dr. Lucht disagreed with ATL's position:

> Q. All right. So the straight facts are that Zeng did not disclose or teach the weight percentage of propyl propionate to the whole electrolyte. Right?
>
> A. I disagree.
>
> Q. Well, we just went over that. It *didn't actually teach* the percentage of the propyl propionate. Right?
>
> A. *Yes, but all the information was in [Zeng] for a chemist* such as myself to determine that value in a straightforward fashion.

Trial Tr. at 802:24-803:7. Dr. Lucht testified that the ratios and formulas, while not in Zeng explicitly, were *inherently* present. ATL fails to address why a reasonable juror could not have found that Zeng included each and every limitation explicitly *or inherently*, but rather only argues that the concentration of propyl propionate was not "on the face of the reference"—*i.e.*, explicitly disclosed. (*See* Dkt. No. 385 at 9.)

Second, ATL argues that "Dr. Lucht's . . . experimentation, by definition, falls outside of Zeng's scope of anticipated disclosure." The Court disagrees. This argument conflates disclosure and enablement. Notably, ATL does not argue that Dr. Lucht's three hours of experimentation was "undue." Rather, it argues that the mere fact that he performed experimentation at all means that "by definition," Zeng does not disclose each and every limitation. This is incorrect. The fact that Dr. Lucht recreated the claimed invention through experimentation may show that all limitations are not "on the face of the reference," but that does not negate the possibility that the reference may inherently teach the claim. ATL's argument, if true, would be inconsistent with the fact that a 102(b) reference may properly anticipate if it "enables one of ordinary skill in the art to make

22

**Appx516**

the invention without ***undue*** experimentation." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545

F.3d 1312, 1314 (Fed. Cir. 2008). Dr. Lucht testified that he performed his experimentation with

nothing but "the information from the [Zeng] patent" in order to show that the claimed ratios and

formulas were inherently present in the Zeng patent, and he testified that he "followed the steps of

Zeng exactly" to arrive at his final conclusions. Trial Tr. at 677:6-22. Such constitutes substantial

evidence that each and every limitation was present inherently in Zeng.

Concerning enablement, rather than arguing that Dr. Lucht could not produce the final

solution without "undue experimentation," ATL argues again that the absence of the specific

formulas and ratios means that Zeng is not an enabling reference. Specifically, ATL contends that

the absence of these specific ratios and formulas is detrimental because "these ratios played a

critical role in the allowance of the '363 Patent." (*See* Dkt. No. 385 at 11.) Again, ATL conflates

sufficient disclosure and enablement and strays from the relevant test. The test is whether a

POSITA could make the invention following the steps of the reference without "undue

experimentation." *Impax Labs.*, 545 F.3d at 1314. ATL does not argue that Dr. Lucht's three hours

of "math and simple chemistry" constituted "undue experimentation," presumably because he

testified to the opposite result when counsel for ATL tried to force this admission:

> Q. To be enabling, it has to teach the invention without undue experimentation. Correct?
>
> A. That's my understanding of the language, yes.
>
> Q. And as we just discussed, you did ***considerable*** experimentation just to get to the weight percentage of a critical component of claim 1 of the '363 Patent?
>
> A. ***I disagree***.

Trial Tr. at 804:2-8. ATL pushed further, attempting to commit Dr. Lucht to an admission, but it

could get no more than the fact that Zeng did not include the "specific equation[s]" on the face of

the reference. ATL argues that this constitutes an "admi[ssion] that Zeng was not an enabling

23

**Appx517**

reference." The Court disagrees. Dr. Lucht conducted experimentation following the steps of Zeng to arrive at the claimed invention. That fact is uncontested. The issue is whether or not his three hours of experimentation was "undue." Dr. Lucht expressly stated that he did not believe these three hours of "math and simple chemistry" to even be a "considerable" amount of experimentation, much less "undue experimentation." Trial Tr. at 804:2-8.

Given Dr. Lucht's clear disagreement with to ATL's argument that he had to engage in undue experimentation to arrive at the claimed invention, ATL falls back on an argument Zeng is not enabling because it fails to explicitly disclose the "novel" features of the '363 Patent, and it argues that the claims are not obvious because the Patent Office said so. (*See* Dkt. No. 385 at 11.) The Court is aware of no authority, and ATL cites none, supporting either of these arguments as a test for enablement.

Finally, the Court rejects ATL's argument that Zeng is not a "printed publication" for the same reason as given for Wang and Deng above. ATL's argument concerning Zeng does not substantially differ from its arguments concerning Wang and Deng. As previously explained, CosMX introduced substantial evidence that Chinese patent applications, such as Wang, Deng, and Zeng are publicly available.

Accordingly, the Court finds that a reasonable juror could have found that Zeng anticipates the '363 Patent. This alone is a basis for denying ATL's JMOL independent from the Samsung S9+ phone and without the need for any further analysis of the other prior art references. Yet, the Court continues.

### 3. Electrolyte Formulations SW-E7 and DP018

ATL argues that CosMX introduced no evidence at trial from which a reasonable juror could have concluded that the SW-E7 and DP018 electrolytes were subject to public use, offered for sale, or actually sold before the priority date of the '363 Patent. Specifically, ATL argues that

**Appx518**

"[t]he only evidence that CosMX introduced for the SW-E7 reference was an email document which showed the alleged formulation of the SW-E7 reference, but failed to show any public use, sale, or offer for sale." (Dkt. No. 385 at 15.) The SW-E7 email was dated four days before the priority date of the '363 Patent, and—according to ATL—Dr. Li, the director of research and development at CosMX, explicitly admitted that such emails were not binding purchase agreements. (*Id.*)

According to ATL, CosMX "attempted to fill this gap in . . . evidence by suggesting that ATL accused products [that] used the SW-E7 electrolyte in its infringement analysis." (*Id.*) Specifically, Dr. Martin accused the electrolyte DP060 as infringing claim 1. At trial, CosMX argued that DP060, DP018, and SW-E7 are, in fact, the same electrolyte (*i.e.*, they all have the same formula) despite having different product codes. ATL contends that Dr. Suli Li, CosMX's director of research, "testified that it was impossible for all three formulations to share the same recipe because 'each recipe only has one corresponding code,'" further testifying that "code" meant the DP number for the electrolyte recipe designation. (*Id.* (quoting Trial Tr. at 888)). According to ATL, if this is true, then DP018 (and by extension, SW-E7) cannot share the same formulation with DP060. (*Id.*) Thus, ATL argues it never accused an electrolyte with the formulation matching that of SW-E7. (*Id.*)

ATL contends that the DP018 reference suffers from many of the same issues as SW-E7. For DP018, ATL notes that CosMX also relies on an email, which ATL contends does not sufficiently demonstrate an offer for sale or actual sale because the email was "not a formal binding purchase agreement." (*Id.* at 16-17 (quoting Trial Tr. at 891)). ATL also concedes that CosMX presented purchase sales contracts, DTX-004 and DTX-005, as evidence of a sale of DP018, but it argues that these purchase agreements are actually for DP018!GDTC0001, which ATL argues

25

**Appx519**

**[REDACTED: CONFIDENTIAL MATERIAL ON THIS PAGE IS REMOVED]**

must be a different electrolyte because "the numbers and the letters that would come after the main DP number that indicate [the electrolyte] is a different version." (*Id.* at 17 (Trial Tr. at 890)).

Further, even assuming that DP018!GDTC0001 is DP018, ATL argues that DP018 would still fail as an anticipatory reference because ████████████████████████ ████████████████████████████████████ (*Id.* at 17.) ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ Thus, ATL argues that neither SW-E7 nor DP018 anticipate claim 1 of the '363 Patent.

In response, CosMX argues that there was more than enough evidence for the jury to find that SW-E7, DP018, and DP060 are the same electrolyte, and that DP018 and SW-E7 anticipate the '363 Patent. (Dkt. No. 404 at 10.) First, CosMX notes that Dr. Lucht testified, without any objection from ATL, that DP018 and SW-E7 are electrolyte formulations that were "purchased by CosMX" prior to the priority date of the '363 Patent. (*Id.* (quoting Trial Tr. at 655:5-656:21)). Further, CosMX argues that it presented emails "from CosMX to electrolyte suppliers purchasing" the electrolytes prior to the patent's priority date, and the emails reflect the "standard way that [CosMX] orders electrolytes from its suppliers." (*Id.*) CosMX contends that this testimony was consistent with the testimony of Dr. Suli Li who testified that these emails were "a very common way of communication for the R&D department when we purchase electrolytes," and that the SW-E7 email was an "order[]" for "about four small bottles of electrolyte to test with." (*Id.* (quoting Trial Tr. at 891:16-21)).

According to CosMX, ATL's argument that Dr. Li "explicitly admitted that such emails are not binding purchase agreements" (*see* Dkt. No. 385 at 15) is a "flagrant misrepresentation of

26

**Appx520**

the record." (Dkt. No. 404 at 11.) Rather, CosMX argues that Dr. Li conceded that these emails are not "*formal* binding purchase agreements." (*Id.* (quoting Trial Tr. at 891:14-15)). That these emails are not *formal* purchase agreements, according to CosMX, does not mean that they are not *binding* purchase agreements, it does not mean that they are not purchase agreements at all, and it certainly does not mean that there is no contemporaneous evidence of a purchase. (*Id.*) CosMX argues that no authority supports ATL's contention that there must be a formal, written contract with "Sign Here" at the bottom to demonstrate anticipation.

Further, CosMX argues that ATL is wrong that a reasonable juror could not find that ATL accused SW-E7 of infringement. (*Id.* at 12.) It is undisputed that Dr. Martin accused the DP060 electrolyte of infringement, and CosMX alleges that the same electrolyte was available before the priority date of the patent in the form of DP018 and SW-E7. Trial Tr. at 84-89. In other words, CosMX argues that "before the filing date of the patent," ATL was aware of DP060 and contended that it "meets all the claim requirements." Trial Tr. at 89:17-18.

CosMX alleges that the record evidence is more than sufficient to establish that DP060, DP018, and SW-E7 are all the same electrolyte. (Dkt. No. 404 at 12.) CosMX notes that Dr. Li explained that DP018 was "one of the electrolytes product [sic] that CosMX had mass production with, and that actually is considered our star product," (Trial Tr. at 883:15-17), that it was "developed at CosMX . . . in 2016" (Trial Tr. at 883:22) well before the '363 Patent's priority date of September 21, 2018, and that it was approved by Dr. Li herself. Importantly, Dr. Li, when asked how DP060 "compare[s] with DP018," Dr. Li answered: "These two electrolytes are identical. The only difference is that they were manufactured by different suppliers." Trial Tr. at 884:10-13. Further, when asked, "[h]ow does SW-E7 electrolyte compare with DP018 and DP060," Dr. Li

27

**Appx521**

responded, "[t]he three electrolytes share the identical formula. The only difference is that they were manufactured by . . . different suppliers." Trial Tr. at 884:23-25.

According to CosMX, ATL's entire argument is premised on a quote from Dr. Li taken out of context. Specifically, Dr. Li, who had just testified that all three of these electrolytes shared the same formula, was asked the following questions:

> Q. . . . I understand that you personally may not know, but CosMX as a company knows the electrolyte formulations of the electrolytes it puts into the batteries it sells. Right?
>
> A. Yes.
>
> Q. Now, it's critical that CosMX knows this information because it could be dangerous to put electrolytes with the wrong formulas into batteries. Right?
>
> A. I am not sure. Actually, each recipe only has one corresponding code. As long as that product has a specific code, it will not go wrong.

Trial Tr. at 887:22-888:7. CosMX notes that Dr. Li testified through a translator, and viewing her statements in response to the question that was asked, CosMX argues that it is clear that she was saying that when a chemist at CosMX goes to grab a beaker of DP018 or DP060, the chemist can be confident of what the associated recipe is. (Dkt. No. 404 at 13.) In other words, CosMX argues that Dr. Li's testimony really means that "there is only one *formula* associated with each code," and "[m]erely stating that each recipe has one code would not establish that each code has one recipe." (*Id.*) According to CosMX, "ATL's entire argument . . . depends on a theory that having testified at length just moments before that a single recipe was associated with two corresponding codes—*i.e.*, that SW-E7 is known as DP018 when it comes from one supplier and as DP060 when it comes from another—Dr. Li suddenly recanted her testimony in response to a question that did not even call for her to do so. That theory is absurd." (*Id.*)

Finally, CosMX argues that DP018 provides another independent basis for the verdict. According to CosMX, the fact that 0.14 means 14% is not a mere assumption but was supported

28

**Appx522**

by Dr. Lucht's testimony that SW-E7 has a 14% concentration of lithium salt (Trial Tr. at 658:17-22) and that DP018 and SW-E7 have the same formula. Moreover, CosMX argues, Dr. Lucht testified that it is "very common" for "the lithium salt to be set at a concentration of 14 percent" across the range of CosMX's electrolytes. Trial Tr. at 658:21-659:2.

The Court agrees with CosMX. First, the Court notes that there was substantial evidence presented at trial that, DP018, DP060, and SW-E7 are all the same electrolyte. Dr. Suli Li testified that SW-E7 is supplied by a company called Smooth Way. Trial Tr. at 885:2-6. She explained that "SW-E7" is the product code used by Smooth Way while the corresponding CosMX code is "DP060." *Id.* Dr. Li further explained that "DP018" was the code used to represent an electrolyte with the same formula but supplied by a different company called Tinci. Trial Tr. at 884:4-15. According to Dr. Li, DP018 and DP060 (SW-E7) are the same electrolyte—*i.e.*, they have the same formula—and the only difference (and reason for the different codes) is the supplier. *Id.* ATL tries to negate all of this testimony because on cross-examination, Dr. Li stated that "each recipe only has one corresponding code." Trial Tr. at 888:5-10. The Court agrees with CosMX that a reasonable interpretation of Dr. Li's statement is that each code only has one formula associated with it, such that when a CosMX chemist grabs DP018 they know the formula for the electrolyte because DP018 is only associated with a single formula. The Court is not persuaded that Dr. Li's testimony precludes a jury finding that DP018, DP060, and SW-E7 all describe the same electrolyte formula coming from desperate providers.

Further, the Court is not persuaded that CosMX's evidence was insufficient to show a sale prior to the priority date of the '363 Patent. Dr. Li testified that DP018 was developed at CosMX in 2016, and she corroborated this testimony with an email that confirmed CosMX's orders of both DP018 and DP060 prior to the patent's priority date. The Court agrees with CosMX that Dr. Li

29

**Appx523**

testifying that they are not "*formal* purchase agreements . . . is not the same as saying they are not *binding* purchase agreements, not the same as saying they are not purchase agreements, and certainly not the same as saying they do not evidence contemporaneous purchases." (Dkt. No. 404 at 11.)

Concerning ATL's final argument that 0.14 may not mean 14%, the Court notes that Dr. Lucht testified that 0.14 in the context of the email means 14%. ATL may disagree with the merits, but disagreement is not a basis for overturning the jury's verdict. Accordingly, the Court finds that a reasonable juror could have found that the SW-E7 and DP018 electrolytes anticipate claim 1 of the '363 Patent.

For the foregoing reasons, the Court finds that CosMX presented substantial evidence upon which a reasonable juror could find that claim 1 of the '352 Patent and claim 1 of the '363 Patent are invalid. Accordingly, the Court finds that ATL is not entitled to JMOL on these issues.

## IV.  PLAINTIFF'S MOTION FOR NEW TRIAL (DKT. NO. 384)

ATL moves for a new trial on the validity of the '363 Patent on the grounds that "the jury instructions did not allow for the jury to properly consider whether or not CosMX provided sufficient evidence at trial to prove that the '363 Patent was invalid." (Dkt. No. 384 at 1.) Specifically, over ATL's objection, the final jury instructions "did not contain the specific language proposed by ATL," which it argues was "necessary to guide the jury in determining whether or not the oral testimony of CosMX's witnesses was sufficient in proving whether an alleged reference was prior art." (*Id.*)  According to ATL, CosMX introduced "no substantial evidence at trial corroborating its witnesses' testimony that [SW-E7 and DP018] were subject to public use, offered for sale, or actually sold before the priority date of the '363 Patent." (*Id.* at 2.)

At trial, ATL moved for the Court include the following additional instructions:

**Appx524**

Oral testimony alone is insufficient to prove that something is prior art. A party seeking to prove something is prior art or that a particular event or reference occurred before the filing date of the asserted patents must provide evidence that corroborates a witness's oral testimony, especially where the oral testimony comes from an interested witness, or a witness testifying on behalf of an interested party This includes any individual or company testifying that his or its product predates the asserted patents. If you find that the party has not corroborated a witness's oral testimony with other evidence, you are not permitted to find that the subject of that oral testimony qualifies as prior art.

If evidence is presented for purposes of attempting to corroborate oral testimony, then you must determine whether this evidence does, in fact, properly corroborate the oral testimony. In making this determination, you should consider the following factors:

- The relationship between the corroborating witness and the alleged prior user;

- The time period between the event and this trial;

- The interest of the corroborating witness in the subject matter of this suit;

- Contradiction or impeachment of the witness's testimony;

- Extent and detail of the corroborating witness's testimony;

- The witness's familiarity with the subject matter of the patented invention and the alleged prior use;

- Probability that a prior sale could occur considering the state of the art at the time; and

- Impact of the invention on the industry, and the commercial value of its practice.

(*Id.* at 3-4.) The Court declined to include this instruction in its final charge to the jury over ATL's objection.

ATL argues that this instruction was "necessary because CoxMX failed to present the required corroborating evidence" for its witnesses' oral testimony that SW-E7 and DP018 were prior art. ATL concedes that CosMX did, in fact, present "non-oral testimonial evidence" that these electrolytes were prior art. (*Id.* at 4.) However, in every instance where CosMX presented

31

**Appx525**

this "non-oral testimonial evidence," ATL argues that such was not sufficient and was not "*actual* corroborating evidence." (*Id.* at 5) (emphasis added).

First, ATL acknowledges that CosMX attempted to have its oral testimony concerning SW-E7 corroborated by an email document purporting to show the formulation of the SW-E7 reference. (*Id.* at 4.) According to ATL, this email was not sufficient to corroborate Dr. Suli Li's testimony because the email was dated "merely four days before the priority date of the '363 Patent" and the email "showed no *indicia* of a commercial transaction." (*Id.* at 4.)

Second, ATL argues, "[h]aving failed to provide any *actual* corroborating evidence that SW-E7 was publicly used or on sale prior to [the] '363 Patent, CosMX instead resorted to creating a false implication for the jury that if ATL had accused SW-E7 as an infringing electrolyte, then the SW-E7 by definition had to have been sold or used in an actual product." (*Id.* at 5.) This theory, according to ATL, was based on "CosMX's outside counsel misrepresent[ing]" that DP060, SW-E7, and DP018 are all the same electrolyte. (*Id.*) ATL argues that "CosMX's attempts to shortcut its burden of proof by arguing ATL accused a prior art electrolyte cannot supplant its obligation to corroborate the oral testimony concerning whether the SW-E7 and DP018 electrolytes were publicly used or on sale before the priority date of the '363 Patent." (*Id.*) Moreover, according to ATL, Dr. Li "testified that it was impossible for all three formulations to share the same recipe because 'each recipe only has one corresponding code.'" (*Id.* (quoting Trial Tr. at 888)).

Accordingly, ATL argues that the jury should have been "instructed on how to consider the singular SW-E7 email, dated only 4 days before the priority date of the '363 Patent, and the probability that such a document sufficiently demonstrated that SW-E7 was sold or publicly used prior to the '363 Patent" given the "dearth of evidence." (*Id.* at 6.) ATL makes the same arguments

32

**Appx526**

concerning DP018, first acknowledging that it was purportedly corroborated by an email, but that this email lacked any *indicia* of a commercial transaction. (*Id.*) ATL also acknowledged that CosMX attempted to corroborate the testimony with two purchase agreements for DP018, but it argues that these purchase agreements were actually for DP018!GDTC0001, which it contends must be a different electrolyte given Dr. Li's testimony concerning CosMX's product codes. (*Id.* at 7.) According to ATL, this "contradiction" reveals a fatal flaw in CosMX's argument and the jury should have been told to consider this "contradiction" and the implications it had on CosMX's invalidity defense. ATL argues that the Court's refusal to instruct the jury using ATL's specific proposed instructions "caused notable prejudice to the jury's verdict," which according to ATL "found that CosMX willfully infringed the '363 Patent but also found that the '363 Patent was invalid." (*Id.* at 3, 8.)

In response, CosMX first argues that ATL's proposed jury instruction was legally erroneous. (Dkt. No. 403.) Specifically, ATL's instruction would have assigned to the jury, rather than the Court, the question of the sufficiency of CosMX's corroborative evidence. According to CosMX, the corroboration requirement reflects a "burden of *production*," not a "burden of persuasion." (*Id.* at 2 (quoting *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996))). CosMX gathers cases from other districts finding that courts do not "need to instruct juries to assess the sufficiency of corroborating evidence" provided that "*some* corroborating evidence exists." (*Id.* (quoting *Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1049 (D. Minn. 2008))). The question for the jury then, according to CosMX and its cited caselaw, is whether "the reference is in fact prior art" under the clear and convincing standard, while the question of the sufficiency of corroborative evidence is a question for the Court. (*Id.*) CosMX argues that no case cited by ATL suggests otherwise, including its lead case, *Mosaic Brands, Inc. v Ridge Wallet LLC*,

33

**Appx527**

which did not involve instructional issues. 55 F.4th 1354, 1364 (Fed. Cir. 2022). Thus, CosMX contends, ATL's proposed instruction would be legally erroneous.

Further, CosMX argues that "a party who requested a legally appropriate instruction must also demonstrate that the instruction actually given was erroneous." (Dkt. No. 403 at 4 (citing *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 701 (5th Cir. 2001))). CosMX contends that ATL's brief is entirely dedicated to the issue of prejudice rather than showing that error actually occurred in the instructions, and thus it argues that ATL's objections are waived. However, even if the objections are not waived, CosMX argues that ATL cannot show that the omission of ATL's specific instruction constituted error. CosMX notes that ATL correctly identified "two emails . . . along with two . . . purchase orders," in addition to the testimony of Dr. Suli Li and Dr. Lucht supporting that the SW-E7 and DP018 electrolytes predated the '363 Patent. According to CosMX, ATL's argument is premised on its assertion that CosMX's only evidence was "the oral testimony of CosMX's witnesses." (Dkt. No. 403 at 5 (quoting Dkt. No. 384 at 3)). However, given that ATL conceded that CosMX did not rely on "[o]ral testimony alone," CosMX argues that there was no reason for the Court to give an instruction that "[o]ral testimony alone is insufficient to prove that something is prior art." (*Id.*)

Finally, CosMX argues that ATL's Motion for a New Trial should be denied because ATL cannot demonstrate prejudice. Specifically, CosMX contends that even had the requisite instruction been given, ATL does not show that it would have changed the outcome.

In reply, ATL argues that "CosMX has failed to present *any* evidence actually 'corroborating'—in any material way—its own witnesses' testimony." (Dkt. No. 411 at 1.) ATL clarifies that its "motion for a new trial does not hinge on whether or not CosMX produced *sufficient* evidence as to corroborate its witnesses' testimony. Rather, the motion demonstrates that

CosMX produced *no evidence at all* that could support its self-serving testimony." (*Id.* at 1-2.) According to ATL, the documentary evidence that CosMX presented at trial "fail, as a matter of law, to support CosMX's allegations." (*Id.* at 3.)

The Court finds that its instructions adequately guided the jury in its determination of whether CosMX's electrolytes were or were not prior art. As a preliminary matter, neither party disputes the underlying legal principle: if a party seeks to use its own invention as prior art, it cannot do so with oral testimony alone; the oral testimony must be corroborated by other evidence. CosMX argues that this corroboration requirement is a "burden of production," and thus it is an issue to be decided by the Court, not the jury.[3] However, CosMX's arguments seem to be in conflict with statements from the Federal Circuit on this issue. *Mosaic*, 55 F.4th at 1363 ("Whether testimony is sufficiently corroborated is ultimately a question of fact.") Meanwhile, ATL asserts that the jury needed to be instructed on the legal requirement of corroboration, which also seems contradictory to some statements from the Federal Circuit on this issue. *Id.* ("the **District Court** correctly concluded that the evidence was sufficient to satisfy the corroboration requirement.")

The Court is persuaded that this confusion is derived from the use of the word "sufficiency" (by the parties and by the Federal Circuit) to mean two different things depending on the context. A brief summary of the relevant law is helpful here. First, the Court agrees that there is a "burden of production" when it comes to corroboration—the same burden of production that exists for any dispute that is to be submitted to the jury: evidence upon which a reasonable juror could find in

---

[3] CosMX relies heavily on a case from the District of Minnesota, which attempts to piece together these seemingly contradictory statements from the Federal Circuit. *See Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030 (D. Minn. 2008), *aff'd*, 649 F.3d 1336 (Fed. Cir. 2011). However, this opinion was written prior to the Federal Circuit's opinion in *Mosaic*, and it is uncertain whether the Federal Circuit agrees with all principles laid out in *Spectralytics*. The Court does not find it appropriate to adopt *Spectralytics* expressly given its lack of analysis on the most recent Federal Circuit caselaw. Nonetheless, the Court is of the opinion that the basic legal principles can be derived from *Mosaic* and other Federal Circuit cases without the need to expressly adopt the reasoning of the District of Minnesota in *Spectralytics*.

favor of the proponent. Put another way, a party seeking to use its own invention as prior art must come forward with *some* corroborating evidence in order for its evidence to be *legally* "sufficient" to submit to the jury. If a party has adduced no evidence or such minimal evidence that no reasonable juror could find in its favor, then the opposing party may be entitled to summary judgment or JMOL, and that is something that the Court determines. This is the kind of "sufficiency" that the Federal Circuit referenced in *Mosaic* when it stated, "the District Court correctly concluded that the evidence was *sufficient* to satisfy the corroboration requirement." *Mosaic*, 55 F.4th at 1364.

The Federal Circuit expressly drew a distinction between the Court's determination of the *legal* sufficiency of the evidence and the credibility of the corroborative evidence in *Mosaic*:

> While the District Court correctly concluded that the evidence was sufficient to satisfy the corroboration requirement, the District Court erred by proceeding to grant summary judgment of anticipation. Finding that Mosaic presented legally sufficient evidence to corroborate the inventor's testimony does not necessarily mean that Mosaic's evidence would also lead every reasonable factfinder – taking the evidence in the light most favorable to Ridge, as the non-moving party – to find by clear and convincing evidence that the SMCII does, in fact, predate the '808 patent's critical date. . . . Before the anticipation issue presented in this case can be resolved, *a factfinder will have to evaluate the credibility and persuasiveness of the evidence of corroboration and make its own judgment as to whether Mosaic has proven, clearly and convincingly, that the SMCII is prior art to Ridge's '818 patent*.

*Id.* at 1364. This last sentence highlights the task of the jury with respect to the corroborative evidence: assessing the *credibility* not the *existence* of corroborative evidence. The Federal Circuit has further characterized the "credibility and persuasiveness of the evidence as the "corroborative value." *Id.* ("[T]he credibility (and therefore corroborative value) of an inventor's [documentary evidence] may vary and may well, therefore, be subject to dispute. . . . Hence, each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive") (internal quotations omitted). The jury is not charged with assessing what exists in

36

the universe of evidence before it, but rather is charged with assessing everything in the universe of evidence before it to determine whether the evidence (in ATL's own words) "**actually** corroborat[es]" the witness's story. (*See* Dkt. No. 411 at 1) (internal quotations omitted). Thus, to prevail on its Motion for a New Trial, ATL must show that the Court failed to properly guide the jury in this task. In that regard, ATL fails.

Specifically, ATL fails to show that the Court erred by rejecting its specific proposed instructions. ATL's proposed instructions consist of two paragraphs. (*See* Dkt. No. 384 at 3-4.) The first paragraph pertains entirely to the **legal** requirement of corroboration while the second paragraph purports to guide the jury in assessing the **credibility** of the corroborative evidence.

ATL's first paragraph is unnecessary as it pertains solely to a determination that was not the jury's to make. That is, the first paragraph relates to the **legal** requirement of corroboration— *i.e.*, that some corroborative evidence must exist for there to be a triable issue of fact concerning whether the references are prior art. Tellingly, the second paragraph of ATL's proposed instruction begins, "**[i]f evidence is presented for purposes of attempting to corroborate oral testimony**, then you must determine whether this evidence does, in fact, properly corroborate the oral testimony." (*Id.*) This sentence, read in the light of *Mosaic*, highlights the superfluous nature of everything that comes before it in the first paragraph. Determining whether "evidence is presented for purposes of attempting to corroborate oral testimony," is not a job for the jury; it is a job for the Court. If, as ATL alleges, CosMX produced "**no evidence at all**" to corroborate its oral testimony, then a new trial is not what ATL actually seeks. It seeks JMOL.[4] Moreover, even if ATL had moved for JMOL or if ATL is correct that the jury was tasked with assessing the legal sufficiency of corroborative

---

[4] Tellingly, ATL argues in its reply brief that the corroborative evidence presented by CosMX "fail[s], as a matter of law." (Dkt. No. 411 at 3.) This argument demonstrates that ATL, at least in part, is making arguments for JMOL that it waived by failing to make such arguments in a Rule 50(a) motion.

37

**Appx531**

evidence, ATL itself admits that CosMX produced at least two emails and two purchase agreements "for purposes of attempting to corroborate" its oral testimony. (*See* Dkt. No. 384 at 7 ("Given these substantial deficiencies *in CosMX's corroborating evidence*, ATL's proposed jury instructions were pivotal in guiding the jury to the proper standard for considering the supportive weight of CosMX's non-testimonial evidence")). There is no question that "evidence [was] presented for purposes of attempting to corroborate oral testimony." Whether or not that evidence actually corroborates the testimony is another matter and is the subject of the second paragraph of ATL's proposed instruction. In short, ATL cannot show any compelling reason why the Court was required to instruct the jury with the first paragraph of its proposed instruction.[5]

The second paragraph fares no better. The second paragraph purports to instruct the jury on assessing the credibility of the corroborative evidence, something that the Federal Circuit has expressly stated is a task for the jury with respect to the corroborative evidence. *Mosaic*, 55 F.4th at 1363. In ATL's own words, these instructions attempt to help the jury understand how much "supportive weight" the corroborative evidence should be given. The instructions recite eight factors that the Federal Circuit endorsed as comprising the "rule of reason" analysis for assessing the credibility of corroborative evidence in *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1998). ATL's motion fails with regard to this second paragraph because ATL neither acknowledges or attempts to analyze the Court's instruction to the jury on assessing the credibility of witnesses and documentary evidence. The Court instructed the jury as follows:

> You, the jury, are the sole judges of the credibility and believability of all the witnesses and the weight and effect to give to all the evidence. Now, in deciding

---

[5] ATL also argues that it would have been legally appropriate to instruct the jury that "[o]ral testimony alone is insufficient to prove that something is prior art" because this Court previously gave a similar instruction in *Solas OLED Ltd. v. Samsung Display Co., Ltd.*, 2021 WL 4950308, at *22 (E.D. Tex. Oct. 25, 2021). The Court need not instruct the jury on every correct statement of law. In some cases, it may be helpful to instruct the jury on all legal principles pertaining to an issue. In other cases, it may be more appropriate to limit the instruction to only those legal principles necessary to guide the jury in making the determination before it. Even though the instruction on the requirement for corroboration has been given in the past, ATL cites no authority that such an instruction is *required*.

38

**Appx532**

the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You alone are to determine the questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider [1] the witness' manner and demeanor on the witness stand, [2] any feelings or interest the witness may have in the outcome of the case, [3] any prejudice or bias that the witness may have, and [4] the consistency or inconsistency of their testimony, considered in the light of the circumstances. Has the witness been contradicted by other evidence? Has he or she made statements at other times and in other places contrary to what they said on the witness stand? You, ladies and gentlemen, must give the testimony of each witness the amount of credibility that you think it deserves.

Trial Tr. at 1290:2-19. The Court also later instructed the jury that they may believe a single witness' oral testimony "even if a greater number of witnesses may have testified to the contrary, *if after considering all the evidence [including the corroborative evidence]*, you believe that single witness." ATL fails to address, much less analyze, these instructions.

Notably, in *Mosaic*, the Federal Circuit explained that the jury's "rule of reason" analysis is not to be applied solely to the corroborative evidence. It is an assessment of the "evidence as a whole." *Mosaic*, 55 F.4th at 1364. Indeed, the "rule of reason" is not necessarily for testing the sufficiency of the corroborative evidence alone, but rather is for determining "the credibility of the witness's story" as a whole. *Id.* (internal quotations omitted). The factors in ATL's own proposed instruction, taken from *Woodland Trust*, primarily emphasize the credibility of the witness's story and the evidence as a whole, not just the corroborating documentary evidence:

- The relationship between *the corroborating witness* and the alleged prior user;

- The time period between the event and this trial;

- The interest of *the corroborating witness* in the subject matter of this suit;

- Contradiction or impeachment *of the witness's testimony*;

- Extent and detail of *the corroborating witness's testimony*;

39

**Appx533**

- ***The witness's*** familiarity with the subject matter of the patented invention and the alleged prior use;

- Probability that a prior sale could occur considering the state of the art at the time; and

- Impact of the invention on the industry, and the commercial value of its practice.

(Dkt. No. 384 at 3-4) (emphasis added).[6] These instructions emphasizing witness credibility were already included in the Court's instructions as to credibility of the evidence generally.[7]

Even a party who requested a legally appropriate instruction must also demonstrate that the instruction actually given was erroneous. *See e.g., C.P. Interests*, 238 F.3d at 701. ATL's Motion for a New Trial acts as though the Court gave no instructions to the jury on how to assess the credibility of witnesses and evidence. This is incorrect. The Court did instruct the jury on how to assess all evidence, oral and documentary. To show that the Court erred, ATL must show that the Court's instruction on assessing credibility of all the evidence does not sufficiently guide the jury in assessing the credibility of the corroborative evidence. However, ATL does not make any argument to this effect or provide any authority holding that ATL's specific instruction was required. Instead, it repeatedly argues that CosMX presented "no evidence" purportedly corroborating its oral testimony, and then—after acknowledging that CosMX did in fact present some corroborating evidence—it argues that this evidence did not "*actually*" corroborate its oral testimony "*in any material way*." (Dkt. No. 411 at 1.) These are waived JMOL arguments that ignore the Court's instruction to the jury on assessing the credibility of all the evidence.

---

[6] *See also In re Reuter*, 670 F.2d 1015, 1021 n.9 (C.C.P.A. 1981).

[7] Both the Court's instructions and ATL's proposed instructions ask the jury to assess the interest that the witness may have in the case, whether the witness has been contradicted by other evidence, and whether the witness has contradicted themselves. Further, both charge the jury with assessing all of the evidence before coming to a conclusion about the credibility of any one witness' story. ATL makes no argument that the Federal Circuit's eight Woodland factors are exhaustive or that the Court must instruct on all eight in order to appropriately guide the jury in assessing the credibility of this evidence as opposed to evidence pertaining to any other factual dispute.

40

**Appx534**

In sum, ATL fails to persuade the Court that the Court's instruction on how to assess the sufficiency of the evidence—including CosMX's oral testimony and documentary evidence corroborating the same—was erroneous. It fails to point to any authority requiring this Court to instruct the jury on how to assess the *legal* sufficiency of corroborative evidence, and it fails to point to any authority stating that an instruction on the credibility of corroborating evidence must be given separate from the instruction on the credibility of all the evidence generally.

Finally, ATL asserts multiple times that the jury found the '363 Patent both willfully infringed and invalid. This is incorrect. The jury determined that CosMX infringed one or more of the Asserted Claims that it found infringed. (Dkt. No. 345.) Further, ATL does not explain how this is relevant to the new trial analysis. In sum, the Court finds that ATL is not entitled to a new trial.

## V.       CONCLUSION

For the reasons stated herein, the Court finds that ATL's JMOL Motion (Dkt. No. 385) and its Motion for a New Trial (Dkt. No. 384) should be and hereby are **DENIED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 3rd day of September, 2024.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

41

**Appx535**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NINGDE AMPEREX TECHNOLOGY LIMITED, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO.  2:22-CV-00232-JRG |
| ZHUHAI COSMX BATTERY CO., LTD., | § § § | |
| *Defendant.* | § § | |

## AMENDED FINAL JUDGMENT

A jury trial commenced in this case on February 1, 2024.  On February 9, 2024, the jury returned a unanimous verdict (Dkt. No. 345) finding that Defendant Zhuhai CosMX Battery Co. Ltd. ("CosMX") infringed one or more claims asserted by Plaintiff Ningde Amperex Technology Limited ("ATL"), such claims being claims 1 and 17 of U.S. Patent No. 10,964,987 (the "'987 Patent"), claim 1 of U.S. Patent No. 10,833,363 (the "'363 Patent"), and claim 1 of U.S. Patent No. 11,329,352 (the "'352 Patent") (collectively, the "Asserted Claims"); that such infringement was willful; that claims 1 and 17 of the '987 Patent were not invalid; that claim 1 of the '363 Patent was invalid; that claim 1 of the '352 Patent was invalid; that ATL should recover from CosMX $3,701,108.00 for such infringement through the date of trial; and that CosMX did not prove that ATL's threat of Chinese patent litigation in ATL's June 21, 2021 letter was both objectively baseless and an attempt to interfere directly with the business relationships of one or more competitors through the use of the litigation process.[1]

---

[1] Based on the Court's granting-in-part of the relief sought in CosMX's JMOL Motion (Dkt. No. 386), reference to the jury's answer to Question 6a has been omitted.

**Appx537**

The Court previously entered Final Judgment on April 26, 2024 (Dkt. No. 369.) Subsequently, the parties filed a Joint Post-Trial Motion Regarding Supplemental Damages, requesting that the Court amend the judgment to include an award of supplemental damages and prejudgment interest. (Dkt. No. 387.) The Court subsequently granted the motion. Additionally, CosMX moved without opposition to amend the final judgment to exclude reference to the jury's answering of question 6a on the verdict form. The Court subsequently granted-in-part the motion on these grounds. This Amended Final Judgment is entered to implement the inclusion of supplemental damages and prejudgment interest, and to remove reference to the jury's answering of question 6a on the verdict form. Additionally, the parties resolved ATL's post-trial motion for an ongoing royalty (Dkt. No. 371) pursuant to a stipulation concerning the ongoing royalty and the reporting requirements concerning the same (the "Stipulation"). (Dkt. No. 423.) The Court has adopted the parties' Stipulation and granted the motion for an ongoing royalty by separate order.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's unanimous verdict, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. CosMX has infringed one or more of the Asserted Claims;

2. CosMX has willfully infringed one or more of the Asserted Claims;

3. Claim 1 of the '363 Patent is invalid;

4. Claim 1 of the '352 Patent is invalid;

5. ATL is hereby awarded compensatory damages for such infringement from and against CosMX, and ATL shall accordingly have and recover from CosMX the sum of $3,701,108.00 U.S. Dollars;

6. ATL's threat of Chinese patent litigation was not both objectively baseless and an attempt to interfere directly with the business relationships of one or more competitors

2

**Appx538**

through the use of the litigation process, and accordingly, ATL is not liable for violating the Sherman Act or the UCL (Cal. Bus. & Prof. Code § 17200);

7. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, ATL is the prevailing party in this case and shall recover its costs from CosMX, and ATL is directed to file its Bill of Costs;

8. Considering the jury's finding of willfulness, and the Court having considered the totality of the circumstances together with the added material benefit of having presided throughout the jury trial and having seen both the same evidence and heard the same arguments as the jury, concludes that enhancement of the compensatory award herein is warranted under 35 U.S.C. § 284. Consequently, the Court enhances the damages award in the amount of $1,000,000.00. ATL shall therefore have and recover from CosMX the additional sum, over and above the compensatory amount set forth above, the sum of $1,000,000.00 U.S. Dollars;

9. ATL is awarded an ongoing forward-looking reasonable royalty from CosMX at the rate of 1% of the agreed "Royalty Base," defined as 39% of worldwide sales of "Existing Models" and "New Models" of the accused products according to the parties' Stipulation; the ongoing royalties accrue on a quarterly basis and are to be reported and due no later than 30 days after the end of each calendar quarter; the award of the ongoing royalty is subject to all other agreements between the parties concerning the ongoing royalty set forth within the parties' Stipulation; and

10. Pursuant to 35 U.S.C. § 284 and Supreme Court guidance that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award," the Court awards pre-judgment interest applicable to all sums awarded herein; pursuant

3

**Appx539**

to the agreement of the parties, the Court awards $459,127 U.S. Dollars in supplemental damages and prejudgment interest.

11. Pursuant to 28 U.S.C. § 1961, the Court awards post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid.

12. This Amended Final Judgment shall be and is effective for all purposes as of April 26, 2024, being the date of entry of the original Final Judgment herein.

All other relief requested by either party which is now pending before the Court and not specifically awarded herein is **DENIED**.

**So ORDERED and SIGNED this 3rd day of September, 2024.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**Appx540**



**Joint Trial Exhibit**

**JTX-006**

NINGDE AMPEREX TECHNOLOGY LIMITED
v. ZHUHAI COSMX BATTERY CO., LTD.

**2:22-CV-232-JRG**

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 8, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,329,352*
ISSUE DATE: *May 10, 2022*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Pam Grant
Certifying Officer

ATL_COSMX_0076447



US011329352B2

## (12) United States Patent
### Guo et al.

(10) **Patent No.:** **US 11,329,352 B2**
(45) **Date of Patent:** **May 10, 2022**

(54) **SECONDARY BATTERY CELL AND WINDING FORMATION SYSTEM THEREOF**

(71) Applicant: **Ningde Amperex Technology Limited**, Fujian (CN)

(72) Inventors: **Peipei Guo**, Fujian (CN); **Yi Zhao**, Fujian (CN); **Ping He**, Fujian (CN); **Hongxin Fang**, Fujian (CN); **Wenqiang Cheng**, Fujian (CN)

(73) Assignee: **NINGDE AMPEREX TECHNOLOGY LIMITED**, Fujian (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 204 days.

(21) Appl. No.: **15/908,327**

(22) Filed: **Feb. 28, 2018**

(65) **Prior Publication Data**
US 2018/0190963 A1 Jul. 5, 2018

**Related U.S. Application Data**

(63) Continuation of application No. PCT/CN2015/088638, filed on Aug. 31, 2015.

(51) **Int. Cl.**
*H01M 10/00* (2006.01)
*H01M 50/54* (2021.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *H01M 50/54* (2021.01); *H01M 10/0409* (2013.01); *H01M 10/0431* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........ H01M 2/266; H01M 2/22; H01M 2/263; H01M 10/0409; H01M 10/0587;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,300,002 B1 * 10/2001 Webb ...................... H01M 4/04
429/94
8,232,008 B2 * 7/2012 Morishima ......... H01M 50/538
429/233
(Continued)

FOREIGN PATENT DOCUMENTS

CN 1805183 A 7/2006
CN 201336332 Y 10/2009
(Continued)

OTHER PUBLICATIONS

Ningde Amperex Technology Limited, International Search Report and Written Opinion, PCT/CN2015/088638, dated May 27, 2016, 17 pgs.
(Continued)

*Primary Examiner* — Nicholas P D'Aniello
(74) *Attorney, Agent, or Firm* — Morgan, Lewis & Bockius LLP

(57) **ABSTRACT**

The present invention provides a secondary battery. The secondary battery comprises a first electrode tab and a first electrode plate. The first electrode plate first electrode plate comprises a first current collector, a first active layer, a first electrode tab receiving groove and a first electrode plate notch. The first active layer is disposed on a surface of the first current collector. The first electrode tab receiving groove is configured to receive the first electrode tab, and the first electrode tab is electrically connected with the first current collector through the first electrode tab receiving groove. The first electrode plate notch is disposed on an edge of the first electrode tab receiving groove.

**12 Claims, 6 Drawing Sheets**



ATL_COSMX_0076448

(51) **Int. Cl.**

| | |
|---|---|
| *H01M 10/0587* | (2010.01) |
| *H01M 10/04* | (2006.01) |
| *H01M 50/528* | (2021.01) |
| *H01M 50/538* | (2021.01) |
| *H01M 10/0525* | (2010.01) |
| *H01M 10/0585* | (2010.01) |

(52) **U.S. Cl.**
CPC ... *H01M 10/0525* (2013.01); *H01M 10/0585* (2013.01); *H01M 10/0587* (2013.01); *H01M 50/528* (2021.01); *H01M 50/538* (2021.01); *H01M 2220/20* (2013.01)

(58) **Field of Classification Search**
CPC ......... H01M 10/0585; H01M 10/0525; H01M 10/0431; H01M 2220/20; H01M 50/54; H01M 50/528; H01M 50/538; Y02E 60/10; Y02P 70/50
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 10,062,897 | B2 * | 8/2018 | Stern ..................... | H01M 50/54 |
| 2004/0161662 | A1 * | 8/2004 | Kim ...................... | H01M 2/263 |
| | | | | 429/94 |
| 2011/0020694 | A1 | 10/2011 | Khakhalev et al. | |
| 2013/0252053 | A1 * | 9/2013 | Woo ........................ | H01M 2/26 |
| | | | | 429/94 |
| 2013/0302674 | A1 * | 11/2013 | Stern ................. | H01M 10/0585 |
| | | | | 429/211 |

| | | | | |
|---|---|---|---|---|
| 2015/0207111 | A1 * | 7/2015 | Tao ....................... | H01M 4/139 |
| | | | | 429/162 |
| 2016/0013455 | A1 * | 1/2016 | Shiu ..................... | H01M 2/266 |
| | | | | 361/679.26 |
| 2017/0092925 | A1 * | 3/2017 | Shiu .................. | H01M 10/0431 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 101783402 | A | 7/2010 | |
| CN | 102315477 | A | 1/2012 | |
| CN | 202373667 | U | 8/2012 | |
| CN | 202423456 | U | 9/2012 | |
| CN | 202495523 | U | 10/2012 | |
| CN | 202839841 | U | 3/2013 | |
| CN | 103579666 | A | 2/2014 | |
| CN | 203574050 | U | 4/2014 | |
| CN | 203733894 | U | 7/2014 | |
| CN | 204538109 | U | 8/2015 | |
| CN | 204905336 | U | 12/2015 | |
| CN | 204946995 | U | 1/2016 | |
| CN | 105406028 | A | 3/2016 | |
| CN | 205355186 | U | 6/2016 | |
| CN | 105990612 | A | 10/2016 | |
| JP | 2000323135 | A | 11/2000 | |
| WO | WO-2012072222 | A1 * | 6/2012 | .......... H01M 4/0402 |

OTHER PUBLICATIONS

Chinese Office Action, CN201580082766.1, dated May 27, 2020, 7 pgs.
Chinese Office Action, CN201580082766.1, dated Jan. 8, 2021, 7 pgs.

* cited by examiner

ATL_COSMX_0076449



Fig.1

ATL_COSMX_0076450



Fig.2

ATL_COSMX_0076451



Fig.3



Fig.4

ATL_COSMX_0076453



Fig.5

ATL_COSMX_0076454



Fig.6

# SECONDARY BATTERY CELL AND WINDING FORMATION SYSTEM THEREOF

## FIELD OF THE INVENTION

The present invention relates to the field of secondary batteries, in particular to a structure of the secondary battery.

## BACKGROUND OF THE INVENTION

The lithium ion battery (one kind of secondary batteries) is widely used in the fields of electronic products, automobiles, electric vehicles, aerospace, micro-electromechanical systems, energy storage and the like. As the application environment and conditions tend to be more complex and rigorous, high requirements are proposed to the usage safety performance, energy density and manufacturing cost of the lithium-ion battery.

In the prior art, the purpose of improving energy density is achieved by configuring a groove on an electrode plate and welding an electrode tab in the groove. However, the process is realized by independent laser cleaning device and welding-winding device respectively at the present stage. The comprehensive cost of the devices is high, and the factory buildings occupy large space, with the result the manufacturing cost of the entire lithium battery is high. Furthermore, the laser cleaned groove on the electrode plate has an overheated perforation or a burned hole on the edge due to focal length fluctuation and deviation, such that a plenty of burrs are formed on a current collector on the edge of the groove; if the electrode plate with burrs is directly manufactured into a cell without processing, then the burrs will pierce the separator to cause internal short circuit, a fire disaster and other severe potential safety hazards. In the prior art, a thick adhesive tape is stuck in the groove to prevent the burrs from piercing the separator. However, sticking an adhesive tape in the groove will certainly increase the thickness of the cell, thus causing loss to energy density.

## SUMMARY OF THE INVENTION

To solve the problems in the prior art, the object of the present invention is to provide a secondary battery, which can prevent the secondary battery from generating internal short circuit while improving the energy density of the secondary battery, thus improving the safety performance of the secondary battery.

Another object of the present invention is to provide a secondary battery winding formation system, which can reduce the volume of the secondary battery winding formation system, save the floor area of a factory building, reduce the manufacturing cost of the secondary battery, and improve the energy density and safety performance of the manufactured secondary battery.

To achieve the above objects, in a first aspect, the present invention provides a secondary battery, comprising an anode electrode plate, an anode electrode tab, a cathode electrode plate, a cathode electrode tab and a separator.

The anode electrode plate comprises: an anode current collector; and an anode active layer disposed on the surface of the anode current collector.

The cathode electrode plate comprises: a cathode current collector; and a cathode active layer disposed on the surface of the cathode current collector.

The separator is disposed between the anode electrode plate and the cathode electrode plate.

The anode electrode plate is formed with: an anode electrode tab receiving groove, provided with the anode current collector at the bottom and the anode active layer on the periphery, the anode electrode tab is received in the anode electrode tab receiving groove and is electrically connected to the anode current collector at the anode electrode tab receiving groove.

The cathode electrode plate is formed with: a cathode electrode tab receiving groove, provided with the cathode current collector at the bottom and the cathode active layer on the periphery, the cathode electrode tab is received in the cathode electrode tab receiving groove and is electrically connected to the cathode current collector at the cathode electrode tab receiving groove.

The anode electrode plate is further formed with: an anode electrode plate die-cut notch, located on the side edge of the anode electrode tab receiving groove and extending through the anode electrode plate.

The cathode electrode plate is further formed with: a cathode electrode plate die-cut notch, located on the side edge of the cathode electrode tab receiving groove and extending through the cathode electrode plate.

The beneficial effects of the present invention are as follows:

In the secondary battery according to the present invention, the anode electrode tab is received in the anode electrode tab receiving groove, and the cathode electrode tab is received in the cathode electrode tab receiving groove, thus effectively improving the energy density of the secondary battery; the anode electrode plate die-cut notch can remove the burrs formed on the current collector on the edge part of the anode electrode tab receiving groove during formation, and the cathode electrode plate die-cut notch can effectively remove the burrs formed on the current collector on the edge part of the cathode electrode tab receiving groove during formation, thus effectively preventing the secondary battery from generating internal short circuit, and improving the safety performance of the secondary battery while ensuring a high energy density.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic view of the secondary battery winding formation system of the present invention;

FIG. **2** is a schematic view of the welded anode electrode plate and electrode tab of the secondary battery of the present invention, wherein, Fig. (a) is a sectional view of the welded anode electrode plate and electrode tab, and Fig. (b) is a top view of the anode electrode plate as shown in Fig. (a);

FIG. **3** is a schematic view of the welded cathode electrode plate and electrode tab of the secondary battery of the present invention, wherein, Fig. (a) is a sectional view of the welded cathode electrode plate and electrode tab, and Fig. (b) is a bottom view of the cathode electrode plate as shown in Fig. (a);

FIG. **4** is a schematic view showing the die-cutting process of the electrode plates of the secondary battery of the present invention, wherein, Fig. (a) is a schematic view showing the die-cutting process of the anode electrode plate, and Fig. (b) is a schematic view showing the die-cutting process of the cathode electrode plate;

FIG. **5** is a schematic view of the electrode plates of the secondary battery of the present invention, wherein Fig. (a) is a schematic view of the anode electrode plate, and Fig. (b) is a schematic view of the cathode electrode plate; and

ATL_COSMX_0076456

FIG. **6** is a schematic view of the electrode plates of a secondary battery in the prior art, wherein, Fig. (a) is a schematic view of the anode electrode plate, and Fig. (b) is a schematic view of the cathode electrode plate.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The secondary battery and winding formation system thereof of the present invention will be elaborated hereafter with reference to the drawings.

First, the secondary battery according to the first aspect of the present invention is elaborated.

With reference to FIG. **2-5**, the secondary battery **1** according to the present invention comprises an anode electrode plate **101**, an anode electrode tab **102**, a cathode electrode plate **103**, a cathode electrode tab **104** and a separator **105**.

The anode electrode plate **101** comprises: an anode current collector **1011**; and an anode active layer **1012** disposed on the surface of the anode current collector **1011**.

The cathode electrode plate **103** comprises: a cathode current collector **1031**; and a cathode active layer **1032** disposed on the surface of the cathode current collector **1031**.

The separator **105** is disposed between the anode electrode plate **101** and the cathode electrode plate **103**.

The anode electrode plate **101** is formed with: an anode electrode tab receiving groove **1013**, provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery, and receiving the anode electrode tab **102** therein, wherein, the anode electrode tab **102** is electrically connected to the anode current collector **1011** at the anode electrode tab receiving groove **1013**.

The cathode electrode plate **103** is formed with: a cathode electrode tab receiving groove **1033**, provided with the cathode current collector **1031** at the bottom and the cathode active layer **1032** on the periphery, and receiving the cathode electrode tab **104** therein, wherein, the cathode electrode tab **104** is electrically connected to the cathode current collector **1031** at the cathode electrode tab receiving groove **1033**.

The anode electrode plate **101** is further formed with: an anode electrode plate die-cut notch **1014**, located on the side edge of the anode electrode tab receiving groove **1013** and extending through the anode electrode plate **101**;

The cathode electrode plate **103** is further formed with: a cathode electrode plate die-cut notch **1034**, located on the side edge of the cathode electrode tab receiving groove **1033** and extending through the cathode electrode plate **103**.

In the secondary battery **1** according to the present invention, the anode electrode tab **102** is received in the anode electrode tab receiving groove **1013**, and the cathode electrode tab **104** is received in the cathode electrode tab receiving groove **1033**, thus effectively improving the energy density of the secondary battery **1**; the anode electrode plate die-cut notch **1014** can remove the burrs formed on the current collector **1011** of the edge part of the anode electrode tab receiving groove **1013** during formation, and the cathode electrode plate die-cut notch **1034** can effectively remove the burrs formed on the current collector **1031** of the edge part of the cathode electrode tab receiving groove **1033** during formation, thus effectively preventing the secondary battery **1** from generating internal short circuit, and in turn improving the safety performance of the secondary battery **1** while ensuring a high energy density.

In the secondary battery **1** according to the present invention, the secondary battery **1** is a wound-type cell.

In the secondary battery **1** according to the present invention, with reference to FIG. **5**(*a*), in one embodiment, the length of the anode electrode plate die-cut notch **1014** in the length direction L is 0.9-1.2 times of the length of the anode electrode tab receiving groove **1013**; and the width of the anode electrode plate die-cut notch **1014** in the width direction W is 0.2-0.8 times of the width of the anode electrode tab receiving groove **1013**.

In the secondary battery **1** according to the present invention, with reference to FIG. **5**(*b*), in one embodiment, the length of the cathode electrode plate die-cut notch **1034** in the length direction L is 0.9-1.2 times of the length of the cathode electrode tab receiving groove **1033**; and the width of the cathode electrode plate die-cut notch **1034** in the width direction W is 0.2-0.8 times of the width of the cathode electrode tab receiving groove **1033**.

In the secondary battery **1** according to the present invention, with reference to FIG. **2**, in one embodiment, the anode electrode plate **101** may not stick an insulating adhesive tape T. Sticking an insulating adhesive tape T on the anode electrode plate **101** could not improve the secondary battery **1**, but on the contrary may probably increase the thickness of the secondary battery **1**, and reduce the energy density of the secondary battery **1**.

In the secondary battery **1** according to the present invention, with reference to FIG. **3**, in one embodiment, the secondary battery **1** further comprises: a first insulating adhesive tape T**1**, stuck at the cathode electrode tab receiving groove **1033** having received the cathode electrode tab **104**; and a second insulating adhesive tape T**2**, stuck on the cathode active layer **1032** at a position aligned with the anode electrode tab receiving groove **1013** after the secondary battery **1** is wound and formed. Since the second insulating adhesive tape T**2** is stuck, the cathode active substance of the cathode active layer **1032** dissociating to the anode electrode tab **102** is reduced; the cathode active substance of the cathode active layer **1032** dissociating and diffusing to the aligned anode electrode tab **102** is reduced; further, the cathode active substance of the cathode active layer **1032** concentrating at the anode electrode tab **102** during the charging and discharging processes of the secondary battery is alleviated; and finally, the problem that the cathode active substance is separated out at the anode electrode tab **102** is alleviated, and in the meanwhile contacting and generating internal short circuit of the anode electrode tab **102** and the cathode electrode plate **103** is avoided when the burrs at the anode electrode tab **102** pierce the separator **105**.

In the secondary battery **1** according to the present invention, with reference to FIG. **2**(*a*), in one embodiment, the anode electrode plate **101** is further formed with an anode concave **1015**, provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery, and located exactly on the back side of the anode electrode tab receiving groove **1013**; and with reference to FIGS. **3**(*a*) and **3**(*b*), in the present embodiment, the secondary battery **1** further comprises: a third insulating adhesive tape T**3**, stuck on the cathode active layer **1032** at a position aligned with the anode concave **1015** after the secondary battery **1** is wound and formed.

In the secondary battery **1** according to the present invention, with reference to FIG. **3**(*a*), in one embodiment, the cathode electrode plate **103** is further formed with a cathode concave **1035**, provided with the cathode current collector **1031** at the bottom and the cathode active layer **1032** on the periphery, and located exactly on the back side of the cathode electrode tab receiving groove **1033**; and with

ATL_COSMX_0076457

reference to FIGS. 3(*a*) and 3(*b*), in the present embodiment, the secondary battery **1** further comprises: a fourth insulating adhesive tape T**4**, stuck on the cathode concave **1035**.

In the secondary battery **1** according to the present invention, in one embodiment, the anode electrode plate **101** is further formed with an anode concave **1015**, provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery, and located exactly on the back side of the anode electrode tab receiving groove **1013**, as shown in FIG. 2(*a*); and the cathode electrode plate **103** is further formed with a cathode concave **1035**, provided with the cathode current collector **1031** at the bottom and the cathode active layer **1032** on the periphery, and located exactly on the back side of the cathode electrode tab receiving groove **1033**, as shown in FIG. 3(*a*). With reference to FIGS. 3(*a*) and 3(*b*), in the present embodiment, the secondary battery **1** further comprises: a third insulating adhesive tape T**3**, stuck on the cathode active layer **1032** at a position aligned with the anode concave **1015** after the secondary battery **1** is wound and formed; and a fourth insulating adhesive tape T**4**, stuck on the cathode concave **1035**.

In the secondary battery **1** according to the present invention, the first insulating adhesive tape T**1**, the second insulating adhesive tape T**2**, the third insulating adhesive tape T**3** and the fourth insulating adhesive tape T**4** are single-sided insulating adhesive tape or double-sided insulating adhesive tape. When double-sided insulating adhesive tapes are adopted, the double-sided insulating adhesive tape sticking areas are denser than the sticking areas when single-sided insulating adhesive tapes are used, such that the integrity of the secondary battery is enhanced, thus avoiding the area from protruding and becoming the largest deformation area after a reforming process of the secondary battery and the secondary battery expands due to charging and discharging.

Second, the secondary battery winding formation system according to the second aspect of the present invention is elaborated.

With reference to FIG. **1**, the secondary battery winding formation system according to the present invention comprises a working platform **201**, a winding mechanism **202**, an anode electrode plate unwinding roller **203**, an anode electrode plate cleaning mechanism **204**, an anode electrode plate die-cutting mechanism **205**, an anode electrode tab supply mechanism **206**, an anode electrode tab connection mechanism **207**, an anode electrode plate convey mechanism **208**, a cathode electrode plate unwinding roller **209**, a cathode electrode plate cleaning mechanism **210**, a cathode electrode plate die-cutting mechanism **211**, a cathode electrode tab supply mechanism **212**, a cathode electrode tab connection mechanism **213**, a cathode electrode plate convey mechanism **214**, a first separator unwinding roller **215**A, a second separator unwinding roller **215**B, a first separator convey mechanism **216**A and a second separator convey mechanism **216**B.

The working platform **201** is fixed immovably.

The winding mechanism **202** is disposed on the working platform **201**.

The anode electrode plate unwinding roller **203** is disposed on the working platform **201**, and is wound with anode electrode plate **101**, wherein, the anode electrode plate **101** comprises: an anode current collector **1011**; and an anode active layer **1012** disposed on the surface of the anode current collector **1011**.

The anode electrode plate cleaning mechanism **204** is disposed on the working platform **201**, is located at the downstream of the anode electrode plate unwinding roller **203**, and is used for cleaning out, on the anode electrode plate **101**, an anode electrode tab receiving groove **1013** provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery.

The anode electrode plate die-cutting mechanism **205** is disposed on the working platform **201**, is located at the downstream of the anode electrode plate cleaning mechanism **204**, and is used for, at the side edge of the anode electrode tab receiving groove **1013**, die-cutting the anode electrode plate **101** to form an anode electrode plate die-cut notch **1014** extending through the anode electrode plate **101**.

The anode electrode tab supply mechanism **206** is disposed on the working platform **201**, is located at the downstream of the anode electrode plate die-cutting mechanism **205**, is wound with an anode electrode tab **102**, and is used for supplying the anode electrode tab **102** to the anode electrode tab receiving groove **1013** of the anode electrode plate **101** of the anode electrode plate die-cut notch **1014**, such that the anode electrode tab **102** is received in the anode electrode tab receiving groove **1013**.

The anode electrode tab connection mechanism **207** is disposed on the working platform **201**, is located at the downstream of the anode electrode plate die-cutting mechanism **205**, and is used for electrically connecting and fixing the anode electrode tab **102** received in the anode electrode tab receiving groove **1013** to the anode current collector **1011** at the anode electrode tab receiving groove **1013**.

The anode electrode plate convey mechanism **208** is disposed on the working platform **201**, and is used for conveying the anode electrode plate **101** unwound from the anode electrode plate unwinding roller **203** to the winding mechanism **202** sequentially via the anode electrode plate cleaning mechanism **204**, the anode electrode plate die-cutting mechanism **205** and the anode electrode tab connection mechanism **207**. The cathode electrode plate unwinding roller **209** is disposed on the working platform **201**, and is wound with a cathode electrode plate **103**, wherein, the cathode electrode plate **103** comprises: a cathode current collector **1031**; and a cathode active layer **1032** disposed on the surface of the cathode current collector **1031**.

The cathode electrode plate cleaning mechanism **210** is disposed on the working platform **201**, is located at the downstream of the cathode electrode plate unwinding roller **209**, and is used for cleaning out, on the cathode electrode plate **103**, a cathode electrode tab receiving groove **1033** provided with the cathode current collector **1031** at the bottom and the cathode active layer **1032** on the periphery.

The cathode electrode plate die-cutting mechanism **211** is disposed on the working platform **201**, is located at the downstream of the cathode electrode plate cleaning mechanism **210**, and is used for, on the side edge of the cathode electrode tab receiving groove **1033**, die-cutting the cathode electrode plate **103** to form a cathode electrode plate die-cut notch **1034** extending through the cathode electrode plate **103**.

The cathode electrode tab supply mechanism **212** is disposed on the working platform **201**, is located at the downstream of the cathode electrode plate die-cutting mechanism **211**, is wound with a cathode electrode tab **104**, and is used for supplying the cathode electrode tab **104** to the cathode electrode plate **103** having die-cut out the cathode electrode plate die-cut notch **1034**, such that the cathode electrode tab **104** is received in the cathode electrode tab receiving groove **1033**.

**Appx570**

ATL_COSMX_0076458

The cathode electrode tab connection mechanism **213** is disposed on the working platform **201**, is located at the downstream of the cathode electrode plate die-cutting mechanism **211**, and is used for electrically connecting and fixing the cathode electrode tab **104** received in the cathode electrode tab receiving groove **1033** to the cathode current collector **1031** at the cathode electrode tab receiving groove **1033**.

The cathode electrode plate convey mechanism **214** is disposed on the working platform **201**, and is used for conveying the cathode electrode plate **103** unwound from the cathode electrode plate unwinding roller **209** to the winding mechanism **202** sequentially via the cathode electrode plate cleaning mechanism **210**, the cathode electrode plate die-cutting mechanism **211** and the cathode electrode tab connection mechanism **213**.

The first separator unwinding roller **215**A is disposed on the working platform **201**, and is wound with a separator **105**.

The second separator unwinding roller **215**B is disposed on the working platform **201**, and is wound with another separator **105**.

The first separator convey mechanism **216**A is disposed on the working platform **201**, and is used for conveying the corresponding separator **105** unwound from the first separator unwinding roller **215**A to the winding mechanism **202**, such that the corresponding separator **105** is configured between the anode electrode plate **101** and the cathode electrode plate **103** after the secondary battery is wound and formed.

The second separator convey mechanism **216**B is disposed on the working platform **201**, and is used for conveying the corresponding separator **105** unwound from the second separator unwinding roller **215**B to the winding mechanism **202**, such that the corresponding separator **105** is configured between the anode electrode plate **101** and the cathode electrode plate **103** after the secondary battery is wound and formed.

In the secondary battery winding formation system **2** according to the present invention, the winding mechanism **202**, the anode electrode plate unwinding roller **203**, the anode electrode plate cleaning mechanism **204**, the anode electrode plate die-cutting mechanism **205**, the anode electrode tab supply mechanism **206**, the anode electrode tab connection mechanism **207**, the anode electrode plate convey mechanism **208**, the cathode electrode plate unwinding roller **209**, the cathode electrode plate cleaning mechanism **210**, the cathode electrode plate die-cutting mechanism **211**, the cathode electrode tab supply mechanism **212**, the cathode electrode tab connection mechanism **213**, the cathode electrode plate convey mechanism **214**, the first separator unwinding roller **215**A, the second separator unwinding roller **215**B, the first separator convey mechanism **216**A and the second separator convey mechanism **216**B are integrated on one working platform **201**, thus reducing the volume of the secondary battery winding formation system **2**, saving the floor area of a factory building, and reducing the manufacturing cost of the secondary battery **1**; the anode electrode plate die-cutting mechanism **205** can remove burrs cleaned out by the anode electrode plate cleaning mechanism **204** and located on the current collector **1011** on the edge part of the anode electrode tab receiving groove **1013**, and the cathode electrode plate die-cutting mechanism **211** can remove burrs cleaned out by the cathode electrode plate cleaning mechanism **210** and located on the current collector **1031** on the edge part of the cathode electrode tab receiving groove **1033**, thus effectively preventing the manufactured

secondary battery **1** from generating internal short circuit, and improving the safety performance of the manufactured secondary battery **1**.

In one embodiment, the anode electrode tab receiving groove **1013** and the anode concave **1015** are respectively cleaned out on the two surfaces of the anode electrode plate **101**; and the anode electrode plate convey mechanism **208** can lead and change the convey direction of the anode electrode plate **101**, thus realizing a double-side cleaning effect.

In one embodiment, the cathode electrode tab receiving groove **1033** and the cathode concave **1035** are respectively cleaned out on the two surfaces of the cathode electrode plate **103**; and the cathode electrode plate convey mechanism **214** can lead and change the convey direction of the cathode electrode plate **103**, thus realizing a double-side cleaning effect.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the secondary battery winding formation system **2** further comprises a central control mechanism **217**, in communication connection with and for controlling at least one selected from the anode electrode plate unwinding roller **203**, the anode electrode plate cleaning mechanism **204**, the anode electrode plate die-cutting mechanism **205**, the anode electrode tab supply mechanism **206**, the anode electrode tab connection mechanism **207**, the cathode electrode plate unwinding roller **209**, the cathode electrode plate cleaning mechanism **210**, the cathode electrode plate die-cutting mechanism **211**, the cathode electrode tab supply mechanism **212**, the cathode electrode tab connection mechanism **213** and the winding mechanism **202**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1** and FIG. **3**, in one embodiment, the secondary battery winding formation system **2** further comprises: a first cathode electrode plate sticking mechanism **218**A, disposed on the working platform **201**, located at the downstream of the cathode electrode tab connection mechanism **213**, and used for sticking a first insulating adhesive tape T**1** on the cathode electrode tab receiving groove **1033** having received the cathode electrode tab **104**; and a second cathode electrode plate sticking mechanism **218**B, disposed on the working platform **201**, located between the first cathode electrode plate sticking mechanism **218**A and the winding mechanism **202**, and used for sticking a second insulating adhesive tape T**2** on the cathode active layer **1032** at a position aligned with the anode electrode tab receiving groove **1013** after the secondary battery **1** is wound and formed.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the anode electrode plate cleaning mechanisms **204** are two, wherein, one anode electrode plate cleaning mechanism **204** is used for cleaning out, on the anode electrode plate **101**, an anode electrode tab receiving groove **1013** provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery; and the other anode electrode plate cleaning mechanism **204** is used for cleaning out, on the anode electrode plate **101**, an anode concave **1015** provided with the anode current collector **1011** at the bottom and the anode active layer **1012** on the periphery and located exactly on the back side of the anode electrode tab receiving groove **1013**; and with reference to FIG. **1** and FIG. **3**, in the present embodiment, the second cathode electrode plate sticking mechanism **218**B is further used for sticking a third insu-

ATL_COSMX_0076459

lating adhesive tape T3 on the cathode active layer 1032 at a position aligned with the anode concave 1015.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the cathode electrode plate cleaning mechanisms 210 are two, wherein, one cathode electrode plate cleaning mechanism 210 is used for cleaning out, on the cathode electrode plate 103, a cathode electrode tab receiving groove 1033 provided with the cathode current collector 1031 at the bottom and the cathode active layer 1032 on the periphery; and the other cathode electrode plate cleaning mechanism 210 is used for cleaning out, on the cathode electrode plate 103, a cathode battery concave 1035 provided with the cathode current collector 1031 at the bottom and the cathode active layer 1032 on the periphery and located exactly on the back side of the cathode electrode tab receiving groove 1033; and with reference to FIG. 1 and FIG. 3, in the present embodiment, the first cathode electrode plate sticking mechanism 218A is further used for sticking a fourth insulating adhesive tape T4 on the cathode concave 1035.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the anode electrode plate cleaning mechanisms 204 are two, wherein, one anode electrode plate cleaning mechanism 204 is used for cleaning out, on the anode electrode plate 101, an anode electrode tab receiving groove 1013 provided with the anode current collector 1011 at the bottom and the anode active layer 1012 on the periphery; and the other anode electrode plate cleaning mechanism 204 is used for cleaning out, on the anode electrode plate 101, an anode concave 1015 provided with the anode current collector 1011 at the bottom and the anode active layer 1012 on the periphery and located exactly on the back side of the anode electrode tab receiving groove 1013; with reference to FIG. 1, in the present embodiment, the cathode electrode plate cleaning mechanisms 210 are two, wherein, one cathode electrode plate cleaning mechanism 210 is used for cleaning out, on the cathode electrode plate 103, a cathode electrode tab receiving groove 1033 provided with the cathode current collector 1031 at the bottom and the cathode active layer 1032 on the periphery; and the other cathode electrode plate cleaning mechanism 210 is used for cleaning out, on the cathode electrode plate 103, a cathode concave 1035 provided with the cathode current collector 1031 at the bottom and the cathode active layer 1032 on the periphery and located exactly on the back side of the cathode electrode tab receiving groove 1033; with reference to FIG. 1 and FIG. 3, in the present embodiment, the first cathode electrode plate sticking mechanism 218A is further used for sticking a fourth insulating adhesive tape T4 on the cathode concave 1035; and the second cathode electrode plate sticking mechanism 218B is further used for sticking a third insulating adhesive tape T3 on the cathode active layer 1032 at a position aligned with the anode concave 1015.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the second battery winding formation system 2 further comprises: a plurality of anode electrode plate sensing mechanisms 219, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the anode electrode 101 starting from the anode electrode plate unwinding roller 203 and passing through the anode electrode plate cleaning mechanism 204, the anode electrode plate die-cutting mechanism 205 and the anode electrode tab connection mechanism 207 until the winding mechanism

202, and used for sensing the position of the anode electrode plate 101 on the convey path; and a plurality of anode electrode plate corrective mechanisms 220, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the anode electrode plate 101 starting from the anode electrode plate unwinding roller 203 and passing through the anode electrode plate cleaning mechanism 204, the anode electrode plate die-cutting mechanism 205 and the anode electrode tab connection mechanism 207 until the winding mechanism 202, and used for correcting the anode electrode plate 101.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the second battery winding formation system 2 further comprises: a plurality of cathode electrode plate sensing mechanisms 221, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the cathode electrode plate 103 starting from the cathode electrode plate unwinding roller 209 and passing through the cathode electrode plate cleaning mechanism 210, the cathode electrode plate die-cutting mechanism 211 and the cathode electrode tab connection mechanism 213 until the winding mechanism 202, and used for sensing the position of the cathode electrode plate 103 on the convey path; and a plurality of cathode electrode plate corrective mechanisms 222, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the cathode electrode plate 103 starting from the cathode electrode plate unwinding roller 209 and passing through the cathode electrode plate cleaning mechanism 210, the cathode electrode plate die-cutting mechanism 211 and the cathode electrode tab connection mechanism 213 until the winding mechanism 202, and used for correcting the cathode electrode plate 103.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the second battery winding formation system 2 further comprises: a plurality of separator sensing mechanisms 223, disposed on the working platform 201, in communication connection with the central control mechanism 217, respectively located on a convey path of the corresponding separator 105 from the first separator unwinding roller 215A to the winding mechanism 202 and another convey path from the second separator unwinding roller 215B to the winding mechanism 202, and used for sensing the position of the corresponding separator 105 on the convey path.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the anode electrode plate unwinding roller 203, the cathode electrode plate unwinding roller 209, the first separator unwinding roller 215A and the second separator unwinding roller 215B can all extend and retract in a direction perpendicular to the working platform 201. The first separator unwinding roller 215A and the second separator unwinding roller 215B extending and retracting in a direction perpendicular to the working platform 201 may cooperate with the separator sensing mechanism 223 to realize deviation correction. Therefore, the feeding of the separator does not add an independent separator corrective mechanism.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the anode electrode plate cleaning mechanism 204 comprises: an anode electrode plate laser

ATL_COSMX_0076460

cleaning system **2041**, for correspondingly cleaning the anode active layer **1012** of the passing anode electrode plate **101**; an anode electrode plate dust removal mechanism **2042**, for removing anode active layer **1012** particles generated when the anode electrode plate laser cleaning system **2041** performs cleaning; and an anode electrode plate adsorption and cooling auxiliary platform **2043**, for adsorbing, fixing and cooling the anode electrode plate **101** passing through the anode electrode plate laser cleaning system **2041**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the anode electrode plate adsorption and cooling auxiliary platform **2043** can be vacuum pumping adsorption.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the cathode electrode plate cleaning mechanism **210** comprises: a cathode electrode plate laser cleaning system **2101**, for correspondingly cleaning the cathode active layer **1032** of the passing cathode electrode plate **103**; a cathode electrode plate dust removal mechanism **2102**, for removing cathode active layer **1032** particles generated when the cathode electrode plate laser cleaning system **2101** performs cleaning; and a cathode electrode plate adsorption and cooling auxiliary platform **2103**, for adsorbing, fixing and cooling the cathode electrode plate **103** passing through the cathode electrode plate laser cleaning system **2101**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the cathode electrode plate adsorption and cooling auxiliary platform **2103** can be vacuum pumping adsorption.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the anode electrode plate die-cutting mechanism **205** comprises: an anode electrode plate die-cutting male die mechanism **2051**; and an anode electrode plate die-cutting female die mechanism **2052**, for cooperating with the anode electrode plate die-cutting male die mechanism **2051** to, when the anode electrode plate **101** passes through the anode electrode plate die-cutting mechanism **205**, die-cut, on the side edge of the anode electrode tab receiving groove **1013**, the anode electrode plate **101** to form an anode electrode plate die-cut notch **1014** extending through the anode electrode plate **101**; and an anode electrode plate die-cut waste collection mechanism **2053**, for collecting the wastes die-cut off from the anode electrode plate **101**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the cathode electrode plate die-cutting mechanism **211** comprises: a cathode electrode plate die-cutting male die mechanism **2111**; and a cathode electrode plate die-cutting female die mechanism **2112**, for cooperating with the cathode electrode plate die-cutting male die mechanism **2111** to, when the cathode electrode plate **103** passes through the cathode electrode plate die-cutting mechanism **211**, die-cut, on the side edge of the cathode electrode tab receiving groove **1033**, the cathode electrode plate **103** to form a cathode electrode plate die-cut notch **1034** extending through the cathode electrode plate **103**; and a cathode electrode plate die-cut waste collection mechanism **2113**, for collecting the wastes die-cut off from the cathode electrode plate **103**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the anode electrode tab connection mechanism **207** comprises: an anode electrode tab welding head mechanism **2071**; and an anode electrode tab welding base mechanism **2072**, for cooperating with the anode electrode tab welding head mechanism **2071** to weld the anode electrode tab **102** to the anode current collector **1011** at the anode electrode tab receiving groove **1013**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the cathode electrode tab connection mechanism **213** comprises: a cathode electrode tab welding head mechanism **2131**; and a cathode electrode tab welding base mechanism **2132**, for cooperating with the cathode electrode tab welding head mechanism **2131** to weld the cathode electrode tab **104** to the cathode current collector **1031** at the cathode electrode tab receiving groove **1033**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the winding mechanism **202** comprises: a dust remover **2021**, for removing the dust of the anode electrode plate **101**, the cathode electrode plate **103** and the two separators **105** conveyed to the winding mechanism **202**; and a winding device **2022**, for stacking up the anode electrode plate **101**, the cathode electrode plate **103** and the two separators **105** conveyed to the winding mechanism **202**, and enabling the corresponding separator **105** to be configured between the anode electrode plate **101** and the cathode electrode plate **103** after the secondary battery is wound and formed by the winding mechanism **202**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the anode electrode plate convey mechanism **208** comprises: a fixed roller **2081**, for passively enabling the anode electrode plate **101** to pass thereon; a main drive mechanism **2082**, for actively driving and conveying the anode electrode plate **101**; and a main drive corrective mechanism **2083**, located at the upstream of the winding mechanism **202** and used for correcting the anode electrode plate **101** having entered the winding mechanism **202**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the cathode electrode plate convey mechanism **214** comprises: a fixed roller **2141**, for passively enabling the cathode electrode plate **103** to pass thereon; a main drive mechanism **2142**, for actively driving and conveying the cathode electrode plate **103**; and a main drive corrective mechanism **2143**, located at the upstream of the winding mechanism **202** and used for correcting the cathode electrode plate **103** having entered the winding mechanism **202**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the first separator convey mechanism **216A** comprises a fixed roller **216A1** for passively enabling the corresponding separator **105** to pass thereon and conveying to the winding mechanism **202**; and the second separator convey mechanism **216B** comprises a fixed roller **216B1** for passively enabling the corresponding separator **105** to pass thereon and conveying to the winding mechanism **202**.

In the secondary battery winding formation system **2** according to the present invention, with reference to FIG. **1**, in one embodiment, the secondary battery winding formation system **2** further comprises: a plurality of anode elec-

ATL_COSMX_0076461

13

trode plate dust removal portions 224, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the anode electrode plate 101 starting from the anode electrode plate cleaning mechanism 204 and passing through the anode electrode plate die-cutting mechanism 205 and the anode electrode tab connection mechanism 207 until the winding mechanism 202, and used for removing the anode active layer 1012 particles generated after the anode electrode plate is cleaned and the electrode tab is welded.

In the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 1, in one embodiment, the secondary battery winding formation system 2 further comprises: a plurality of cathode electrode plate dust removal portions 225, disposed on the working platform 201, in communication connection with the central control mechanism 217, located on a convey path of the cathode electrode plate 103 starting from the cathode electrode plate cleaning mechanism 210 and passing through the cathode electrode plate die-cutting mechanism 211 and the cathode electrode tab connection mechanism 213 until the winding mechanism 202, and used for removing the cathode active layer 1032 particles generated after the cathode electrode plate is cleaned and the electrode tab is welded.

A comparison is performed hereafter between the performance of the secondary battery manufactured by the secondary battery winding formation system 2 of the present invention and the performance of the secondary battery manufactured by the prior art.

Embodiment 1 takes the manufacturing of the 335272 type cell (the finished battery is 3.3 mm thickness, 52 mm width, and 72 mm length) as an example. In the secondary battery 1 manufactured by the secondary battery winding formation system 2 according to the present invention, with reference to FIG. 2-5, the anode electrode plate cleaning mechanism 204 and the cathode electrode plate cleaning mechanism 210 are used to respectively clean out an anode electrode tab receiving groove 1013 and a cathode electrode tab receiving groove 1033 which are 12 mm length (in the length direction L) and 8 mm width (in the width direction W) at preset positions on the anode electrode plate 101 and the cathode electrode plate 103; the burr areas on the side edges of the anode electrode tab receiving groove 1013 and the cathode electrode tab receiving groove 1033 are die-cut by the anode electrode plate die-cutting mechanism 205 and the cathode electrode plate die-cutting mechanism 211 to form an anode electrode plate die-cut notch 1014 and a cathode electrode plate die-cut notch 1034 which are 12 mm length and 3 mm width; the long sides of the anode electrode plate die-cut notch 1014 and the cathode electrode plate die-cut notch are coincident with the corresponding long sides of the anode electrode tab receiving groove 1013 and the cathode electrode tab receiving groove 1033; the anode electrode tab 102 and the cathode electrode tab 104 which are 6 mm width are respectively welded in the anode electrode tab receiving groove 1013 and the cathode electrode tab receiving groove 1033. The first insulating adhesive tape T1 is stuck on the cathode electrode tab receiving groove 1033 having received the cathode electrode tab 104; the second insulating adhesive tape T2 is stuck on the cathode active layer 1032 at a position aligned with the anode electrode tab receiving groove 1013 after the secondary battery 1 is wound and formed; the third insulating adhesive tape T3 is stuck on the cathode active layer 1032 at a position aligned with the anode concave 1015 after the secondary battery 1 is wound and formed; the fourth insu-

14

lating adhesive tape T4 is stuck on the cathode concave 1035; and the insulating adhesive tapes T1-T4 are 10 μm thickness, 15 mm length and 24 mm width. The insulating adhesive tape is not stuck on the anode electrode plate 101. The secondary battery structure according to one embodiment of the present invention is manufactured as above.

Comparison example 1 also takes the manufacturing of the 335272 type cell (the finished battery is 3.3 mm thickness, 52 mm width, and 72 mm length) as an example, and uses the conventional independent laser cleaning device, welding device and winding device in the prior art to manufacture a secondary battery. With reference to FIG. 6, except that the burr areas on the side edges of the anode electrode tab receiving groove 1013 and the cathode electrode tab receiving groove 1033 are not die-cut and removed and that T1-T4 adopt a 35 μm thickness insulating adhesive tape, the others are the same as the embodiment 1.

Comparison example 2 also takes the manufacturing of the 335272 type cell (the finished battery is 3.3 mm thickness, 52 mm width, and 72 mm length) as an example, wherein, except that T1-T4 adopt a 10 μm thickness insulating adhesive tape, the others are the same as the comparison example 1.

Twenty pouch cell lithium ion battery samples are respectively selected from the embodiment 1, the comparison example 1 and the comparison example 2 to perform capacity test and thickness measurement; and then the tested pouch cell lithium ion battery samples are dismantled to observe the internal short circuit situation of the cleaning grooves. The results are as shown in table 1.

TABLE 1

the test results of the embodiment 1 and the comparison examples 1-2

|  | Average capacity mAh | Average volume energy density Wh/L | Average thickness mm | The number of samples generating internal short circuit |
|---|---|---|---|---|
| Embodiment 1 | 3027.5 | 937 | 3.28 | 0 |
| Comparison example 1 | 3027.3 | 925 | 3.32 | 0 |
| Comparison example 2 | 3027.4 | 937 | 3.28 | 12 |

It can be seen from the above table 1 that: in the embodiment 1, the secondary batteries manufactured by the secondary battery winding formation system 2 of the present invention ensure a high average volume energy density while none of the cells generates internal short circuit; in the comparison example 1, similarly, none of the cells generates the internal short circuit problem, however the average volume energy density is obviously reduced because a thick insulating adhesive tape is stuck; and in the comparison example 2, a high average volume energy density is ensured, however a high ratio of cells generate internal short circuit.

Therefore, in the embodiment 1, the electrode plate structure using die-cutting off the burr areas on the side edges of the anode electrode tab receiving groove 1013 and the cathode electrode tab receiving groove 1033 can completely solve the internal short circuit problem caused by the burrs, thus improving the safety use performance of the cell; furthermore, the secondary battery winding formation system 2 can reduce the comprehensive manufacturing cost of the cell.

ATL_COSMX_0076462

15

What is claimed is:

1. A secondary battery, comprising:
a first electrode tab;
a first electrode plate, comprising:
   a first current collector; and
   a first active substance, disposed on a first surface of the first current collector and a second surface of the first current collector, wherein the second surface is opposite to the first surface;
a first electrode tab receiving groove, defined by an exposed portion of the first surface of the first current collector and the first active substance on a periphery of the first electrode tab receiving groove, the first electrode tab receiving groove receiving the first electrode tab, wherein the first electrode tab is electrically connected with the first current collector through the first electrode tab receiving groove;
a first recess that is opposite to the first electrode tab receiving groove, defined by a corresponding portion of the second surface of the first current collector and the first active substance on a periphery of the first recess;
a first electrode plate notch disposed on a side edge of the first electrode tab receiving groove and extending through the second surface and the first surface of the first current collector; and
the first electrode tab receiving groove is formed by the first current collector and at least two first active substance walls;
wherein the secondary battery is a wound-type secondary battery.

2. The secondary battery according to claim 1, further comprising:
a second electrode tab;
a second electrode plate, comprising:
   a second current collector; and
   a second active substance, disposed on a surface of the second current collector;
a second electrode tab receiving groove, configured to receive the second electrode tab, wherein the second electrode tab is electrically connected with the second current collector through the second electrode tab receiving groove; and
a second electrode plate notch disposed on a side edge of the second electrode tab receiving groove and extending through the surface of the second current collector.

3. The secondary battery according to claim 2, wherein:
the first electrode plate is an anode electrode plate;
the first current collector is an anode current collector;
the first active substance is an anode active substance;
the first electrode tab is an anode electrode tab;
the first electrode tab receiving groove is an anode electrode tab receiving groove;
the first recess is an anode recess;
the first electrode plate notch is an anode electrode plate notch;
the second electrode plate is a cathode electrode plate;
the second current collector is a cathode current collector;
the second active substance is a cathode active substance;
the second electrode tab is a cathode electrode tab;

16

the second electrode tab receiving groove is a cathode electrode tab receiving groove; and
the second electrode plate notch is a cathode electrode plate notch.

4. The secondary battery according to claim 3, wherein:
a length of the first electrode plate notch is 0.9-1.2 times a length of the first electrode tab receiving groove along a length direction of the first electrode plate; and
a width of the first electrode plate notch is 0.2-0.8 times a width of the first electrode tab receiving groove along a width direction of the first electrode plate.

5. The secondary battery according to claim 3, further comprising:
a first insulating adhesive tape, disposed on the second electrode tab receiving groove; and
a second insulating adhesive tape, disposed on the second active substance and facing the first electrode tab receiving groove.

6. The secondary battery according to claim 5, further comprising:
a third insulating adhesive tape, disposed on the anode recess.

7. The secondary battery according to claim 5, further comprising:
a fourth insulating adhesive tape;
the cathode electrode plate comprising a cathode recess, wherein the cathode recess and the cathode electrode tab receiving groove are disposed on opposite sides of the cathode current collector; and
the fourth insulating adhesive tape is disposed on the cathode recess.

8. The secondary battery according to claim 7, wherein:
each of the first insulating adhesive tape, the second insulating adhesive tape, the third insulating adhesive tape, and the fourth insulating adhesive tape is a single-sided insulating adhesive tape.

9. The secondary battery according to claim 1, wherein:
the first electrode tab receiving groove is defined by the first active substance and extends to the first surface of the first current collector; and
the first electrode plate notch extends through the first current collector from the first surface of the first current collector.

10. The secondary battery according to claim 2, wherein:
the second electrode tab receiving groove is defined in the second active substance and extends to the surface of the second current collector; and
the second electrode plate notch extends through the second current collector from the surface of the second current collector.

11. The secondary battery according to claim 1, wherein a whole of the first electrode tab is parallel with the first surface of the first current collector.

12. The secondary battery according to claim 1, wherein a bottom of the first electrode plate notch is located between the first active substance disposed on two opposite sides of the first electrode tab receiving groove in the length direction of the first electrode plate.

\* \* \* \* \*

ATL_COSMX_0076463

**Joint Trial Exhibit**

**JTX-002**

NINGDE AMPEREX TECHNOLOGY LIMITED
v. ZHUHAI COSMX BATTERY CO., LTD.

**2:22-CV-232-JRG**



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 8, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *10,833,363*
ISSUE DATE: *November 10, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Pam Grant
Certifying Officer



ATL_COSMX_0075282



US010833363B2

## (12) United States Patent
### Wang et al.

(10) Patent No.: **US 10,833,363 B2**
(45) Date of Patent: **Nov. 10, 2020**

(54) **ELECTROLYTE AND ELECTROCHEMICAL DEVICE**

(71) Applicant: **NINGDE AMPEREX TECHNOLOGY LIMITED**, Ningde (CN)

(72) Inventors: **Kefei Wang**, Ningde (CN); **Fei Wu**, Ningde (CN)

(73) Assignee: **NINGDE AMPEREX TECHNOLOGY LIMITED**, Ningde (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 110 days.

(21) Appl. No.: **16/211,853**

(22) Filed: **Dec. 6, 2018**

(65) **Prior Publication Data**

US 2020/0099098 A1 Mar. 26, 2020

(30) **Foreign Application Priority Data**

Sep. 21, 2018 (CN) .......................... 2018 1 1108529

(51) **Int. Cl.**
| | |
|---|---|
| *H01M 10/0566* | (2010.01) |
| *H01M 10/0525* | (2010.01) |
| *H01M 4/13* | (2010.01) |

(52) **U.S. Cl.**
CPC ... *H01M 10/0566* (2013.01); *H01M 10/0525* (2013.01); *H01M 2300/0025* (2013.01)

(58) **Field of Classification Search**
CPC ............. H01M 10/05; H01M 10/0566; H01M 10/0545
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 9,812,739 B2 | 11/2017 | Kefei |
| 2014/0322596 A1 | 10/2014 | Shatunov et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101640290 A | 2/2010 |
| CN | 102244294 A | 11/2011 |

(Continued)

OTHER PUBLICATIONS

Extended European Search Report dated Jan. 14, 2020 in European application 19198416.0, 7 pages in English.

(Continued)

*Primary Examiner* — Kenneth J Douyette
(74) *Attorney, Agent, or Firm* — Juan Carlos A. Marquez; Marquez IP Law Office, PLLC

(57) **ABSTRACT**

The present application relates to an electrolyte and an electrochemical device comprising the electrolyte. The electrolyte comprises a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on the total weight of the electrolyte, the content X of the nitrile compound and the content Y of the trinitrile compound meet the conditions represented by Formula (1) and Formula (2): {about 2 wt %$\leq$(X+Y)$\leq$about 11 wt % . . . (1), about 0.1$\leq$(X/Y)$\leq$about 8 . . . (2)}. The electrolyte of the present application is capable of effectively inhibiting the increase in DC internal resistance of an electrochemical device so that the electrochemical device has excellent cycle and storage performance.

**16 Claims, 3 Drawing Sheets**



Electrode C

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2016/0301103 A1 | 10/2016 | Kim et al. | |
| 2017/0018803 A1 | 1/2017 | Wang et al. | |
| 2017/0069934 A1* | 3/2017 | Kim | H01M 10/0567 |
| 2017/0125845 A1 | 5/2017 | Yu et al. | |
| 2017/0288268 A1 | 10/2017 | Kim et al. | |
| 2017/0317385 A1* | 11/2017 | Zhang | H01M 10/0568 |
| 2017/0324116 A1* | 11/2017 | Ohashi | H01M 10/0567 |
| 2018/0108947 A9 | 4/2018 | Zhuang | |
| 2018/0233778 A1 | 8/2018 | Park et al. | |
| 2019/0245245 A1 | 8/2019 | Zhang et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102522590 A | 6/2012 |
| CN | 103348516 A | 10/2013 |
| CN | 103401020 A | 11/2013 |
| CN | 103633371 A | 3/2014 |
| CN | 103682416 B | 3/2014 |
| CN | 103779607 A | 5/2014 |
| CN | 103928708 A | 7/2014 |
| CN | 103956517 A | 7/2014 |
| CN | 104332653 A | 2/2015 |
| CN | 104752769 A | 7/2015 |
| CN | 104766995 A | 7/2015 |
| CN | 104979589 A | 10/2015 |
| CN | 105074993 A | 11/2015 |
| CN | 105098237 A | 11/2015 |
| CN | 105355968 A | 2/2016 |
| CN | 105355975 A | 2/2016 |
| CN | 105529498 A | 4/2016 |
| CN | 105609874 A | 5/2016 |
| CN | 105680088 A | 6/2016 |
| CN | 105895957 A | 8/2016 |
| CN | 106099185 A | 11/2016 |
| CN | 106654128 A | 5/2017 |
| CN | 106784589 A | 5/2017 |
| CN | 106816633 A | 6/2017 |
| CN | 107275553 A | 10/2017 |
| CN | 107394269 A | 11/2017 |
| CN | 107408734 A | 11/2017 |
| CN | 108242567 A | 7/2018 |
| CN | 109301326 A | 2/2019 |
| JP | 2017022108 A | 1/2017 |
| KR | 101195931 B1 | 12/2012 |
| KR | 20170051286 A | 5/2017 |

OTHER PUBLICATIONS

Chinese First Office Action dated Jan. 19, 2020 in Chinese counterpart application 201811108529.X, 12 pages in Chinese.

* cited by examiner

ATL_COSMX_0075284



FIG. 1a

ATL_COSMX_0075285



## FIG. 1b



## FIG. 1c

ATL_COSMX_0075286



FIG. 2



FIG. 3



FIG. 4

ATL_COSMX_0075287

# ELECTROLYTE AND ELECTROCHEMICAL DEVICE

## BACKGROUND OF THE INVENTION

The present application claims the benefit of priority from China Patent Application No. 201811108529.X, filed on 21 Sep. 2018, the disclosure of which is hereby incorporated by reference in its entirety.

### 1. Field of the Invention

The present disclosure relates to the technical field of energy storage technologies, in particular to an electrolyte and an electrochemical device containing the electrolyte.

### 2. Description of the Related Art

With the rapid development of electronic devices and electric vehicles, the requirement for high capacity electrochemical devices has grown. In order to increase capacity density of electrochemical devices, there is a need for effective methods to develop high-voltage electrochemical devices.

At present, electrochemical devices with a working voltage above 4.4V have become a hot research area in many research institutes and enterprises. However, at high voltages, the oxidation activity of the positive electrode material increases, and the stability decreases, which makes the electrolyte decompose on the surface of the positive electrode easily or cause deterioration of the battery material, resulting in a decrease in battery capacity. In order to solve the above problems, it is definitely necessary to provide an improved electrochemical device.

## SUMMARY OF THE INVENTION

An embodiment of the present application provides an electrolyte and an electrochemical device containing the electrolyte, wherein the electrolyte comprises a compound comprising two cyano groups (herein also referred to as "a dinitrile compound"), a compound comprising three cyano groups (herein also referred to as "a trinitrile compound"), and propyl propionate. The dinitrile compound can form a protective film on the cathode of the electrochemical device, so as to inhibit the decomposition of the solvent in the electrochemical device. However, since the protective film itself is decomposed on the surface of the cathode at a high potential, the effect of inhibiting decomposition of the solvent cannot be sustained for a long time. The present inventors unexpectedly found that by using a mixture of a dinitrile compound, a trinitrile compound and propyl propionate, a firm protective film which is not easily decomposed on the surface of the cathode at a high potential can be formed. The electrolyte according to the embodiment of the present application can effectively inhibit the increase in DC internal resistance of the electrochemical device.

In an embodiment, the present application provides an electrolyte. The electrolyte comprises a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on the total weight of the electrolyte, the weight percentage (X) of the dinitrile compound and the weight percentage (Y) of the trinitrile compound based on the total weight of the electrolyte solution meet the conditions represented by Formula (1) and Formula (2):

$$\text{about } 2 \text{ wt } \% \leq (X+Y) \leq \text{about } 11 \text{ wt } \% \tag{1); and}$$

$$\text{about } 0.1 \leq (X/Y) \leq \text{about } 8 \tag{2}.$$

According to an embodiment of the present application, the weight percentage (Y) of the trinitrile compound and the weight percentage (Z) of the propyl propionate based on the total weight of the electrolyte meet the condition represented by Formula (3):

$$\text{about } 0.01 \leq (Y/Z) \leq \text{about } 0.3 \tag{3}.$$

According to an embodiment of the present application, the weight percentage of the dinitrile compound is X, and X is about 0.01-10 wt %; the weight percentage of the trinitrile compound is Y, and Y is about 0.01-10 wt %; and the weight percentage of the propyl propionate is Z, and Z is about 5-50 wt %. The electrolyte according to the embodiments of the present application can effectively inhibit the increase in DC internal resistance of the electrochemical device, thereby achieving a better effect.

According to an embodiment of the present application, the electrolyte further comprises a fluoroether, wherein based on the total weight of the electrolyte, the content of fluoroether is about 0.01-10 wt %. The fluoroether can form a better protective film with the trinitrile compound, thereby improving the DC internal resistance and the storage performance of the electrochemical device.

According to an embodiment of the present application, the electrolyte further comprises a cyclic phosphonic anhydride, wherein, based on the total weight of the electrolyte, the content of the cyclic phosphonic anhydride is about 0.01-10 wt %. The addition of the cyclic phosphonic anhydride can further inhibit the increase in DC internal resistance during the cycle.

According to an embodiment of the present application, the electrolyte further comprises one selected from the group consisting of: a cyclic carbonate ester having a carbon-carbon double bond, a fluorinated chain carbonate ester, a fluorinated cyclic carbonate ester, a compound having a sulfur-oxygen double bond, and any combination thereof. These compounds can form a firm protective film which is not easily to be decomposed at the electrode interface with the dinitrile compound, the trinitrile compound and propyl propionate, thereby further inhibiting the side reactions in the electrochemical device and reducing the voltage drop during storage of the electrochemical device, so as to improve the long-term storage performance and reliability of the electrochemical device.

In another embodiment, the present application provides an electrochemical device and an electronic device using the electrochemical device. The electrochemical device comprises electrodes and an electrolyte which is any of the electrolyte described above.

According to an embodiment of the present application, the electrode includes a current collector and a coating on the current collector. The coating includes a single-sided coating, a double-sided coating, or a combination thereof. The single-sided coating is a coating formed by applying a slurry on one surface of the current collector. The double-sided coating is a coating formed by applying a slurry on two surfaces of the current collector. The electrode with the single-sided coating has an electrode compaction density D1, and the electrode with the double-sided coating has an electrode compaction density D2, wherein D1 and D2 meet the following relationship: about $0.8 \leq D1/D2 \leq$ about 1.2.

According to an embodiment of the present application, the electrode s include a cathode and an anode In some embodiments, when the electrode is an cathode, about 3.5 $g/cm^3 \leq D2 \leq$ about 4.3 $g/cm^3$. In some other embodiments, when the electrode is an anode, about 1.2 $g/cm^3 \leq D2 \leq 1.8$ $g/cm^3$.

ATL_COSMX_0075288

3

In the electrochemical device according to the embodiments of the present application, when the electrolyte of the electrochemical device comprises a compound comprising two cyano groups, a compound comprising three cyano groups, and propyl propionate, and the electrode compaction densities meet the above relationships, the electrode can have good electrical conductivity, the effects of the cathode and anode active materials are well exerted, which is important to controlling the expansion of electrochemical devices. Therefore, the electrochemical device according to the embodiments of the present application achieves high capacity density and has excellent cycle and storage performances.

In another embodiment, the present application provides an electronic device including the electrochemical device.

Additional aspects and advantages of the embodiments of the present application will be partially described, illustrated or explained by way of examples in the description as follows.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described according to the appended drawings in which:

The drawings needed for describing the embodiments of the present application or the prior art will be briefly described below to facilitate the description of the embodiments of the present application. Obviously, the drawings in the following description are only a portion of the embodiments of the present application. For those skilled in the art, the drawings of other embodiments can be obtained according to the structures illustrated in the drawings without creative efforts.

FIG. 1a shows the DC internal resistances of fresh batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC).

FIG. 1b shows the DC internal resistances of batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC) after 200 cycles of charge and discharge.

FIG. 1c shows the DC internal resistances of batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC) after 400 cycles of charge and discharge.

FIG. 2 is a view schematically showing the structure of an electrode A with a single-sided coating of the present application.

FIG. 3 is a view schematically showing the structure of an electrode B with a double-sided coating of the present application.

FIG. 4 is a view schematically showing the structure of an electrode C with a single-sided coating and a double-sided coating of the present application.

PREFERRED EMBODIMENT OF THE PRESENT APPLICATION

Embodiments of the present application will be described in detail below. Throughout the specification of the present application, the same or similar components and components having the same or similar functions are denoted by similar reference numerals. The embodiments described herein with respect to the figures are explanatory, and illustrative, and are provided to facilitate the basic under-

4

standing of the application. The embodiments of the present application should not be interpreted as limitations to the present application. Unless otherwise expressly indicated, the following terms used herein have the meanings indicated below.

As used herein, the term "about" is used to describe and depict minor variations. When used in connection with an event or circumstance, the term may refer to an example in which the event or circumstance occurs precisely, and an example in which the event or circumstance occurs approximately. For example, when used in connection with a value, the term may refer to a range of variation less than or equal to ±10% of the stated value, such as less than or equal to ±5%, less than or equal to ±4%, less than or equal to ±3%, less than or equal to ±2%, less than or equal to ±1%, less than or equal to ±0.5%, less than or equal to ±0.1%, or less than or equal to ±0.05%. In addition, amounts, ratios, and other values are sometimes presented in a range format in this application. It is to be understood that such a range format is provided for convenience and simplicity, and should be understood flexibly to include not only the numerical values that are explicitly defined in the range, but also all the individual values or sub-ranges that are included in the range, as if each value and sub-range are explicitly specified.

As used herein, "hydrocarbyl" covers alkyl, alkenyl, and alkynyl groups. For example, the hydrocarbyl may be a straight-chain hydrocarbon structure having 1 to 20 carbon atoms. The hydrocarbon group also may be a branched or cyclic hydrocarbon structure having 3 to 20 carbon atoms. When a hydrocarbon group having a specific number of carbon atoms is defined, it may cover all geometric isomers having the carbon number. The hydrocarbon group herein may also be a hydrocarbon group having 1 to 15 carbon atoms, a hydrocarbon group having 1 to 10 carbon atoms, a hydrocarbon group having 1 to 5 carbon atoms, a hydrocarbon group having 5 to 20 carbon atoms, a hydrocarbon group having 5 to 15 carbon atoms or a hydrocarbon group having 5 to 10 carbon atoms. Additionally, the hydrocarbon group may be optionally substituted. For example, the hydrocarbon group may be substituted by halo including fluorine, chlorine, bromine, and iodine, an alkyl group, an aryl group or a heteroaryl group.

As used herein, the "alkyl group" may be a linear saturated hydrocarbon structure having 1 to 20 carbon atoms. The alkyl group also may be a branched or cyclic hydrocarbon structure having 3 to 20 carbon atoms. For example, the alkyl group may be an alkyl group having 1-20 carbon atoms, an alkyl group having 1-10 carbon atoms, an alkyl group having 1-5 carbon atoms, an alkyl group having 5-20 carbon atoms, an alkyl group having 5-15 carbon atoms, or alkyl group having 5-10 carbon atoms. When an alkyl group having a specific number of carbon atoms is defined, it may cover all geometric isomers having the carbon number. Therefore, for example, "butyl" means n-butyl, sec-butyl, isobutyl, tert-butyl and cyclobutyl; and "propyl" includes n-propyl, isopropyl and cyclopropyl. Examples of the alkyl group include, but are not limited to, methyl, ethyl, n-propyl, isopropyl, cyclopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl, cyclobutyl, n-pentyl, isoamyl, neopentyl, cyclopentyl, methylcyclopentyl, ethylcyclopentyl, n-hexyl, isohexyl, cyclohexyl, n-heptyl, octyl, cyclopropyl, cyclobutyl, norbornanyl and so on. Additionally, the alkyl group may be optionally substituted.

As used herein, the term "alkylene group" means a linear or branched divalent saturated hydrocarbon group. For example, the alkylene group may be an alkylene group

ATL_COSMX_0075289

having 1-20 carbon atoms, an alkylene group having 1-15 carbon atoms, an alkylene group having 1-10 carbon atoms, an alkylene group having 1-5 carbon atoms, an alkylene group having 5-20 carbon atoms, an alkylene group having 5-15 carbon atoms, or alkylene group having 5-10 carbon atoms. Representative alkylene group includes (for example) methylene, ethane-1,2-diyl ("ethylene"), propane-1,2-diyl, propane-1,3-diyl, butane-1,4-diyl, pentane-1,5-diyl and the like. Additionally, the alkylene group may be optionally substituted.

As used herein, the term "alkenylene group" covers both linear and branched alkenylene groups. When an alkenylene group having a specific number of carbon atoms is defined, it may cover all geometric isomers having the carbon number. For example, the alkenylene group may be an alkenylene group having 2-20 carbon atoms, an alkenylene group having 2-15 carbon atoms, an alkenylene group having 2-10 carbon atoms, an alkenylene group having 2-5 carbon atoms, an alkenylene group having 5-20 carbon atoms, an alkenylene group having 5-15 carbon atoms, or alkenylene group having 5-10 carbon atoms. Representative alkenylene group includes (for example) ethenylene, propenylene, butenylene and the like. Additionally, the alkenylene group may be optionally substituted.

As used herein, the term "aryl" encompasses both monocyclic and polycyclic systems. A polycyclic ring may have two or more rings in which two carbons are shared by two adjacent rings (where the rings are "fused"), in which at least one of the rings is aromatic and other rings may be for example, a cycloalkyl group, a cycloalkenyl group, an aryl group, a heterocyclyl group and/or a heteroaryl group. For example, the aryl group may be a $C_6$-$C_{50}$ aryl group, a $C_6$-$C_{40}$ aryl group, a $C_6$-$C_{30}$ aryl group, a $C_6$-$C_{20}$ aryl group, or a $C_6$-$C_{10}$ aryl group. Representative aryl group includes (for example) phenyl, methylphenyl, propylphenyl, isopropylphenyl, benzyl and naphthalen-1-yl, naphthalen-2-yl and the like. Additionally, the aryl group may be optionally substituted.

As used herein, the term "heteroaryl group" covers a monocyclic heteroaromatic group which may include one to three heteroatoms, for example, pyrrole, furan, thiophene, imidazole, oxazole, thiazole, triazole, pyrazole, pyridine, pyrazine, pyrimidine, and the like. The term heteroaryl group also includes a polycyclic heteroaromatic system having two or more rings in which two atoms are shared by two adjacent rings (where the ring is "fused"), in which at least one of the rings is a heteroaryl group, and other rings may be a cycloalkyl group, a cycloalkenyl group, an aryl group, a heterocyclyl group and/or a heteroaryl group. The heteroatom in the heteroaryl group may be for example O, S, N, Se, and so on. For example, the heteroaryl group may be a $C_2$-$C_{50}$ heteroaryl group, a $C_2$-$C_{40}$ heteroaryl group, a $C_2$-$C_{30}$ heteroaryl group, a $C_2$-$C_{20}$ heteroaryl group, or a $C_2$-$C_{10}$ heteroaryl group. Additionally, the aryl group may be optionally substituted.

When the above substituents are substituted, the substituent is selected from the group consisting of halogen, an alkyl group, a cycloalkyl group, an alkenyl group, an aryl group, and a heteroaryl group.

As used herein, the content of each component is obtained based on the total weight of the electrolyte.

I. Electrolyte

An embodiment of the present application provides an electrolyte, which comprises an electrolyte and a solvent in which the electrolyte is dissolved. It is one of the main characteristics of the electrolyte of the present application that the electrolyte comprises a dinitrile compound, a trini-

trile compound, and propyl propionate, wherein, based on the total weight of the electrolyte, the weight percentage of the is X and the weight percentage of the trinitrile compound is Y, and X and Y meet the conditions represented by Formula (1) and Formula (2):

$$\text{about 2 wt \%} \leq (X+Y) \leq \text{about 11 wt \%} \tag{1; and}$$

$$\text{about } 0.1 \leq (X/Y) \leq \text{about 8} \tag{2}.$$

In some embodiments, X and Y meet about 2 wt %≤(X+Y)≤about 8 wt % and about 0.1≤(X/Y)≤about 6 simultaneously. In some embodiments, X and Y meet about 3 wt %≤(X+Y)≤6 wt % and about 0.2≤(X/Y)≤about 5 simultaneously. In some embodiments, X and Y meet about 4 wt %≤(X+Y)≤about 5 wt % and about 0.3≤(X/Y)≤about 4 simultaneously. In some embodiments, X and Y meet about 2 wt %≤(X+Y)≤about 5 wt % and about 0.1≤(X/Y)≤about 1 simultaneously.

In some embodiments, based on the total weight of the electrolyte, the weight percentage of the trinitrile compound is Y and the weight percentage of the propyl propionate is Z, and Y and Z meet the condition represented by Formula (3):

$$\text{about } 0.01 \leq (Y/Z) \leq \text{about 0.3} \tag{3}.$$

In some embodiments, Y and Z meet about 0.01≤(Y/Z)≤about 0.2. In some embodiments, Y and Z meet about 0.02≤(Y/Z)≤about 0.1.

In some embodiments, the weight percentage of the dinitrile compound is about 0.01-10 wt %. In some embodiments, the weight percentage of the dinitrile compound is not less than about 0.01 wt %, not less than about 0.1 wt %, not less than about 0.3 wt %, or not less than about 0.5 wt %. In some embodiments, the weight percentage of the dinitrile compound is not greater than about 10 wt %, not greater than about 8 wt %, or not greater than about 6 wt %.

In some embodiments, the weight percentage of the trinitrile compound is about 0.01-10 wt %. In some embodiments, the weight percentage of the trinitrile compound is not less than about 0.01 wt %, not less than about 0.1 wt %, not less than about 0.3 wt %, or not less than about 0.5 wt %. In some embodiments, the weight percentage of the trinitrile compound is not greater than about 10 wt %, not greater than about 8 wt %, not greater than about 5 wt %, not greater than about 4 wt %, or not greater than about 3 wt %.

In some embodiments, the weight percentage of the propyl propionate is about 5-50 wt %. In some embodiments, the weight percentage (Z) of the propyl propionate is about 5-40 wt %, about 10-40 wt %, about 10-30 wt %, about 20-50 wt %, about 20-40 wt %, about 20-30 wt %, or about 25-30 wt %.

Compound Comprising Two Cyano Groups (Dinitrile Compound)

In some embodiments, the dinitrile compound according to the present application includes a compound of Formula [4] or [5]:

$$\text{CN—R}_1\text{—CN} \tag{4},$$

$$\text{CN—R}_2\text{—(O—R}_3)_n\text{—O—R}_4\text{—CN} \tag{5},$$

or a combination thereof,

wherein in Formula [4] or [5], $R_1$, $R_2$, $R_3$ and $R_4$ are each independently an alkylene having 1-20 carbon atoms, for example, an alkylene group having 1-15 carbon atoms, an alkylene group having 1-10 carbon atoms, an alkylene group having 1-5 carbon atoms, an alkylene group having 5-10 carbon atoms, an alkylene group having 5-20 carbon atoms, an alkylene group having 5-15 carbon atoms, an alkenylene group having 2-20 carbon atoms, an alkenylene group

ATL_COSMX_0075290

7

8

having 2-15 carbon atoms, an alkenylene group having 2-10 carbon atoms, an alkenylene group having 2-5 carbon atoms, an alkenylene group having 5-20 carbon atoms, an alkenylene group having 5-15 carbon atoms, or an alkenylene group having 5-10 carbon atoms, and n is an integer from 0 to 5.

In some embodiments, the dinitrile compound according to the present application is a compound of Formula [4] or [5].

In some embodiments, the dinitrile compound of the present application includes, but is not limited to, butanedinitrile, glutaronitrile, adiponitrile, 1,5-dicyanopentane, 1,6-dicyanohexane, 1,7-dicyanoheptane, 1,8-dicyanooctane, 1,9-dicyanononane, 1,10-dicyanodecane, 1,12-dicyanododecane, tetramethylbutanedinitrile, 2-methylglutaronitrile, 2,4-dimethylglutaronitrile, 2,2,4,4-tetramethylglutaronitrile, 1,4-dicyanopentane, 2,6-dicyanoheptane, 2,7-dicyanooctane, 2,8-dicyanononane, 1,6-dicyanodecane, 1,2-dicyanobenzene, 1,3-dicyanobenzene, 1,4-dicyanobenzene, 3,5-dioxa-pimelonitrile, 1,4-bis(cyanoethoxy)butane, ethylene glycol bis(2-cyanoethyl)ether, diethylene glycol bis(2-cyanoethyl)ether, triethylene glycol bis(2-cyanoethyl)ether, tetraethylene glycol bis(2-cyanoethyl)ether, 3,6,9,12,15,18-hexaoxaeicosanoic dinitrile, 1,3-bis(2-cyanoethoxy) propane, 1,4-bis(2-cyanoethoxy)butane, 1,5-bis(2-cyanoethoxy)pentane, ethylene glycol bis(4-cyanobutyl) ether, 1,4-dicyano-2-butene, 1,4-dicyano-2-methyl-2-butene, 1,4-dicyano-2-ethyl-2-butene, 1,4-dicyano-2,3-dimethyl-2-butene, 1,4-dicyano-2,3-diethyl-2-butene, 1,6-dicyano-3-hexene, 1,6-dicyano-2-methyl-3-hexene, or 1,6-dicyano-2-methyl-5-methyl-3-hexene. The dinitrile compounds may be used alone or in combination of two or more thereof.

Compound Comprising Three Cyano Groups (Trinitrile Compound)

In some embodiments, the trinitrile compound according to the present application includes a compound of Formula [6] or [7]:

$$CN\!-\!(CH_2)_x\!-\!CH\{(CH_2)_y\!-\!CN\}\!-\!(CH_2)_z\!-\!CN, \quad (6)$$

$$X_4\!-\!O\!-\!R_6\!-\!\overset{\overset{\displaystyle R_5}{|}}{\underset{\underset{\underset{\underset{X_6}{|}}{O}}{|}}{\underset{R_8}{|}}}\!-\!R_7\!-\!O\!-\!X_5, \quad (7)$$

or a combination thereof,

wherein in Formula [6], x, y, and z represents an integer from 0 to 5 and x, y, and z are not 0 at the same time; and

in Formula [7], $R_5$ may be hydrogen or an alkyl group having 1-20 carbon atoms, for example, an alkyl group having 1-10 carbon atoms, an alkyl group having 1-5 carbon atoms, an alkyl group having 5-20 carbon atoms, an alkyl group having 5-15 carbon atoms, or an alkyl group having 5-10 carbon atoms; $R_6$, $R_7$, and $R_8$ each independently may be an alkylene group having 1-20 carbon atoms, for example, an alkylene group having 1-15 carbon atoms, an alkylene group having 1-10 carbon atoms, an alkylene group having 1-5 carbon atoms, an alkylene group having 5-20 carbon atoms, an alkylene group having 5-15 carbon atoms, or an alkylene group having 5-10 carbon atoms; and $X_4$, $X_5$ and $X_6$ each independently may be $-R_9-CN$, wherein $R_9$ may be an alkylene group having 1-20 carbon atoms, for example, an alkylene group having 1-15 carbon atoms, an alkylene group having 1-10 carbon atoms, an alkylene group having 1-5 carbon atoms, an alkylene group having 5-20 carbon atoms, an alkylene group having 5-15 carbon atoms, or an alkylene group having 5-10 carbon atoms.

In some embodiments, the trinitrile compound according to the present application is a compound of Formula [6] or [7].

In some embodiments, the trinitrile compound of the present application includes, but is not limited to, 1,3,5-pentanetricarbonitrile, 1,2,3-propanetrinitrile, 1,3,6-hexanetricarbonitrile, 1,2,6-hexanetricarbonitrile, 1,2,3-tris(2-cyanoethoxy)propane, 1,2,4-tris(2-cyanoethoxy)butane, 1,1,1-tris(cyanoethoxymethylene)ethane, 1,1,1-tris(cyanoethoxymethylene)propane, 3-methyl-1,3,5-tris(cyanoethoxy)pentane, 1,2,7-tris(cyanoethoxy)heptane, 1,2,6-tris(cyanoethoxy)hexane, or 1,2,5-tris(cyanoethoxy)pentane. The trinitrile compounds may be used alone or in combination of two or more thereof.

Fluoroether Compound

In some embodiments, the fluoroether compound of the present application includes at least one of the compounds of Formula [8], Formula [9], Formula [10], or Formula [11]:

$$Rf1\text{-}O\text{-}Rf2 \quad [8];$$

$$Rf1\text{-}O\text{---}R \quad [9];$$

$$Rf1\text{-}O\text{---}(R'\text{---}O)_n\text{-}Rf2 \quad [10]; \text{ and}$$

$$Rf1\text{-}O\text{---}(R'\text{---}O)_n\text{---}R \quad [11],$$

where in Formulae [8], [9], [10], and [11], Rf1 and Rf2 are each independently a linear or branched $C_1$ to $C_{12}$ fluoroalkyl group at least one hydrogen atom of which is replaced with fluorine, R is a linear or branched $C_1$ to $C_{12}$ alkyl group, and R' is a linear or branched $C_1$ to $C_5$ alkylene group, and n is an integer from 1 to 5.

In some embodiments, the fluoroether compound of the present application is a compound of Formula [8], Formula [9], Formula [10], or Formula [11].

In some embodiments, Rf1 or Rf2 is each independently a fluoroalkyl group selected from the group consisting of $HCF_2\!-\!$, $CF_3\!-\!$, $HCF_2CF_2\!-\!$, $CH_3CF_2\!-\!$, $CF_3CH_2\!-\!$, $CF_3CF_2\!-\!$, $(CF_3)_2CH\!-\!$, $HCF_2CF_2CH_2\!-\!$, $CF_3CH_2CH_2\!-\!$, $HCF_2CF_2CF_2CH_2\!-\!$, $HCF_2CF_2CF_2CF_2CH_2\!-\!$, $CF_3CF_2CH_2\!-\!$, $CF_3CFHCF_2CH_2\!-\!$, $HCF_2CF(CF_3)CH_2\!-\!$, and $CF_3CF_2CH_2CH_2\!-\!$.

The fluoroether can form a better protective film with the trinitrile compound, thereby further improving the DC internal resistance and the storage performance of the battery.

In some embodiments, the fluoroether of the present application includes, but is not limited to:

$HCF_2CF_2CH_2OCF_2CF_2H$(FEPE), $(CF_3)_2CFCF(CF_2CF_3)$ $(OCH_3)$ (TMMP), $CF_3CHFCF_2CH(CH_3)OCF_2CHFCF_3$ (TPTP), $HCF_2CF_2CH_2OCF_2CF_2CF_2CF_2H$, $HCF_2CF_2OCH_2CF_3$, $HCF_2CF_2OCH_2CH_2OCF_2CF_2H$, $HCF_2CF_2OCH_2$ $CH_2CH_2OCF_2CF_2H$, $HCF_2CF_2CH_2OCF_2CF_2H$, $HCF_2CF_2OCH_2CH_2OCF_2CF_2CF_2H$, $HCF_2CF_2OCH_2CH_2$ $CH_2OCF_2CF_2CF_2H$, $CH_3OCH_2CH_2OCH_2CH_2F$, $CH_3$ $OCH_2CH_2OCH_2CF_3$, $CH_3OCH_2CH(CH_3)OCH_2CH_2F$, $CH_3$ $OCH_2CH(CH_3)OCH_2CF_3$, $FCH_2CH_2OCH_2CH_2OCH_2$ $CH_2F$, $FCH_2CH_2OCH_2CH(CH_3)OCH_2CH_2F$, $CF_3CH_2O$ $(CH_2CH_2O)_2CH_2CF_3$ or $CF_3CH_2OCH_2CH(CH_3)OCH_2CF_3$. The fluoroether may be used alone or in combination of two or more thereof.

ATL_COSMX_0075291

9

The structural formulas of FEPE, TMMP, and TPTP are shown below:

1,1-difluoro-2,2-difluoroethyl-2',2'-difluoro-3',3'-difluoropropyl ether, (FEPE)

2-trifluoromethyl-3-methoxyperfluoropentane, (TMMP)

2-(trifluoro-2-fluoro-3-difluoropropoxy)-3-difluoro-4-fluoro-5-trifluoropentane. (TPTP)

In some embodiments, based on the total weight of the electrolyte, the content of the fluoroether is not less than about 0.01 wt %, not less than about 0.1 wt %, or not less than about 0.5 wt %. In some embodiments, the content of the fluoroether is not greater than about 5 wt %, not greater than about 4 wt %, not greater than about 3 wt %, or not greater than about 2 wt %.

Cyclic Phosphonic Anhydride Compound

In some embodiments, the cyclic phosphonic anhydride according to the present application includes one or more of the compounds of Formula [12]:

[12]

wherein in Formula [12], $R_{10}$, $R_{11}$, and $R_{12}$ each independently may be hydrogen; each independently may be an alkyl group having 1-20 carbon atoms, for example, an alkyl group having 1-15 carbon atoms, an alkyl group having 1-10 carbon atoms, an alkyl group having 1-5 carbon atoms, an alkyl group having 5-20 carbon atoms, an alkyl group having 5-15 carbon atoms, and an alkyl group having 5-10 carbon atoms; and each independently may be an aryl group having 6-50 carbon atoms, for example, an aryl group having 6-30 carbon atoms, an aryl group having 6-26 carbon atoms, an aryl group having 6-20 carbon atoms, an aryl group having 10-50 carbon atoms, an aryl group having 10-30 carbon atoms, an aryl group having 10-26 carbon atoms, or an aryl group having 10-20 carbon atoms, wherein $R_{10}$, $R_{11}$, and $R_{12}$ may be different from or the same as each other, or any two of them are the same.

In some embodiments, the cyclic phosphonic anhydride compound of the present application includes, but is

10

limited to, compounds of following formulae, which may be used alone, or in combination of two or more thereof:

(TM3P)

(TE3P)

(T3P)

ATL_COSMX_0075292

**11**

-continued

**12**

-continued

ATL_COSMX_0075293

-continued

In some embodiments, based on the total weight of the electrolyte, the content of the cyclic phosphonic anhydride is not less than about 0.01 wt % or not less than about 0.1 wt %. In some embodiments, the content of the cyclic

phosphonic anhydride is not less than about 0.3 wt % or not less than about 0.5 wt %. In some embodiments, the content of the cyclic phosphonic anhydride is not greater than about 4 wt % or not greater than about 3 wt %.

Other Additives

The electrolyte of the present application may further comprises one or more selected from the group consisting of: a cyclic carbonate ester having a carbon-carbon double bond, a fluoro chain carbonate ester, a fluorinated cyclic carbonate ester, or a compound having a sulfur-oxygen double bond.

In some embodiments, the cyclic carbonate ester having a carbon-carbon double bond useful in the present application includes, but is not limited to: vinylene carbonate, methyl vinylene carbonate, ethyl vinylene carbonate, 1,2-dimethyl vinylene carbonate, 1,2-diethyl vinylene carbonate, fluorovinylene carbonate, and trifluoromethylvinylene carbonate; vinyl ethylene carbonate, 1-methyl-2-vinylethylene carbonate, 1-ethyl-2-vinylethylene carbonate, 1-n-propyl-2-vinylethylene carbonate, 1-methyl-2-vinylethylene carbonate, 1,1-divinylethylene carbonate, and 1,2-divinylethylene carbonate; and 1,1-dimethyl-2-methylene ethylene carbonate, and 1,1-diethyl-2-methylene ethylene carbonate. The cyclic carbonate ester having a carbon-carbon double bond may be used alone or in combination of two or more thereof.

In some embodiments, based on the total weight of the electrolyte, the content of the cyclic carbonate ester having a carbon-carbon double bond is not less than about 0.01 wt %, not less than about 0.1 wt %, or not less than about 0.3 wt %. In some embodiments, the content of the cyclic carbonate ester having a carbon-carbon double bond is not less than about 0.5 wt %. In some embodiments, the content of the cyclic carbonate ester having a carbon-carbon double bond is not greater than about 5 wt %, not greater than about 3 wt %, or not greater than about 1 wt %.

In some embodiments, the fluorinated chain carbonate ester according to the present application includes, but is not limited to: fluoromethmetyl carbonate, difluoromethmethyl carbonate, trifluoromethmethyl carbonate, trifluoroethmethyl carbonate, or bis(trifluoroethyl) carbonate. The fluorinated chain carbonate ester may be used alone or in combination of two or more thereof.

In some embodiments, based on the total weight of the electrolyte, the content of the fluorinated chain carbonate ester is not less than about 0.01 wt % or not less than about 0.1 wt %. In some embodiments, the content of the fluorinated chain carbonate ester is not less than about 0.3 wt %. In some embodiments, the content of the fluorinated chain carbonate ester is not less than about 0.5 wt %. In some other embodiments, the content of the fluorinated chain carbonate ester is not greater than about 3 wt % or not greater than about 5 wt %. In some other embodiments, the content of the fluorinated chain carbonate ester is not greater than about 1 wt %. In some embodiments, the fluorinated cyclic carbonate ester according to the present application includes, but is not limited to, fluoroethylene carbonate, 4,4-difluoroethylene carbonate, 4,5-difluoroethylene carbonate, 4-fluoro-4-methylethylene carbonate, 4,5-difluoro-4-methylethylene carbonate, 4-fluoro-5-methylethylene carbonate, 4,4-difluoro-5-methylethylene carbonate, 4-(fluoromethyl)-ethylene carbonate, 4-(difluoromethyl)-ethylene carbonate, 4-(trifluoromethyl)-ethylene carbonate, 4-(fluoromethyl)-4-fluoroethylene carbonate, 4-(fluoromethyl)-5-fluoroethylene carbonate, 4-fluoro-4,5-dimethylethylene carbonate, 4,5-difluoro-4,5-dimethylethylene carbonate, and 4,4-difluoro-5,

Appx588

JTX-002.0013

ATL_COSMX_0075294

15

5-dimethylethylene carbonate. The fluorinated cyclic carbonate esters may be used alone or in combination of two or more thereof.

In some embodiments, the content of the fluorinated cyclic carbonate ester is not less than about 0.1 wt % based on the total weight of the electrolyte. In some embodiments, the content of the fluoro cyclic carbonate ester is not less than about 0.5 wt %. In some embodiments, the content of the fluorinated cyclic carbonate ester is not less than about 2 wt %. In some embodiments, the content of the fluorinated cyclic carbonate ester is not less than about 4 wt %. In some embodiments, the content of the fluorinated cyclic carbonate ester is not greater than about 15 wt %. In some embodiments, the content of the fluorinated cyclic carbonate ester is not greater than about 10 wt %. In some embodiments, the content of the fluorinated cyclic carbonate ester is not greater than about 8 wt %.

In some embodiments, the compound having a sulfur-oxygen double bond according to the present application includes, but is not limited to: a cyclic sulfate ester, a chain sulfate ester, a chain sulfonate ester, a cyclic sulfonate ester, a chain sulfite ester, a cyclic sulfite ester, a chain sulfone, a cyclic sulfones, and so on. The compound having a sulfur-oxygen double bond may be used alone or in combination of two or more thereof.

In some embodiments, based on the total weight of the electrolyte, the content of the compound having a sulfur-oxygen double bond is not less than about 0.01 wt %. In some embodiments, the content of the compound having a sulfur-oxygen double bond is not less than about 0.1 wt %. In some embodiments, the content of the compound having a sulfur-oxygen double bond is not less than about 0.3 wt %. In some embodiments, the content of the compound having a sulfur-oxygen double bond is not less than about 0.5 wt %. In some other embodiments, the content of the compound having a sulfur-oxygen double bond is not greater than about 5 wt %. In some embodiments, the content of the compound having a sulfur-oxygen double bond is not greater than about 4 wt %. In some embodiments, the content of the compound having a sulfur-oxygen double bond is not greater than about 3 wt %.

In some embodiments, the cyclic sulfate ester according to the present application includes, but is not limited to: 1,2-ethylene glycol sulfate, 1,2-propylene glycol sulfate, 1,3-propylene glycol sulfate, 1,2-butylene glycol sulfate, 1,3-butylene glycol sulfate, 1,4-butylene glycol sulfate, 1,2-pentylene glycol sulfate, 1,3-pentylene glycol sulfate, 1,4-pentylene glycol sulfate, and 1,5-pentylene glycol sulfate. The cyclic sulfate ester may be used alone or in combination of two or more thereof.

In some embodiments, the chain sulfate ester according to the present application includes, but is not limited to: a dialkyl sulfate such as dimethyl sulfate, methyl ethyl sulfate, and diethyl sulfate. The chain sulfate ester may be used alone or in combination of two or more thereof.

In some embodiments, the chain sulfonate ester according to the present application includes, but is not limited to: methyl fluorosulfonate, ethyl fluorosulfonate, methyl methanesulfonate, ethyl methanesulfonate, butyl dimesylate, methyl 2-(methylsulfonyloxy)propionate, ethyl 2-(methylsulfonyloxy)propionate, methyl methylsulfonyloxyacetate, ethyl methylsulfonyloxyacetate, phenyl methylsulfonate, and pentafluorophenyl methylsulfonate. The chain sulfonate ester may be used alone or in combination of two or more thereof.

In some embodiments, the cyclic sulfonate ester according to the present application includes, but is not limited to:

16

1,3-propanesultone, 1-fluoro-1,3-propanesultone, 2-fluoro-1,3-propanesultone, 3-fluoro-1,3-propanesultone, 1-methyl-1,3-propanesultone, 2-methyl-1,3-propanesultone, 3-methyl-1,3-propanesultone, 1-propene-1,3-sultone, 2-propene-1,3-sultone, 1-fluoro-1-propene-1,3-sultone, 2-fluoro-1-propene-1,3-sultone, 3-fluoro-1-propene-1,3-sultone, 1-fluoro-2-propene-1,3-sultone, 2-fluoro-2-propene-1,3-sultone, 3-fluoro-2-propene-1,3-sultone, 1-methyl-1-propene-1,3-sultone, 2-methyl-1-propene-1,3-sultone, 3-methyl-1-propene-1,3-sultone, 1-methyl-2-propene-1,3-sultone, 2-methyl-2-propene-1,3-sultone, 3-methyl-2-propene-1,3-sultone, 1,4-butane sultone, 1,5-pentane sultone, methylene methanedisulfonate, and ethylene methanedisulfonate. The cyclic sulfonate ester may be used alone or in combination of two or more thereof.

In some embodiments, the chain sulfite ester according to the present application includes, but is not limited to: dimethyl sulfite, methyl ethyl sulfite, and diethyl sulfite. The chain sulfite ester may be used alone or in combination of two or more thereof.

In some embodiments, the cyclic sulfite ester according to the present application includes, but is not limited to: 1,2-ethylene glycol sulfite, 1,2-propylene glycol sulfite, 1,3-propylene glycol sulfite, 1,2-butylene glycol sulfite, 1,3-butylene glycol sulfite, 1,4-butylene glycol sulfite, 1,2-pentylene glycol sulfite, 1,3-pentylene glycol sulfite, 1,4-pentylene glycol sulfite, and 1,5-pentylene glycol sulfite. The cyclic sulfite ester may be used alone or in combination of two or more thereof.

In some embodiments, the chain sulfone ester according to the present application includes, but is not limited to: a dialkyl sulfone compound such as dimethyl sulfone, and diethyl sulfone.

In some embodiments, the cyclic sulfone according to the present application includes, but is not limited to: sulfolane, methyl sulfolane, 4,5-dimethyl sulfolane, and sulfolene. The cyclic sulfone may be used alone or in combination of two or more thereof.

Electrolyte

The electrolyte used in the electrolyte according to the embodiments of the present application may be an electrolyte known in the prior art, including, but not limited to: an inorganic lithium salt, for example $LiClO_4$, $LiAsF_6$, $LiPF_6$, $LiBF_4$, $LiSbF_6$, $LiSO_3F$, and $LiN(FSO_2)_2$; a fluorine-containing organic lithium salt, for example $LiCF_3SO_3$, $LiN(FSO_2)(CF_3SO_2)$, $LiN(CF_3SO_2)_2$, $LiN(C_2F_5SO_2)_2$, cyclic lithium 1,3-hexafluoropropane disulfonimide, cyclic lithium 1,2-tetrafluoroethane disulfonimide, $LiN(CF_3SO_2)(C_4F_9SO_2)$, $LiC(CF_3SO_2)_3$, $LiPF_4(CF_3)_2$, $LiPF_4(C_2F_5)_2$, $LiPF_4(CF_3SO_2)_2$, $LiPF_4(C_2F_5SO_2)_2$, $LiBF_2(CF_3)_2$, $LiBF_2(C_2F_5)_2$, $LiBF_2(CF_3SO_2)_2$, and $LiBF_2(C_2F_5SO_2)_2$; and a lithium salt containing a dicarboxylic acid complex, for example, lithium bis(oxalato)borate, lithium difluoro(oxalato)borate, lithium tris(oxalato)phosphate, lithium difluorobis(oxalato)phosphate, and lithiumtetrafluoro(oxalato)phosphate. In addition, the electrolyte may be used alone or in combination of two or more thereof. For example, in some embodiments, the electrolyte includes a combination of $LiPF_6$ and $LiBF_4$. In some embodiments, the electrolyte includes a combination of an inorganic lithium salt such as $LiPF_6$ or $LiBF_4$ and a fluorine-containing organic lithium salt such as $LiCF_3SO_3$, $LiN(CF_3SO_2)_2$, or $LiN(C_2F_5SO_2)_2$. In some embodiments, the concentration of the electrolyte is in the range of about 0.8-about 3 mol/L, for example, about 0.8-about 2.5 mol/L, about 0.8-about 2 mol/L, about 1-about 2 mol/L, for example, 1 mol/L, 1.15 mol/L, 1.2 mol/L, 1.5 mol/L, 2 mol/L or 2.5 mol/L.

ATL_COSMX_0075295

        

Solvent

The solvent used in the electrolyte according to the embodiments of the present application may be any non-aqueous solvent known in the art as a solvent for an electrolyte.

In some embodiments, the non-aqueous solvent useful in the present application includes, but is not limited to: a cyclic carbonate ester, a chain carbonate ester, a cyclic carboxylate ester, a chain carboxylate ester, a cyclic ether, a chain ether, a phosphorus-containing organic solvent, a sulfur-containing organic solvent, an aromatic fluorine-containing solvent or any combination thereof.

In some embodiments, the cyclic carbonate ester according to the present application generally has 3-6 carbon atoms, and includes, but is not limited to: for example, ethylene carbonate, propylene carbonate, butylene carbonate, and other cyclic carbonates.

In some embodiments, the chain carbonate ester according to the present application includes, but is not limited to: a chain carbonate ester such as dimethyl carbonate, ethyl methyl carbonate, diethyl carbonate, methyl n-propyl carbonate, ethyl n-propyl carbonate, and di-n-propyl carbonate; and a fluorinated chain carbonate ester, for example, bis(fluoromethyl) carbonate, bis(difluoromethyl) carbonate, bis(trifluoromethyl) carbonate, bis(2-fluoroethyl) carbonate, bis(2,2-difluoroethyl) carbonate, bis(2,2,2-trifluoroethyl) carbonate, 2-fluoroethylmethyl carbonate, 2,2-difluoroethylmethyl carbonate, and 2,2,2-trifluoroethylmethyl carbonate.

In some embodiments, the cyclic carboxylate ester according to present application includes, but is not limited to: γ-butyrolactone, γ-valerolactone, and the like, and a cyclic carboxylate ester some hydrogen atoms of which are substituted with fluorine.

In some embodiments, the chain carboxylate ester according to the present application includes, but is not limited to: methyl acetate, ethyl acetate, propyl acetate, isopropyl acetate, butyl acetate, sec-butyl acetate, isobutyl acetate, tert-butyl acetate, methyl propionate, ethyl propionate, propyl propionate, isopropyl propionate, methyl butyrate, ethyl butyrate, propyl butyrate, methyl isobutyrate, ethyl isobutyrate, methyl valerate, ethyl valerate, methyl pivalate and ethyl pivalate or the like, and a chain carboxylate ester some hydrogen atoms of which are substituted with fluorine. The fluorinated chain carboxylate ester includes, but is not limited to: methyl trifluoroacetate, ethyl trifluoroacetate, propyl trifluoroacetate, butyl trifluoroacetate and 2,2,2-trifluoroethyl trifluoroacetate.

In some embodiments, the cyclic ether according to the present application includes, but is not limited to: tetrahydrofuran, 2-methyltetrahydrofuran, 1,3-dioxolan, 2-methyl-1,3-dioxolane, 4-methyl-1,3-dioxolane, 1,3-dioxane, 1,4-dioxane and dimethoxypropane. In some embodiments, the chain ether according to the present application includes, but is not limited to: dimethoxymethane, 1,1-dimethoxyethane, 1,2-dimethoxyethane, diethoxymethane, 1,1-diethoxyethane, 1,2-di ethoxyethane, ethoxymethoxymethane, 1,1-ethoxymethoxyethane and 1,2-ethoxymethoxyethane.

In some embodiments, the phosphorus-containing organic solvent according to the present application includes, but is not limited to: trimethyl phosphate, triethyl phosphate, dimethyl ethyl phosphate, methyl diethyl phosphate, ethylene methyl phosphate, ethylene ethyl phosphate, triphenyl phosphate, trimethyl phosphite, triethyl phosphite, triphenyl phosphite, tris(2,2,2-trifluoroethyl) phosphate and tris(2,2,3,3,3-pentafluoropropyl) phosphate.

In some embodiments, the sulfur-containing organic solvent according to the present application includes, but is not limited to: sulfolane, 2-methylsulfolane, 3-methylsulfolane, dimethyl sulfone, diethyl sulfone, ethyl methyl sulfone, methyl propyl sulfone, dimethyl sulfoxide, methyl methanesulfonate, ethyl methanesulfonate, methyl ethanesulfonate, ethyl ethanesulfonate, dimethyl sulfate, diethyl sulfate and dibutyl sulfate, as well as a sulfur-containing organic solvent some hydrogen atoms of which are substituted with fluorine.

In some embodiments, the aromatic fluorine-containing organic solvent according to the present application includes, but is not limited to: fluorobenzene, difluorobenzene, trifluorobenzene, tetrafluorobenzene, pentafluorobenzene, hexafluorobenzene, and trifluoromethylbenzene.

In some embodiments, the non-aqueous solvent of the present application may be used alone, or in combination of two or more thereof:

II. Electrochemical Device

The electrochemical device of the present invention includes any device in which an electrochemical reaction takes place, and specific examples include all kinds of primary batteries, secondary batteries, fuel cells, solar cells, or capacitors. In particular, the electrochemical device is a lithium secondary battery including a lithium metal secondary battery, a lithium ion secondary battery, a lithium polymer secondary battery or a lithium ion polymer secondary battery. In some embodiments, the electrochemical device of the present application is an electrochemical device having a cathode having a cathode active material capable of absorbing and releasing metal ions; an anode having a anode active material capable of absorbing and releasing metal ions, and characterized by comprising any of the electrolytes of the present application.

Electrolyte

The electrolyte used in the electrochemical device of the present application is any of the aforementioned electrolytes according to the present application. Moreover, the electrolyte used in the electrochemical device of the present application may include other electrolytes falling within the scope of present application.

Anode

The anode material used in the electrochemical device according to the embodiments of the present application can be prepared using materials, construction and manufacturing methods well known in the art. For example, the anode of the present application can be prepared using the technique described in U.S. Pat. No. 9,812,739B, the entire contents of which are incorporated herein by reference.

In some embodiments, the anode active material is any substance capable of electrochemically absorbing and releasing a metal ion such as lithium ion. In some embodiments, the anode active material includes a carbonaceous material, a silicon-carbon material, an alloy material or a lithium-containing metal composite oxide material. In some embodiments, the anode active material includes one or more of those described above.

In some embodiments, the anode can be formed by adding a binder and a solvent to, and if necessary, adding a thickener, a conductive material, a filler, or the like the anode active material, to prepare a slurry, coating the slurry to a current collector, drying, and then pressing.

In some embodiments, when the anode includes an alloy-based material, a thin film layer (anode active material layer) as an anode active material can be formed by vapor deposition, sputtering, or plating.

In some embodiments, when the anode includes lithium metal, an anode active material layer is formed from, for

ATL_COSMX_0075296

example, a conductive skeleton of twisted spherical shape and metal particles dispersed in the conductive skeleton, wherein the conductive skeleton of twisted spherical shape may have a porosity of about 5% to about 85%, and a protective layer may be further disposed on the anode active material layer of lithium metal.

Cathode

The cathode material used in the electrochemical device of the present application can be prepared using materials, construction and manufacturing methods well known in the art. In some embodiments, the cathode of the present application can be prepared using the technique described in U.S. Pat. No. 9,812,739B, the entire contents of which are incorporated herein by reference.

In some embodiments, the cathode active material includes, but is not limited to: a sulfide, a phosphate salt compound and a lithium-transition metal composite oxide. In some embodiments, the cathode active material includes a lithium-transition metal compound which has a structure capable of removing and intercalating lithium ions. In some embodiments, the composition of the lithium-transition metal compound can refer to the technical content described in U.S. Pat. No. 9,812,739B.

In some embodiments, the cathode is prepared by forming a cathode material from a cathode active material layer including a lithium-transition metal compound powder and a binder on a current collector.

In some embodiments, the cathode active material layer can generally be produced by: dry mixing a cathode material and a binder (and a conductive material and a thickener, if necessary) to form flakes, pressing the obtained flakes on a cathode current collector or dissolving or dispersing the material in a liquid medium to form a slurry, coating the slurry on a cathode current collector, and drying. In some embodiments, the material of the cathode active material layer includes any material known in the art. In some embodiments, the cathode active material layer includes materials described in U.S. Pat. No. 9,812,739B.

Electrode Compaction Density

The electrochemical device of the present application comprises a cathode and an anode, a separator and an electrolyte. The electrode includes a current collector and a coating on the current collector. The coating includes a single-sided coating, a double-sided coating, or a combination thereof. The single-sided coating is a coating formed by applying a slurry on one surface of the current collector. The double-sided coating is a coating formed by applying a slurry on two opposite surfaces of the current collector.

In some embodiments, as shown in FIG. **2**, an electrode A includes a current collector **1** and a coating **2** on the current collector **1**. As shown in FIG. **2**, the coating **2** is only present on one surface of the current collector, and such coating is a single-sided coating.

In some embodiments, as shown in FIG. **3**, an electrode B includes a current collector **1** and a coating **2** on the current collector. As shown in FIG. **3**, the coating **2** is present on two opposite surfaces of the current collector, and such coating is a double-sided coating.

In some embodiments, as shown by an electrode C in FIG. **4**, one surface of a portion of a current collector **1** is coated with a slurry to form a coating **2** and the two opposite surfaces of the other portion of the current collector **1** are coated with a slurry to form a coating **2**. Such coating includes both a single-sided coating and a double-sided coating.

In a wound electrochemical device, the cathode and the cathode are usually each formed by winding an elongated

electrode, so that both a single-sided coating and a double-sided coating are present on the elongated electrode. In a laminated electrochemical device, the cathode and the anode are usually formed by laminating-shaped electrode s, and there is only a single-sided coating or a double-sided coating on the same electrode. In an electrochemical device in which the wound and laminated electrode s are assembled in combination, the cathode and anode generally comprise an elongated electrode having both a single-sided coating and a double-sided coating, and a -shaped electrode having only a single-sided coating or a double-sided coating.

The electrode has an electrode compaction density. The electrode compaction density is obtained by: measuring the thickness of an electrode using a precise measurement tool, such as a ten-thousandths micrometer; then taking the electrode of a certain area and accurately measuring the area and weight; and calculating the electrode compaction density by a formula below:

$$\text{Electrode compaction density} = (\text{Weight of electrode} - \text{Weight of current collector})/\text{Area of electrode}/(\text{Thickness of electrode} - \text{Thickness of current collector})$$

A lower compaction density makes the porosity higher, making some of the particles in an insulating state, and unable to participate in charge and discharge, thereby resulting in a low specific discharge capacity, thus affecting the performance of the electrochemical device. A too high compaction density may cause difficulty in infiltrability of the electrolyte and decrease in solution retention, such that the cycle and rate performances cannot be guaranteed. Properly controlling the electrodecompaction density of the single-sided and double-sided coating is important to obtain electrochemical devices with high capacity density, and excellent cycle and storage performances.

In some embodiments, the electrode with a single-sided coating has an electrode compaction density D1, and an electrode with a double-sided coating has an electrode compaction density D2, and D1 and D2 meet the relationship: about $0.8 \leq D1/D2 \leq$ about 1.2, under this circumstance, the effects of the cathode and anode active materials are well exerted, so that the electrode can obtain good electrical conductivity, which is also important to control the expansion of electrochemical devices. Therefore, the obtained electrochemical device has high capacity density and excellent cycle and storage performances.

In some embodiments, D1 and D2 meet the relationship: about $0.9 \leq D1/D2 \leq$ about 1.1. Under this circumstance, the performance of the electrochemical device can be further improved.

In some embodiments, D1 and D2 meet the relationship: about $0.9 \leq D1/D2 \leq$ about 1.1.

In some embodiments, D1 and D2 meet the relationship: about $0.95 \leq D1/D2 \leq$ about 1.05. Under this circumstance, the distributions of pores and pore sizes in the single-sided coating and the double-sided coating are more uniform, the distributions of the conductive agent and the binder are more uniform, the contact resistance and charge exchange resistance of the electrode are lowered, and the active area capable of participating in the reaction is increased, thereby significantly improving the electrochemical performance of the material and further improving the performances of the electrochemical device.

In some embodiments, the electrode may be a cathode or an anode. When the electrode is a cathode, about 3.5 g/cm³ $\leq D2 \leq$ about 4.3 g/cm³. When D2 is within this range, the cathode can have good electrical conductivity, and the effect of the cathode active material can be well exerted.

ATL_COSMX_0075297

When the electrode is an anode, about $1.2 \text{ g/cm}^3 \leq D2 \leq$ about $1.8 \text{ g/cm}^3$. When D2 is within this range, the anode can have a higher breaking strength, thereby preventing the electrode particles from falling off during the cycle.

Separator

In some embodiments, the electrochemical device of the present application is provided with a separator between the positive electrode and the negative electrode to prevent short circuit. The material and shape of the separator used in the electrochemical device of the present application are not particularly limited, and may be any of the techniques disclosed in the prior art. In some embodiments, the separator includes a polymer or an inorganic substance or the like formed from a material which is stable to the electrolyte of the present application.

For example, the separator may include a substrate layer and a surface treatment layer. The substrate layer is a non-woven fabric, film, or composite film having a porous structure, and the material of the substrate layer is at least one selected from polyethylene, polypropylene, polyethylene terephthalate, and polyimide. Particularly, a porous polypropylene film, a porous polyethylene film, a polypropylene nonwoven fabric, a polyethylene nonwoven fabric, or a porous polypropylene-polyethylene-polypropylene composite film may be used.

At least one surface of the substrate layer is provided with a surface treatment layer, which may be a polymer layer or an inorganic layer, or a layer formed by mixing a polymer and an inorganic substance.

The inorganic layer comprises inorganic particles and a binder. The inorganic particles are one or more selected from alumina, silica, magnesia, titanium oxide, hafnium dioxide, tin oxide, cerium dioxide, nickel oxide, zinc oxide, calcium oxide, zirconia, yttria, silicon carbide, boehmite, aluminum hydroxide, magnesium hydroxide, calcium hydroxide and barium sulfate. The binder is one or more selected from polyvinylidene fluoride, a copolymer of vinylidene fluoride-hexafluoropropylene, a polyamide, polyacrylonitrile, a polyacrylate ester, polyacrylic acid, a polyacrylate salt, polyvinylpyrrolidone, polyvinyl ether, polymethyl methacrylate, polytetrafluoroethylene, and polyhexafluoropropylene. The polymer layer contains a polymer, and the material of the polymer includes at least one of a polyamide, polyacrylonitrile, a polyacrylate ester, polyacrylic acid, a polyacrylate salt, polyvinylpyrrolidone, polyvinyl ether, polyvinylidene fluoride or poly(vinylidene fluoride-hexafluoropropylene).

III. Application

At a high voltage, the oxidizability of the cathode material is increased, and the stability is lowered, which makes the electrolyte easily decompose on the surface of the positive electrode or results in deterioration of the materials of the electrochemical device, so that the capacity of the electrochemical device is decreased. Prior to the present application, the primary solution is to add a film-forming additive to the electrolyte. However, doing so will cause an increase in the DC internal resistance of the battery, thereby resulting in a decrease in the cycle performance and a decrease in the capacity retention rate.

The electrolyte according to the embodiments of the present application can be used to inhibit the increase in DC internal resistance of an electrochemical device, and thus applicable to an electronic device comprising the electrochemical device.

The use of the electrochemical device according to the present application is not particularly limited, and can be used in various known applications, such as notebook computers, pen-input computers, mobile computers, e-book players, portable phones, portable fax machines, portable copiers, portable printers, head-mounted stereo headphones, video recorders, LCD TVs, portable cleaners, portable CD players, Mini discs, transceivers, electronic notebooks, calculators, memory cards, portable recorders, radios, backup power sources, motors, vehicles, motorcycles, motorbicycle, bicycles, lighting apparatus, toys, game consoles, clocks, electric tools, flashing light, cameras, large batteries for household use, or lithium ion capacitors.

EXAMPLES

Hereinafter, the present application will be specifically described by way of examples and comparative examples; however, the present application is not limited thereto as long as they do not deviate from the spirit of the present application.

1. Preparation of Lithium-Ion Battery

(1) Preparation of an Anode

Graphite, conductive carbon black (Super-P), styrene-butadiene rubber, and sodium carboxymethyl cellulose (CMC) were mixed at a weight ratio of about 95:2:2:1 in deionized water as a solvent, and stirred uniformly, to obtain an anode slurry. The slurry was coated on a copper foil having a thickness of about 12 μm, dried, cold pressed, and cut, and then a tab was welded, to obtain an anode.

(2) Preparation of a Cathode

Lithium cobalt oxide ($LiCoO_2$), conductive carbon black (Super-P), and polyvinylidene fluoride (PVDF) were mixed at a weight ratio of about 95:2:3 in N-methylpyrrolidone as a solvent, and stirred uniformly, to obtain a cathode slurry. The slurry was coated on an aluminum foil having a thickness of about 12 μm, dried, cold pressed, and cut, and then a tab was welded, to obtain a cathode.

(3) Preparation of an Electrolyte:

Under a dry argon atmosphere, EC, PC, and DEC (at a weight ratio of about 1:1:1) were mixed, and then $LiPF_6$ was added and mixed uniformly, to form a basic electrolyte, in which the concentration of $LiPF_6$ is 1.15 mol/L. Different amounts of substances shown in Tables 1-1 to 9 were added to the basic electrolyte to obtain the electrolytes of different examples and comparative examples, wherein the contents of each substance in the electrolyte described below were obtained based on the total weight of the electrolyte.

(4) Preparation of a Separator

A porous PE polymer film was used as a separator.

(5) Preparation of Lithium-Ion Battery

The obtained cathode, anode and separator were wound in sequence and placed in the outer packaging foil, with a liquid injection port being left. The electrolyte was injected via the liquid injection port, encapsulated, formed and capacity graded to obtain a lithium ion battery. The fresh battery herein refers to a battery which is obtained through aforementioned preparation process and is ready for shipping.

ATL_COSMX_0075298

23

24

## 2. Test Methods of Battery Performance

(1) Test Method for Change in DC Internal Resistance at 20% SOC

At 25° C., the battery was charged to 4.45 V at a constant current of 1 C (nominal capacity) and then charged to a current of ≤0.05 C at a constant voltage of 4.45 V, allowed to stand for 5 min, and discharged to a cut-off voltage of 3 V at a constant current of 1 C. The actual discharge capacity was recorded. The battery was adjusted to 50% of the full charge capacity required with the actual capacity, continuously discharged for 10 s at a current of 0.3 C. The DC internal resistances (DCIRs) (average of the measurements from 15 batteries) after one cycle, 200 cycles and 400 cycles was obtained by dividing the current with the difference between the voltage before discharge and the voltage at the end of discharge.

(2) Test Method for Storage Performance at High Temperature of 60° C.

The battery was allowed to stand at 25° C. for 30 minutes, charged to 4.45 V at a constant current of 0.5 C and then charged to 0.05 C at a constant voltage of 4.45 V, allowed to stand for 5 minutes, and then stored at 60° C. for 21 days. The thickness expansion rate of the battery was measured and calculated by a formula below:

(4) Test Method for Voltage Drop

At 25° C., the battery was charged to 4.45 V at a constant current of 1 C and then charged to a current of 0.05 C at a constant voltage, discharged to 3.2 V at a constant current of 1 C, and allowed to stand for 5 minutes. Then the voltage was tested, and after 24 h's storage at 85° C., the voltage was tested again. Voltage drop=Voltage before storage−Voltage after storage.

(5) Intermittent Cycle Test Method

At 50° C., the lithium ion battery was charged to 4.45 V at a constant voltage of 0.5 C and then to a cut-off current of 0.05 C at a constant current, allowed to stand for 20 h, and then discharged to 3.0 V at a constant current of 0.5 C. Repeating charge/discharge as above, the capacity retention rate of the fresh battery, and the battery after 30, 50, and 100 cycles was calculated respectively. Capacity retention rate after cycles=(Discharge capacity after corresponding cycles/Discharge capacity of the first cycle)×100%

## 3. Test Results

The abbreviations for the chemical materials used in the examples of present application are shown in the following two tables:

| Material | Abbreviation | Material Name | Abbreviation |
|---|---|---|---|
| Ethylene carbonate | EC | 1,3-propanesultone | PS |
| Propylene carbonate | PC | Ethylene sulfate | DTD |
| Ethyl methyl carbonate | EMC | Butanedinitrile | SN |
| Dimethyl carbonate | DMC | Adiponitrile | ADN |
| | | 1,4-dicyano-2-butene | DCB |
| Diethyl carbonate | DEC | 1,3,6-Hexanetricarbonitrile | HTCN-1 |
| γ-butyrolactone | GBL | 1,2,6-Hexanetricarbonitrile | HTCN-2 |
| γ-valerolactone | VL | 1,3,5-Pentanetricarbonitrile | PTCN |
| Ethyl propionate | EP | Ethylene glycol bis(2-cyanoethyl) ether | EDN |
| Propyl propionate | PP | 1,1-difluoro-2,2-difluoroethyl-2',2'difluoro-3',3'-difluoropropyl ether | FEPE |
| | | 2-trifluoromethyl-3-methoxyperfluoropentane | TMMP |
| | | 2-(trifluoro-2-fluoro-3-difluoro)-3-difluoro-4-fluoro-5-trifluoropentane | TPTP |
| Vinylene carbonate | VC | 1-Propylphosphonic cyclic anhydride | T3P |
| Fluoroethylene carbonate | FEC | 1-Methylphosphonic cyclic anhydride | TM3P |
| | | 1-Ethylphosphonic cyclic anhydride | TE3P |
| | | 1,2,3-tris(2-cyanoethoxy)propane | TCEP |

Thickness expansion rate=[(Thickness after storage−Thickness before storage)/Thickness before storage]×100%

(3) Test Method for Battery Capacity Retention Rate

At 45° C., the battery was charged to 4.45 V at a constant current of 1 C and then charged to a current of 0.05 C at a constant voltage, and discharged to 3.0 V at a constant current of 1 C, the above being the first cycle. Multiple cycles were performed on the battery under the above conditions. The capacity retention rate of the fresh battery and the battery after 200 cycles and 400 cycles was calculated respectively. The capacity retention rate after cycles is calculated by a formula below:

Capacity retention rate after the cycle=(Discharge capacity after corresponding cycles/Discharge capacity after the first cycle)×100%

| | | |
|---|---|---|
| Dinitrile compound | A | $A_1$: SN; $A_2$: ADN; $A_3$: EDN; $A_4$: DCB |
| Trinitrile compound | B | $B_1$: HTCN-1; $B_2$: HTCN-2; $B_3$: PTCN; $B_4$: TCEP |
| Propyl propionate (PP) | C | |
| Fluoroether | D | $D_1$: FEPE; $D_2$: TMMP; $D_3$: TPTP |
| Cyclic phosphonic anhydride | E | $E_1$: T3P $E_2$: TM3P; $E_3$: TE3P |
| Other additives | F | $F_1$: VC; $F_2$: PS; $F_3$: DTD |
| Cyclic carboxylate ester | H | $H_1$: GBL; $H_2$: VL |
| Single- and double-side compaction density | G | |

(1) Different amounts of a compound comprising two cyano groups, a compound comprising three cyano groups and/or propyl propionate as shown in Tables 1-1 and 1-2 were added to the basic electrolyte. The electrolyte was

ATL_COSMX_0075299

injected into a battery prepared according to the above method. The DC internal resistance at 20% SOC of the batteries was tested. The test results are shown in Tables 1-1 and 1-2.

and Y meet about 2 wt %≤(X+Y)≤about 8 wt % and about 0.1≤(X/Y)≤about 6, the combination of the additives can exhibit synergistic effect and can sufficiently suppress the increase in DC internal resistance.

TABLE 1-1

| | $A_1$ (X wt %) | $B_1$ (Y wt %) | C (Z wt %) | X + Y | X/Y | DC internal resistance (mΩ) at 20% SOC | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Fresh Battery | After 200 cycles | After 400 cycles |
| S1-1 | 4 | 1 | 30 | 5 | 4 | 50.8 | 84.3 | 91.2 |
| S1-2 | 4 | 2 | 30 | 6 | 2 | 54.4 | 88.0 | 98.6 |
| S1-3 | 4 | 3 | 30 | 7 | 1.3 | 55.7 | 88.9 | 99.4 |
| S1-4 | 4 | 0.5 | 30 | 4.5 | 8 | 57.8 | 92.0 | 101.0 |
| S1-5 | 3 | 0.5 | 30 | 3.5 | 6 | 57.1 | 91.2 | 93.5 |
| S1-6 | 4 | 0.4 | 30 | 4.2 | 10 | 55.9 | 99.4 | 112.8 |
| S1-7 | 3 | 2 | 30 | 5 | 1.5 | 52.3 | 84.4 | 91.5 |
| S1-8 | 2 | 2 | 30 | 4 | 1 | 51.9 | 84.2 | 91.4 |
| S1-9 | 1 | 2 | 30 | 3 | 0.5 | 52.3 | 86.5 | 92.4 |
| S1-10 | 0.5 | 2 | 30 | 2.5 | 0.25 | 54.8 | 79.4 | 102.5 |
| S1-11 | 0.2 | 2 | 30 | 2.2 | 0.1 | 59.2 | 91.8 | 105.3 |
| S1-12 | 1 | 5 | 30 | 6 | 0.2 | 58.5 | 97.0 | 104.1 |
| S1-13 | 7 | 3 | 30 | 10 | 2.3 | 60.4 | 92.9 | 107.3 |
| D1-1 | 0 | 0 | 0 | 0 | 0 | 63.8 | 140.9 | 190.4 |
| D1-2 | 0 | 1 | 0 | 1 | 0 | 62.3 | 138.5 | 188.2 |
| D1-3 | 4 | 0 | 0 | 4 | 0 | 61.8 | 136.5 | 184.2 |
| D1-4 | 0.1 | 1 | 0 | 1.1 | 0.1 | 63.8 | 120.9 | 126.4 |
| D1-5 | 4 | 0.1 | 0 | 4.1 | 40 | 68.3 | 109.8 | 124.9 |
| D1-6 | 7 | 5 | 0 | 12 | 1.4 | 69.2 | 112.3 | 133.0 |
| D1-7 | 1 | 11 | 0 | 12 | 0.09 | 63.8 | 100.9 | 139.3 |
| D1-8 | 11 | 1 | 0 | 12 | 10 | 72.0 | 116.3 | 135.4 |

TABLES 1-2

| | A (X wt %) | B (Y wt %) | C (Z wt %) | X + Y | X/Y | DC internal resistance (mΩ) at 20% SOC | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Fresh Battery | After 200 cycles | After 400 cycles |
| S1-14 | $A_2(4)$ | $B_2(3)$ | 30 | 7 | 1.3 | 55.5 | 88.1 | 98.7 |
| S1-15 | $A_2(4)$ | $B_2(0.5)$ | 30 | 4.5 | 8 | 57.2 | 91.6 | 100.6 |
| S1-16 | $A_2(3)$ | $B_2(0.5)$ | 30 | 3.5 | 6 | 55.9 | 89.4 | 98.8 |
| S1-17 | $A_3(3)$ | $B_3(2)$ | 30 | 5 | 1.5 | 51.1 | 82.6 | 90.7 |
| S1-18 | $A_3(2)$ | $B_3(2)$ | 30 | 4 | 1 | 51.2 | 83.3 | 90.5 |
| S1-19 | $A_3(1)$ | $B_3(2)$ | 30 | 3 | 0.5 | 51.3 | 85.1 | 91.1 |
| S1-20 | $A_3(0.5)$ | $B_4(2)$ | 30 | 2.5 | 0.25 | 54.3 | 79.1 | 90.1 |
| S1-21 | $A_2(0.2)$ | $B_2(2)$ | 30 | 2.2 | 0.1 | 58.5 | 91.2 | 104.8 |
| S1-22 | $A_2(1)$ | $B_2(5)$ | 30 | 6 | 0.2 | 58.1 | 96.5 | 103.3 |
| S1-23 | $A_2(7)$ | $B_2(3)$ | 30 | 10 | 2.3 | 60.2 | 92.3 | 106.5 |
| S1-24 | $A_4(2)$ | $B_3(2)$ | 30 | 4 | 1 | 57.9 | 86.1 | 93.4 |

As shown in Table 1-1, in Comparative Examples D1-1 to D1-8, butanedinitrile or 1,3,6-hexanetricarbonitrile was added alone, and no propyl propionate was added. The DC internal resistance of the battery was significantly increased after cycles.

When butanedinitrile, 1,3,6-hexanetricarbonitrile and propyl propionate were used in Examples S1-1 to S1-13 simultaneously, the increase in DC internal resistance of the battery after cycles was obviously inhibited.

When the propyl propionate content is kept unchanged, and the relation between the butanedinitrile content X and the 1,3,6-hexanetricarbonitrile content Y is adjusted, it is found that when X and Y meet the conditions represented by both Formula (1) and Formula (2): {about 2 wt %≤(X+Y)≤about 11 wt % . . . (1); and about 0.1≤(X/Y)≤about 8 . . . (2)}, the inhibition effect on the increase in DC internal resistance of the battery after cycles is remarkable. When X

FIG. 1a shows the DC internal resistances of fresh batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC). FIG. 1b shows the DC internal resistances of batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC) after 200 cycles of charge and discharge. FIG. 1c shows the DC internal resistances of batteries of Examples S1-1 and S1-2 of the present application and Comparative Example D1-1 at different charge states (10% SOC, 20% SOC, and 70% SOC) after 400 cycles of charge and discharge. It can be seen that the increase in DC internal resistance during cycles in Examples S1-1 and S1-2 is significantly improved compared with Comparative Example D1-1.

As shown in Table 1-2, when the dinitrile compound is adiponitrile or ethylene glycol bis(2-cyanoethyl)ether, and

ATL_COSMX_0075300

27

the trinitrile compound is 1,2,6-hexanetricarbonitrile, 1,3,6-Hexanetricarbonitrile, or 1,2,3-tris(2-cyanoethoxy)propane, the effect of inhibiting the increase in DC internal resistance can also be achieved. When the dinitrile compound is ethylene glycol bis(2-cyanoethyl)ether, or the trinitrile compound is 1,2,3-tris(2-cyanoethoxy)propane, the effect of inhibiting the increase in DC internal resistance of the battery after cycles is more significant.

(2) Different amounts of a compound comprising two cyano groups, a compound comprising three cyano groups and/or propyl propionate as shown in Table 2 were added to the basic electrolyte. The electrolyte was injected into a battery prepared according to the above method. The DC internal resistance at 20% SOC of the battery was tested. The test results are shown in Table 2.

TABLE 2

| | C (Z wt %) | $A_1$ (X wt %) | $B_1$ (Y wt %) | Y/Z | DC internal resistance (mΩ) at 20% SOC | | |
| | | | | | Fresh battery | After 200 cycles | After 400 cycles |
|---|---|---|---|---|---|---|---|
| S1-1 | 30 | 4 | 1 | 0.03 | 50.8 | 84.3 | 91.2 |
| S2-1 | 5 | 4 | 1 | 0.2 | 68.7 | 85.2 | 97.6 |
| S2-2 | 10 | 4 | 1 | 0.1 | 60.3 | 83.1 | 95.7 |
| S2-3 | 20 | 4 | 1 | 0.05 | 56.1 | 81.6 | 93.9 |
| S2-4 | 40 | 4 | 1 | 0.025 | 47.5 | 78.2 | 87.2 |
| S2-5 | 50 | 4 | 1 | 0.02 | 56.3 | 82.6 | 98.3 |
| S2-6 | 10 | 4 | 3 | 0.3 | 64.3 | 89.5 | 97.7 |
| S2-7 | 50 | 4 | 0.5 | 0.01 | 53.2 | 84.3 | 94.1 |
| D2-1 | 4 | 4 | 1 | 0.25 | 72.1 | 108.5 | 118.9 |
| D2-2 | 60 | 4 | 1 | 0.017 | 42.0 | 100.1 | 113.9 |
| D2-3 | 10 | 4 | 5 | 0.5 | 62.3 | 85.4 | 111.3 |
| D2-4 | 50 | 4 | 0.1 | 0.0025 | 53.2 | 89.3 | 109.4 |

As shown in Table 2, when the content of propyl propionate is within the range of 5 wt % to 50 wt %, the DC internal resistance of the fresh battery decreases continuously with the propyl propionate content increasing. In addition, when the content of the propyl propionate is less than 5 wt % or greater than 50 wt %, the DC internal resistance of the battery is greatly increased after 200 cycles, and the performance is deteriorated. The combination of additives can form a cathode protection film so as to reduce the side reactions, thereby effectively controlling the polarization and side reactions of the battery. The ratio of the content of the trinitrile compound to the content of propyl propionate has great effect on the change in DC internal resistance of the battery. When Y/Z is within the range of 0.01-0.3, a better inhibition effect on the increase in DC internal resistance is achieved.

(3) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetricarbonitrile (B1) and a fluoroether of different contents as shown in Table 3 were added. The obtained electrolyte was

28

injected to a battery prepared according to the above method. The DC internal resistance at 20% SOC and the 21-day thickness expansion rate at 60° C. were tested. The test results are shown in Table 3.

TABLE 3

| | D (content, wt %) | DC internal resistance (mΩ) of fresh battery at 20% SOC | 21-day thickness expansion rate at 60° C. |
|---|---|---|---|
| S1-1 | 0 | 50.8 | 7.6% |
| S3-1 | $D_1$(0.1) | 50.2 | 6.2% |
| S3-2 | $D_1$(0.5) | 49.8 | 6.0% |
| S3-3 | $D_1$(1) | 48.6 | 5.7% |
| S3-4 | $D_1$(1.5) | 48.5 | 5.1% |
| S3-5 | $D_1$(2) | 48.4 | 4.8% |
| S3-6 | $D_1$(2.5) | 48.3 | 4.9% |
| S3-7 | $D_1$(3) | 48.1 | 5.6% |
| S3-8 | $D_1$(5) | 49.3 | 6.8% |
| S3-9 | $D_2$(1) | 49.2 | 6.1% |

TABLE 3-continued

| | D (content, wt %) | DC internal resistance (mΩ) of fresh battery at 20% SOC | 21-day thickness expansion rate at 60° C. |
|---|---|---|---|
| S3-10 | $D_3$(1) | 49.4 | 5.7% |
| D3-1 | $D_1$(6) | 51.3 | 8.5% |

As can be seen from Table 3, with the addition of fluoroether (0.1-5 wt %), the DC internal resistance and the thickness expansion rate of the fresh battery are improved to a certain extent, and the storage performance is slightly decreased when the addition amount is large, but it is still within the desired range. When the fluoroether content is more than 5 wt %, the DC internal resistance and the thickness expansion rate after storage at 60° C. of the fresh battery are deteriorated.

(4) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetricarbonitrile (B1) and a cyclic phosphonic anhydride of different contents as shown in Table 4 were added. The obtained electrolyte was injected to a battery prepared according to the above method. The DC internal resistance at 20% SOC and the capacity retention ratio of the battery were tested. The test results are shown in Table 4.

ATL_COSMX_0075301

TABLE 4

| | E (content, wt %) | DC internal resistance (mΩ) at 20% SOC | | | Capacity retention rate | | |
|---|---|---|---|---|---|---|---|
| | | Fresh battery | After 200 cycles | After 400 cycles | Fresh battery | After 200 cycles | After 400 cycles |
| S1-1 | 0 | 50.8 | 84.3 | 91.2 | 100% | 93.5% | 86.3% |
| S4-1 | $E_1(0.1)$ | 48.3 | 51.5 | 88.2 | 100% | 95.7% | 90.1% |
| S4-2 | $E_1(0.5)$ | 45.4 | 48.2 | 82.3 | 100% | 96.3% | 91.4% |
| S4-3 | $E_1(1)$ | 44.6 | 47.1 | 80.5 | 100% | 96.1% | 90.7% |
| S4-4 | $E_1(2)$ | 45.6 | 47.3 | 81.6 | 100% | 95.2% | 89.6% |
| S4-5 | $E_1(3)$ | 45.9 | 49.1 | 89.4 | 100% | 94.7% | 88.5% |
| S4-6 | $E_2(1)$ | 45.2 | 48.3 | 88.3 | 100% | 95.3% | 91.0% |
| S4-7 | $E_3(1)$ | 45.3 | 48.7 | 89.5 | 100% | 95.1% | 90.8% |
| D4-1 | $E_1(4)$ | 46.1 | 58.6 | 105.3 | 100% | 92.1% | 85.3% |

It can be seen from Table 4 that with the addition of cyclic phosphonic anhydride (0.1-3 wt %), the DC internal resistance of the fresh battery and the battery after cycles is improved to a certain extent, which may be attributed to the relatively stable structure of the composite protective film formed by the combined additives; and the cycle performance is improved first and then deteriorated with the addition of the cyclic phosphonic anhydride. When the content is more than 3 wt %, the cycle performance is affected, which may be caused by the decomposition of the cyclic phosphonic anhydride.

(5) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetrinitrile (B1) and a fluoroether and a cyclic phosphonic anhydride of different contents as shown in Table 5 were added. The obtained electrolyte was injected to a battery prepared according to the above method. The DC internal resistance at 20% SOC, the 21-day thickness expansion rate at 60° C., and the capacity retention rate of the battery were tested. The test results are shown in Table 5.

TABLE 5

| | $D_1$ (content: wt %) | $E_1$ (content: wt %) | DC internal resistance (mΩ) at 20% SOC | | | 21-day thickness expansion rate at 60° C. | Capacity retention rate | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Fresh battery | After 200 cycles | After 400 cycles | | Fresh battery | After 200 cycles | After 400 cycles |
| S1-1 | 0 | 0 | 50.8 | 84.3 | 91.2 | 7.6% | 100% | 93.5% | 86.3% |
| S3-1 | 0.1 | 0 | 50.2 | 83.1 | 90.4 | 6.2% | 100% | 94.2% | 87.9% |
| S4-2 | 0 | 0.5 | 45.4 | 48.2 | 82.3 | 6.7% | 100% | 96.3% | 91.4% |
| S5-1 | 0.1 | 0.5 | 44.7 | 47.2 | 80.8 | 6.0% | 100% | 96.4% | 91.6% |
| S5-2 | 1 | 0.5 | 43.8 | 46.3 | 80.5 | 5.3% | 100% | 96.8% | 91.7% |
| S5-3 | 1 | 0.3 | 44.1 | 48.2 | 79.3 | 4.3% | 100% | 97.1% | 92.3% |
| S5-4 | 1 | 0.1 | 46.3 | 50.5 | 86.2 | 4.5% | 100% | 97.6% | 92.9% |
| S5-5 | 3 | 2 | 43.5 | 47.1 | 81.3 | 4.0% | 100% | 94.8% | 89.4% |

As can be seen from Table 5, with the addition of the fluoroether and the cyclic phosphonic anhydride, the DC internal resistance, the storage performance and the cycle performance of the fresh battery and the battery after cycles are further improved.

(6) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetricarbonitrile (B1) and other additives of different contents as shown in Table 6 were added. The obtained electrolyte was injected to a battery prepared according to the above method. The voltage drop after storage at 3.2V and 85° C. for 24 h of the battery were tested. The test results are shown in Table 6.

TABLE 6

| | VC (content: wt %) | VEC (content: wt %) | FEC (content: wt %) | PS (content: wt %) | DTD (content: wt %) | Voltage drop after storage at 3.2 V and 85° C. for 24 hrs |
|---|---|---|---|---|---|---|
| S6-1 | 0.5 | — | — | — | — | 0.35 V |
| S6-2 | 0.5 | — | — | 3 | — | 0.32 V |
| S6-3 | 0.5 | — | — | 3 | 0.5 | 0.23 V |
| S6-4 | 1 | — | — | 3 | — | 0.3 V |
| S6-5 | 1 | — | 3 | 3 | — | 0.20 V |
| S6-6 | — | 0.5 | — | 3 | 0.5 | 0.25 V |
| D6-1 | — | — | — | — | — | 0.4 V |

ATL_COSMX_0075302

The addition of the film-forming additives VC, VEC, FEC, PS, DTD can further improve the stability of the solid electrolytic interface (SEI) film of the battery. Using a combination of various additives is more conducive to improve the stability of the battery, which is beneficial to the long-term storage of the battery and thus improves the battery reliability.

(7) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetri-carbonitrile (B1) were added. The obtained electrolyte was injected to a battery prepared according to the above method. The electrode compaction density ratio (D1/D2) of the battery was changed according to Table 7, and the capacity retention rate of the battery was tested. The test results are shown in Table 7.

TABLE 7

| | | Capacity retention rate | | |
|---|---|---|---|---|
| | Compaction density ratio (D1/D2) | Fresh battery | After 200 cycles | After 400 cycles |
| S7-1 | 0.8 | 100% | 93.8% | 89.3% |
| S7-2 | 0.9 | 100% | 95.3% | 90.1% |
| S7-3 | 0.95 | 100% | 95.9% | 90.8% |
| S7-4 | 1.0 | 100% | 96.8% | 91.4% |
| S7-5 | 1.05 | 100% | 95.8% | 90.7% |
| S7-6 | 1.1 | 100% | 95.2% | 90.2% |
| S7-7 | 1.2 | 100% | 93.7% | 88.8% |
| D7-1 | 1.3 | 100% | 91.2% | 83.6% |
| D7-1 | 0.7 | 100% | 90.5% | 82.7% |

As can be seen from Table 7, the electrode compaction density ratio (D1/D2) of the lithium ion battery has a significant effect on the cycle performance of the lithium ion battery. A too large or too small D1/D2 will damage the cycle performance of lithium-ion batteries. It can be seen that when D1/D2 is within the range of 0.8-1.2, a better cycle performance is obtained, possibly because the combined additives facilitate the reduction of the electrode interface resistance and the reduction of the cell polarization.

(8) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetri-carbonitrile (B1) and a cyclic phosphonic anhydride of different contents as shown in Table 8 were added. The obtained electrolyte was injected to a battery prepared according to the above method. The electrode compaction density ratio (D1/D2) was changed according to Table 8, and the capacity retention rate of the obtained battery was tested. The test results are shown in Table 8.

TABLE 8

| | $D_1$ (content:) | $E_1$ (content:) | G | Fresh battery | After 200 cycles | After 400 cycles |
|---|---|---|---|---|---|---|
| S8-1 | 1 | — | 0.8 | 100% | 94.9% | 90.1% |
| S8-2 | 1 | — | 1.0 | 100% | 97.3% | 92.5% |
| S8-3 | 1 | — | 1.2 | 100% | 94.8% | 89.9% |
| S8-4 | — | 0.3 | 0.8 | 100% | 94.3% | 89.6% |
| S85 | — | 0.3 | 1.0 | 100% | 97.9% | 92.2% |
| S8-6 | — | 0.3 | 1.2 | 100% | 95.0% | 90.5% |
| S8-7 | 1 | 0.3 | 1.0 | 100% | 98.1% | 93.3% |

With the addition of the fluoroether or the cyclic phosphonic anhydride, the cycle performance of the lithium ion battery is further improved when the electrode compaction density of the battery is within the range of 0.8-1.2.

(9) To the basic electrolyte, 30 wt % of propyl propionate, 4 wt % of butanedinitrile (A1), 1 wt % of 1,3,6-hexanetri-carbonitrile (B1) and a cyclic carboxylate ester of different contents as shown in Table 9 were added. The obtained electrolyte was injected to a battery prepared according to the above method. The capacity retention rate after inter-mittent cycle of the obtained battery was tested. The test results are shown in Table 9.

TABLE 9

| | | Capacity retention rate after intermittent cycle | | | |
|---|---|---|---|---|---|
| | H (content: wt %) | Fresh battery | After 30 cycles | After 50 cycles | After 100 cycles |
| S1-1 | 0 | 100% | 73.80% | 64.30% | 54.50% |
| S9-1 | $H_1(1)$ | 100% | 82.50% | 74.60% | 64.20% |
| S9-2 | $H_1(10)$ | 100% | 87.20% | 81.40% | 77.20% |
| S9-3 | $H_1(20)$ | 100% | 86.20% | 81.30% | 78.00% |
| S9-4 | $H_1(30)$ | 100% | 88.30% | 83.30% | 79.80% |
| S9-5 | $H_1(40)$ | 100% | 87.50% | 80.60% | 75.20% |
| S9-6 | $H_1(50)$ | 100% | 86.30% | 74.40% | 63.20% |
| S9-7 | $H_1(60)$ | 100% | 85.20% | 71.60% | 57.60% |
| S9-8 | $H_2(1)$ | 100% | 81.80% | 73.20% | 61.80% |
| S9-9 | $H_2(10)$ | 100% | 86.50% | 80.80% | 76.10% |
| S9-10 | $H_2(20)$ | 100% | 85.30% | 81.30% | 77.10% |
| S9-11 | $H_2(30)$ | 100% | 88.10% | 83.00% | 79.30% |
| S9-12 | $H_2(40)$ | 100% | 87.10% | 80.10% | 74.80% |
| S9-13 | $H_2(50)$ | 100% | 85.20% | 73.70% | 61.90% |
| S9-14 | $H_2(60)$ | 100% | 82.20% | 70.10% | 55.90% |

The capacity retention rate after intermittent cycle of the battery increases with the increase of the amount of the cyclic carboxylate ester, possibly because the cyclic car-boxylate forms a passivated film on the surface of the cathode. However, when the cyclic carboxylate ester content is close to 40 wt %, the intermittent cycle performance deteriorates to a certain extent, which is mainly caused by a side reaction between $LiPF_6$ and the cyclic carboxylate ester. Therefore, the amount of the cyclic carboxylate ester is preferably moderate and should not be too large.

References throughout the specification to "some embodi-ments", "partial embodiments", "one embodiment", "another example", "example", "specific example" or "par-tial examples" mean that at least one embodiment or example of the application includes specific features, struc-tures, materials or characteristics described in the embodi-ments or examples. Thus, the descriptions appear throughout the specification, such as "in some embodiments", "in an embodiment", "in one embodiment", "in another example", "in an example", "in a particular example" or "for example", are not necessarily the same embodiment or example in the application. Furthermore, the particular features, structures, materials or characteristics herein may be combined in any suitable manner in one or more embodiments or examples.

While the illustrative embodiments have been shown and described, it will be understood by those skilled in the art that the embodiments are not to be construed as limiting the present invention, and modifications, substitutions and changes can be made to the embodiments without departing from the spirit and scope of the present application.

The above-described embodiments of the present inven-tion are intended to be illustrative only. Numerous alterna-tive embodiments may be devised by persons skilled in the art without departing from the scope of the following claims

The above-described embodiments of the present inven-tion are intended to be illustrative only. Numerous alterna-tive embodiments may be devised by persons skilled in the art without departing from the scope of the following claims.

ATL_COSMX_0075303

33

What is claimed is:

1. An electrolyte, comprising a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on a total weight of the electrolyte, a weight percentage of the dinitrile compound is X and a weight percentage of the trinitrile compound is Y, where X and Y meet conditions represented by Formula (1) and Formula (2):

$$\text{about 2 wt \%} \leq (X+Y) \leq \text{about 11 wt \%} \qquad (1); \text{ and}$$

$$\text{about } 0.1 \leq (X/Y) \leq \text{about 8} \qquad (2),$$

wherein, based on the total weight of the electrolyte, a weight percentage of the propyl propionate is Z, where Y and Z meet a condition represented by Formula (3):

$$\text{about } 0.01 \leq (Y/Z) \leq \text{about 0.3} \qquad (3).$$

2. The electrolyte according to claim 1, wherein the dinitrile compound comprises a compound of Formula (4) or (5):

$$CN\text{—}R_1\text{—}CN \ (4);$$

$$CN\text{—}R_2\text{—}(O\text{—}R_3)_n\text{—}O\text{—}R_4\text{—}CN \ (5);$$

or a combination thereof,
where $R_1$, $R_2$, $R_3$ and $R_4$ are each independently an alkylene group having 1-5 carbon atoms or an alkenylene group having 2-5 carbon atoms, and n represents an integer from 0 to 5.

3. The electrolyte according to claim 1, wherein the dinitrile compound is one selected from the group consisting of butanedinitrile, glutaronitrile, adiponitrile, 1,5-dicyanopentane, 1,6-dicyanohexane, 1,7-dicyanoheptane, 1,8-dicyanooctane, 1,9-dicyanononane, 1,10-dicyanodecane, 1,12-dicyanododecane, tetramethylbutanedinitrile, 2-methylglutaronitrile, 2,4-dimethylglutaronitrile, 2,2,4,4-tetramethylglutaronitrile, 1,4-dicyanopentane, 2,6-dicyanoheptane, 2,7-dicyanooctane, 2,8-dicyanononane, 1,6-dicyanodecane, 1,2-dicyanobenzene, 1,3-dicyanobenzene, 1,4-dicyanobenzene, 3,5-dioxa-pimelonitrile, 1,4-bis(cyanoethoxy)butane, ethylene glycol bis(2-cyanoethyl)ether, diethylene glycol bis(2-cyanoethyl)ether, triethylene glycol bis(2-cyanoethyl)ether, tetraethylene glycol bis(2-cyanoethyl)ether, 3,6,9,12,15,18-hexaoxaeicosanoic dinitrile, 1,3-bis(2-cyanoethoxy)propane, 1,4-bis(2-cyanoethoxy)butane, 1,5-bis(2-cyanoethoxy)pentane, ethylene glycol bis(4-cyanobutyl)ether, 1,4-dicyano-2-butene, 1,4-dicyano-2-methyl-2-butene, 1,4-dicyano-2-ethyl-2-butene, 1,4-dicyano-2,3-dimethyl-2-butene, 1,4-dicyano-2,3-diethyl-2-butene, 1,6-dicyano-3-hexene, 1,6-dicyano-2-methyl-3-hexene, 1,6-dicyano-2-methyl-5-methyl-3-hexene, and any combination thereof.

4. The electrolyte according to claim 1, wherein the trinitrile compound comprises a compound of Formula (6) or (7):

$$CN\text{——}(CH_2)_x\text{——}CH\{(CH_2)_y\text{——}CN\}\text{——}(CH_2)_z\text{——}CN; \qquad (6)$$

$$\begin{array}{c} R_5 \\ | \\ X_4\text{——}O\text{——}R_6\text{——}C\text{——}R_7\text{——}O\text{——}X_5; \\ | \\ R_8 \\ | \\ O \\ | \\ X_6 \end{array} \qquad (7)$$

or a combination thereof,

34

where in Formula (6), x, y, and z represent an integer from 0 to 5, and x, y, and z are not 0 at the same time; and

in Formula (7), $R_5$ represents hydrogen or an alkyl group having 1-5 carbon atoms, $R_6$, $R_7$ and $R_8$ are each independently an alkylene group having 1-5 carbon atoms, and $X_4$, $X_5$ and $X_6$ are each independently —$R_9$—CN, in which $R_9$ represents an alkylene group having 1-5 carbon atoms.

5. The electrolyte according to claim 1, wherein the trinitrile compound is one selected from the group consisting of: 1,3,5-pentanetricarbonitrile; 1,2,3-propanetrinitrile; 1,3,6-hexanetricarbonitrile; 1,2,6-hexanetricarbonitrile; 1,2,3-tris(2-cyanoethoxy)propane; 1,2,4-tris(2-cyanoethoxy)butane; 1,1,1-tris(cyanoethoxymethylene)ethane; 1,1,1-tris(cyanoethoxymethylene)propane; 3-methyl-1,3,5-tris(cyanoethoxy)pentane; 1,2,7-tris(cyanoethoxy)heptane; 1,2,6-tris(cyanoethoxy)hexane; 1,2,5-tris(cyanoethoxy)pentane; and any combination thereof.

6. The electrolyte according to claim 1, wherein X is about 0.01-10 wt %, Y is about 0.01-10 wt %, and a weight percentage Z of the propyl propionate is about 5-50 wt %.

7. The electrolyte according to claim 1, further comprising a fluoroether comprising at least one of the compounds of Formula (8), Formula (9), Formula (10) or Formula (11):

$$Rf1\text{-}O\text{-}Rf2 \qquad (8);$$

$$Rf1\text{-}O\text{—}R \qquad (9);$$

$$Rf1\text{-}O\text{-}(R'\text{—}O)_n\text{-}Rf2 \qquad (10); \text{ and}$$

$$Rf1\text{-}O\text{-}(R'\text{—}O)_n\text{—}R \qquad (11),$$

wherein Formulae (8), (9), (10), and (11), Rf1 and Rf2 are each independently a linear or branched $C_1$ to $C_{12}$ fluoroalkyl group having at least one hydrogen atom substituted with fluoro, R is a linear or branched $C_1$ to $C_{12}$ alkyl group, and R' is a linear or branched $C_1$ to $C_5$ alkylene group, and n is an integer from 1 to 5.

8. The electrolyte according to claim 7, wherein Rf1 or Rf2 is each independently a fluoroalkyl group selected from the group consisting of $HCF_2$—, $CF_3$—, $HCF_2CF_2$—, $CH_3CF_2$—, $CF_3CH_2$—, $CF_3CF_2$—, $(CF_3)_2CH$—, $HCF_2CF_2CH_2$—, $CF_3CH_2CH_2$—, $HCF_2CF_2CF_2CH_2$—, $HCF_2CF_2CF_2CH_2$—, $CF_3CF_2CH_2$—, $CF_3CFHCF_2CH_2$—, $HCF_2CF(CF_3)CH_2$—, and $CF_3CF_2CH_2CH_2$—.

9. The electrolyte according to claim 7, wherein the fluoroether is one selected from the group consisting of: $HCF_2CF_2CH_2OCF_2CF_2H$, $(CF_3)_2CFCF(CF_2CF_3)(OCH_3)$, $CF_3CHFCF_2CH(CH_3)OCF_2CHFCF_3$, $HCF_2CF_2CH_2OCF_2CF_2CF_2CF_2H$, $HCF_2CF_2OCH_2CF_3$, $HCF_2CF_2OCH_2CH_2OCF_2CF_2H$, $HCF_2CF_2CH_2OCH_2CH_2CH_2OCF_2CF_2H$, $HCF_2CF_2CH_2OCF_2CF_2CF_2H$, $HCF_2CF_2OCH_2CH_2OCF_2CF_2H$, $HCF_2CF_2OCH_2CH_2CH_2OCF_2CF_2CF_2H$, $CH_3OCH_2CH_2OCH_2CH_2F$, $CH_3OCH_2CH_2OCH_2CF_3$, $CH_3OCH_2CH(CH_3)OCH_2CH_2F$, $CH_3OCH_2CH(CH_3)OCH_2CF_3$, $FCH_2CH_2OCH_2CH_2OCH_2CH_2F$, $FCH_2CH_2OCH_2CH(CH_3)OCH_2CH_2F$, $CF_3CH_2O(CH_2CH_2O)_2CH_2CF_3$, $CF_3CH_2OCH_2CH(CH_3)OCH_2CF_3$, and any combination thereof.

10. The electrolyte according to claim 1, further comprising a cyclic phosphonic anhydride, based on the total weight of the electrolyte, a content of cyclic phosphonic anhydride is about 0.01-10 wt %.

ATL_COSMX_0075304

35

11. The electrolyte according to claim 1, further comprising one selected from a group consisting of: a cyclic carbonate ester having a carbon-carbon double bond, a fluorinated chain carbonate ester, a fluorinated cyclic carbonate ester, a compound having a sulfur-oxygen double bond, and any combination thereof.

12. The electrolyte according to claim 1, further comprising a cyclic carboxylate ester, including γ-butyrolactone or γ-valerolactone or a combination thereof.

13. An electrochemical device, wherein the electrochemical device comprises electrodes and an electrolyte comprising a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on the total weight of the electrolyte, the weight percentage of the dinitrile compound is X and the weight percentage of the trinitrile compound is Y, where X and Y meet the conditions represented by Formula (1) and Formula (2):

$$\text{about 2 wt \%} \leq (X+Y) \leq \text{about 11 wt \%} \qquad (1); \text{ and}$$

$$\text{about } 0.1 \leq (X/Y) \leq \text{about 8} \qquad (2).$$

14. The electrochemical device according to claim 13, wherein the electrode comprises a current collector and a coating on the current collector, the coating comprising a single-sided coating and a double-sided coating, wherein: the single-sided coating is a coating formed by applying a slurry on one surface of the current collector; and the

36

double-sided coating is a coating formed by applying a slurry on two opposite surfaces of the current collector; and

the electrode with the single-sided coating has an electrode compaction density D1, and the electrode with the double-sided coating has an electrode compaction density D2, wherein D1 and D2 meet the relationship: about $0.8 \leq D1/D2 \leq$ about 1.2.

15. The electrochemical device according to claim 14, wherein the electrodes comprise a cathode and a anode, wherein when the electrode is a cathode, 3.5 g/cm$^3$ $\leq$ D2 $\leq$ 4.3 g/cm$^3$; or when the electrode is an anode, 1.2 g/cm$^3$ $\leq$ D2 $\leq$ 1.8 g/cm$^3$.

16. An electronic device, comprising an electrochemical device that includes electrodes and an electrolyte comprising a dinitrile compound, a trinitrile compound, and propyl propionate, wherein, based on the total weight of the electrolyte, the weight percentage of the dinitrile compound is X and the weight percentage of the trinitrile compound is Y, where X and Y meet the conditions represented by Formula (1) and Formula (2):

$$\text{about 2 wt \%} \leq (X+Y) \leq \text{about 11 wt \%} \qquad (1); \text{ and}$$

$$\text{about } 0.1 \leq (X/Y) \leq \text{about 8} \qquad (2).$$

* * * * *

ATL_COSMX_0075305



**Joint Trial Exhibit**

**JTX-004**

NINGDE AMPEREX TECHNOLOGY LIMITED
v. ZHUHAI COSMX BATTERY CO., LTD.

2:22-CV-232-JRG

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

November 8, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *10,964,987*
ISSUE DATE: *March 30, 2021*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Pam Grant
Certifying Officer


US010964987B2

(12) **United States Patent**
Yi et al.

(10) **Patent No.:** US 10,964,987 B2
(45) **Date of Patent:** Mar. 30, 2021

(54) **SEPARATOR AND ENERGY STORAGE DEVICE**

(71) Applicant: **Ningde Amperex Technology Limited**, Fujian (CN)

(72) Inventors: **Jianjian Yi**, Fujian (CN); **Xinzhi Zhang**, Fujian (CN); **Zengbin Wei**, Fujian (CN); **Xinghua Tao**, Fujian (CN)

(73) Assignee: **Ningde Amperex Technology Limited**, Ningde (CN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 79 days.

(21) Appl. No.: **16/013,887**

(22) Filed: **Jun. 20, 2018**

(65) **Prior Publication Data**

US 2019/0319243 A1     Oct. 17, 2019

(30) **Foreign Application Priority Data**

Apr. 11, 2018     (CN) .......................... 201810321779.5

(51) **Int. Cl.**

| | |
|---|---|
| *H01M 2/16* | (2006.01) |
| *H01M 2/14* | (2006.01) |
| *H01M 50/449* | (2021.01) |
| *H01M 10/0525* | (2010.01) |
| *H01M 50/403* | (2021.01) |
| *H01M 50/411* | (2021.01) |
| *H01M 50/446* | (2021.01) |

(52) **U.S. Cl.**
CPC ..... ***H01M 50/449*** (2021.01); ***H01M 10/0525*** (2013.01); ***H01M 50/403*** (2021.01); ***H01M 50/411*** (2021.01); ***H01M 50/446*** (2021.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2018/0123107 A1* | 5/2018 | Yu | .......................... | H01M 4/505 |
| 2019/0123319 A1* | 4/2019 | Shimura | ............. | H01M 2/1646 |
| 2019/0305278 A1* | 10/2019 | Saeki | ...................... | H01M 4/62 |
| 2019/0355953 A1* | 11/2019 | Nam | ................... | H01M 2/1686 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1882436 A | 12/2006 |
| CN | 103155217 A | 6/2013 |
| CN | 103474602 A | 12/2013 |
| CN | 205004376 U | 1/2016 |

* cited by examiner

*Primary Examiner* — Osei K Amponsah
(74) *Attorney, Agent, or Firm* — Taylor English Duma LLP

(57) **ABSTRACT**

The application provides a separator and an energy storage device. The separator comprises: a porous substrate; and a porous layer arranged on a surface of the porous substrate, wherein the porous layer comprises inorganic particles and a binder, and a ratio of Dv90 of the inorganic particles to the thickness of the porous layer is in a range from 0.3 to 3.0. Excellent adhesion exists between the separator and the electrode according to the present application, which ensures that the energy storage device has good safety performance. Moreover, the rate performance and cycle performance of the energy storage device can be greatly improved due to the existence of inorganic particles in the separator.

**17 Claims, 2 Drawing Sheets**





FIG.1



FIG.2

ATL_COSMX_0075691



FIG.3



FIG.4

# SEPARATOR AND ENERGY STORAGE DEVICE

## CROSS REFERENCES TO RELATED APPLICATIONS

This application claims the benefit of Chinese Patent Application No. 201810321779.5 filed on Apr. 11, 2018. The entire contents of the above application are hereby incorporated by reference in their entirety.

## FIELD OF THE APPLICATION

The application relates to the field of energy storage devices, and in particular, to a separator and an energy storage device.

## BACKGROUND OF THE APPLICATION

Non-aqueous secondary batteries, particularly lithium-ion batteries, are widely used in portable electronic devices such as notebook computers, digital cameras, camcorders, and cellphones, due to their high energy density and good rate performance. In recent years, the application of lithium-ion batteries as the power supply for electrical vehicles, is also promoting the development of lithium-ion battery technology. In the cycle process of the lithium-ion battery, with the progress of charging and discharging, there will be a gap between the electrode and the separator, resulting in a reduction of the cycle capacity of the lithium-ion battery and thereby having an influence on its service life. Therefore, there is an urgent need for a technical solution to solve the problem of the gap between the separator and the electrode so as to improve the service life of the lithium-ion battery.

## SUMMARY OF THE APPLICATION

A separator and an energy storage device are provided according to the present application. With the separator provided by the application, not only the problem of the gap between the separator and the electrode can be solved, but also excellent adhesive force between the separator and the electrode can be maintained; moreover, the rate performance and cycle performance of the energy storage device can be improved due to the pore structures maintained in the separator of the application.

A separator is provided according to an example of the present application. The separator comprises: a porous substrate; and a porous layer arranged on a surface of the porous substrate, wherein the porous layer comprises inorganic particles and a binder, and a ratio of Dv90 of the inorganic particles to the thickness of the porous layer is in a range of 0.3 to 3.0. The Dv90 of the inorganic particles refers to a particle size which reaches 90% the cumulative volume from the side of small particle size in the granularity distribution on a volume basis.

In the above-described separator, the porous layer has a thickness of 0.2 μm to 10 μm.

In the above-described separator, the porous layer has pores formed by the binder, and the inorganic particles are distributed in the pores.

In the above-described separator, the pores have an average pore size of 0.3 μm to 20 μm.

In the above-described separator, the volume ratio of the inorganic particles to the binder is in a range from 0.2 to 3.0.

In the above-described separator, the porous layer has a porosity of 20% to 90%.

In the above-described separator, the inorganic particles are one or more selected from the group consisting of alumina, silica, magnesia, titanium oxide, hafnium dioxide, tin oxide, zirconia, cerium dioxide, nickel oxide, zinc oxide, calcium oxide, boehmite, aluminum hydroxide, magnesium hydroxide, calcium hydroxide, and barium sulfate.

In the above-described separator, the binder is one or more selected from the group consisting of polyvinylidene fluoride, vinylidene fluoride-hexafluoropropylene copolymer, polyamide, polyacrylonitrile, polyacrylate, polyacrylic acid, polyacrylates, sodium carboxymethylcellulose, polyvinylpyrrolidone, polyvinyl ether, polymethyl methacrylate, polytetrafluoroethylene and polyhexafluoropropylene.

An energy storage device is further provided according to the present application, which comprises the above-described separator.

In the above-described energy storage device, the energy storage device is a lithium-ion battery.

A method for preparing a separator is further provided according to the present application, the method comprising the steps of:

mixing inorganic particles with a binder to generate a mixture, and adding a first solvent into the mixture and stirring the mixture with the first solvent to obtain an uniform coating solution; coating the uniform coating solution onto a surface of a porous substrate to form a wet film; immersing the wet film into a coagulating solution for phase transformation; and drying the phase-transformed wet film to obtain the separator.

In the above-described method, the solid content in the coating solution is in a range of 7% to 25%.

In the above-described method, the coagulating solution comprises a second solvent and a third solvent, and the second solvent has a mass percentage of 20% to 60%.

In the above-described method, the first solvent is one or more independently selected from the group consisting of N-methylpyrrolidone (NMP), dimethylacetamide (DMAC) and dimethylformamide (DMF).

In the above-described method, the porous substrate comprises a polymer film, a multilayer polymer film, or a non-woven fabric formed of any one or more of the following polymers: polyethylene, polypropylene, polyethylene terephthalate, polyphthaloyl diamine, polybutylene terephthalate, polyester, polyacetal, polyamide, polyimide, polyetheretherketone, polyaryletherketone, polyetherimide, polyamide imide, polybenzimidazole, polyethersulfone, polyphenylene oxide, cycloolefin copolymer, polyphenylene sulfide, and polyethylene naphthalene.

In the above-described method, the polyethylene is at least one component selected from the group consisting of high density polyethylene, low density polyethylene, and ultrahigh molecular weight polyethylene.

In the above-described method, the second solvent is one or more independently selected from the group consisting of N-methylpyrrolidone, dimethylacetamide and dimethylformamide, and the third solvent is one or more selected from the group consisting of deionized water, ethanol, propanol, acetone, dimethyl carbonate and diethyl carbonate.

An excellent adhesion exists between the separator and the electrode according to the present application, thus ensuring that the energy storage device has good safety performance. Moreover, the porous layer is arranged on a surface of the separator, and the inorganic particles contained in the pores in the porous layer can serve to support the pores, and therefore the pores can be well protected from being destroyed. As such, the probability of pore blockage due to compression and swelling in the separator is reduced,

ATL_COSMX_0075693

3

4

the separator would exhibit high ionic conductivity, and the rate performance and cycle performance of the energy storage device are greatly improved.

### BRIEF DESCRIPTION OF THE ACCOMPANYING DRAWINGS

FIG. **1** is an electronic microscope image (3000 times magnification) of pores of the lower surface of the porous layer (i.e., the surface of the porous layer that is away from the porous substrate) in example 3;

FIG. **2** is an electronic microscope image (10,000 times magnification) of the cross section of the porous layer in the thickness direction in example 3;

FIG. **3** is an electronic microscope image (3000 times magnification) of pores of the lower surface of the porous layer (i.e., the surface of the porous layer that is away from the porous substrate) in comparative example 2; and

FIG. **4** is an electronic microscope image (10,000 times magnification) of the cross section of the porous layer in the thickness direction in comparative example 2.

### DETAILED DESCRIPTION OF THE PREFERRED EXAMPLES

Exemplary examples will be described in details. While these exemplary examples may be implemented in various forms, the applicationshould not be construed as limited to the examples of the application set forth herein. Rather, these examples are provided with the purpose of making the disclosure of the application thorough and complete and fully conveying the scope of the application to those skilled in the art.

A separator and a preparation method thereof as well as an energy storage device according to the present application will be described in details hereinafter.

In a first aspect of the application, the separator comprises a porous substrate and a porous layer. The porous layer is arranged on a surface of the porous substrate. Specifically, the porous layer is arranged on one surface of the porous substrate, or the porous layer is arranged on both surfaces of the porous substrate, or the porous layer is arranged on part of the surface of the porous substrate. The porous substrate comprises a polymer film, a multilayer polymer film, or a non-woven fabric formed of any one or more of the following polymers: polyethylene, polypropylene, polyethylene terephthalate, polyphthaloyl diamine, polybutylene terephthalate, polyester, polyacetal, polyamide, polyimide, polyetheretherketone, polyaryletherketone, polyetherimide, polyamide imide, polybenzimidazole, polyethersulfone, polyphenylene oxide, cycloolefin copolymer, polyphenylene sulfide, and polyethylene naphthalene. The above-mentioned polyethylene is at least one component selected from the group consisting of high density polyethylene, low density polyethylene, and ultrahigh molecular weight polyethylene.

In an example of the application, the porous layer arranged on the porous substrate comprises a binder and inorganic particles. The porous layer has pores formed by the binder, and the pores at least comprises a part of the inorganic particles. A ratio of Dv90 of the inorganic particles to the thickness of the porous layer is in a range from 0.3 to 3.0. The Dv90 of the inorganic particles refers to a particle size which reaches 90% the cumulative volume from the side of small particle size in the granularity distribution on a volume basis. The binder is one or more selected from the group consisting of polyvinylidene fluoride, vinylidene fluo-

ride-hexafluoropropylene copolymer, polyamide, polyacrylonitrile, polyacrylate, polyacrylic acid, polyacrylates, sodium carboxymethylcellulose, polyvinylpyrrolidone, polyvinyl ether, polymethyl methacrylate, polytetrafluoroethylene and polyhexafluoropropylene. The binder can provide a sufficient binding interface for the electrode, thus ensuring a high adhesive force between the separator and the electrode, and enabling the energy storage device (such as a lithium-ion battery) to have a high safety performance.

The pores in the porous layer allow the separator to have good electrolyte diffusion and absorption capabilities, improving the ionic conductivity of the separator, and thereby improving the rate performance of the energy storage device (such as a lithium-ion battery). The average pore size of the porous layer is not less than 0.3 μm, which makes the separator have good electrolyte diffusion and absorption capabilities, improves the ionic conductivity of the separator, reduces the polarization reaction, and thus can improve the rate performance of the energy storage device (such as a lithium-ion battery). The porous layer may have a porosity of 20% to 90%.

The inorganic particles distributed in the pores of the porous layer provide a good mechanical support for the porous layer, preventing the porous layer from compressing and collapsing during processing the energy storage device (such as a lithium-ion battery), and preventing the porous layer from being compressed and destroyed. Inorganic particles refer to a class of inorganicmaterials obtained from natural or synthetic compounds through the process of shaping and high-temperature sintering or the like. The inorganic particles are one or more selected from the group consisting of alumina, silica, magnesia, titanium oxide, hafnium dioxide, tin oxide, zirconia, cerium dioxide, nickel oxide, zinc oxide, calcium oxide, boehmite, aluminum hydroxide, magnesium hydroxide, calcium hydroxide, and barium sulfate. The inorganic particles may contain polar functional groups such as a hydroxyl group. The surface of the inorganic particles containing polar functional groups can be more easily combined with the non-solvent (third solvent) in the coagulating solution in the preparation process, which facilitates the diffusion of the non-solvent (third solvent) into the porous layer along the surface of the inorganic particles so that larger pores are formed in the vicinity of the inorganic particles, and the rate performance of the energy storage device (such as a lithium-ion battery) is thereby improved. The non-solvent (third solvent) in the coagulating solution will be described below.

In an example of the present application, the volume ratio of the inorganic particles to the binder in the porous layer is in a range from 0.2 to 3.0. An exchange between the first solvent in the coating solution and the third solvent in the coagulating solution can be increased by increasing the volume ratio of the inorganic particles to the binder, and the porosity of the porous layer is increased; conversely, if the volume ratio of the inorganic particles to the binder is reduced, the porosity of the porous layer will be decreased. If the volume ratio of the inorganic particles to the binder is too low, the average pore size of the porous layer will be decreased, and the porosity of the porous layer will be decreased; moreover, if the content of inorganic particles is decreased, the mechanical strength and heat resistance of the porous layer is decreased. If the volume ratio of the inorganic particles to the binder is too high, the adhesive force of the porous layer will be reduced, and the porous layer is easily detached from the surface of the porous substrate, resulting in deterioration of the safety performance of the energy storage device (such as a lithium-ion battery).

ATL_COSMX_0075694

5

The porous layer has a thickness of 0.2 μm to 10 μm. If the thickness of the porous layer is too high, the gas permeability of the porous layer will be deteriorated, and the rate performance of the energy storage device (such as a lithium-ion battery) will be decreased. If the thickness of the porous layer is too low, the adhesive force of the porous layer will be reduced, a gap will easily occur between the separator and the electrode, and the hardness of the energy storage device (such as a lithium-ion battery) will be decreased, resulting in deterioration of the safety performance of the energy storage device (such as a lithium-ion battery).

In addition, in an example of the present application, pores having a larger average pore size can be obtained by controlling the ratio of Dv90 of the inorganic particles to the thickness of the porous layer. In the electrolyte environment, after the binder (such as polyvinylidene fluoride) in the porous layer swells, more through-holes can be retained, which avoids swelling and pore blockage, ensures a channel for ion transportation, reduces polarization reactions, and improves the rate performance of the energy storage device (such as a lithium-ion battery). The Dv90 of the inorganic particles refers to a particle size which reaches 90% the cumulative volume from the side of small particle size in the granularity distribution on a volume basis.

In some examples of the present application, the ratio of the Dv90 of the inorganic particles to the thickness of the porous layer is in a range from 0.4 to 1.5. By increasing the ratio of Dv90 of the inorganic particles to the thickness of the porous layer, the mechanical strength of the porous layer is increased, and the porous layer is prevented from undergoing pore blockage due to compression in the preparation or cycle process of the energy storage device (such as a lithium-ion battery), thereby increasing the rate performance of the energy storage device (such as a lithium-ion battery). Conversely, the mechanical properties of the porous layer may be reduced by reducing the ratio of Dv90 of inorganic particles to the thickness of the porous layer, leading to pore blockage of the porous layer due to compression in the preparation and cycle processes of the energy storage device (such as a lithium-ion battery), and the rate performance of the energy storage device (such as a lithium-ion battery) is reduced. In addition, if the ratio of the Dv90 of the inorganic particles to the thickness of the porous layer is too high, the pore size distribution of the porous layer tends to be non-uniform, resulting in a non-uniform surface of the porous layer, which further makes the porous layer easy to detach from the surface of the porous substrate and forms defects in the energy storage device (such as a lithium-ion battery). Moreover, if the ratio of Dv90 of the inorganic particles to the thickness of the porous layer is too high, the adhesive force of the porous layer is reduced, affecting the safety performance of the energy storage device (such as a lithium-ion battery). If the ratio of Dv90 of the inorganic particles to the thickness of the porous layer is too low, the inorganic particles cannot be effectively exposed on the surface of the porous layer, which does not facilitate an exchange between the first solvent in the coating solution and the third solvent in the coagulating solution in the preparation of the porous layer, therefore cannot enhance diffusion, and is not advantageous for the development of the pores.

The method for preparing the separator according to the present application is described below. Firstly, the inorganic particles are mixed with the binder, and then the first solvent is added into the mixture and the mixture is stirred to obtain a uniform coating solution, wherein the binder dissolves in the first solvent. The first solvent is one or more selected

6

from the group consisting of N-methylpyrrolidone (NMP), dimethylacetamide (DMAC) and dimethylformamide (DMF). The porous layer formed using N-methylpyrrolidone (NMP) has the largest average pore size and the highest porosity; the porous layer formed using dimethylformamide (DMF) has the smallest average pore size and the lowest porosity; and the porous layer formed using dimethylacetamide (DMAC) has an average pore size and a porosity between those of the porous layer formed using N-methylpyrrolidone (NMP) and the porous layer formed using dimethylformamide (DMF). The temperature of the coating solution may be in a range from 15 degrees Celsius to 30 degrees Celsius. The solid content of the coating solution may be in a range from 7% to 25%. Within this range, if the solid content of the coating solution is increased, the viscosity of the coating solution is increased, the exchange rate between the third solvent in the coagulating solution and the first solvent in the coating solution becomes lower, and the average pore size and porosity of the formed porous layer are reduced; conversely, if the solid content of the coating solution is reduced, the average pore size and porosity of the porous layer are increased. However, if the solid content of the coating solution is too high and exceeds this range, the gas permeability of the porous layer does not meet the requirements and cannot satisfy the use for an energy storage device (such as a lithium-ion battery). If the solid content of the coating solution is too low, which is below this range, the strength of the porous layer is decreased, and it is difficult to form a film on the surface of the porous substrate.

Next, the coating solution is uniformly coated on the surface of the porous substrate to form a wet film. The coating method of the coating solution is dip coating. Meanwhile, any other suitable coating process may also be used.

Thereafter, the porous substrate with the wet film is immersed into a coagulating solution for phase transformation, wherein the coagulating solution may include a second solvent and a third solvent, and the second solvent and the third solvent are soluble with each other. The second solvent is one or more selected from the group consisting of N-methylpyrrolidone (NMP), dimethylacetamide (DMAC) and dimethylformamide (DMF), and the third solvent is one or more selected from the group consisting of deionized water, ethanol, propanol, acetone, dimethyl carbonate, and diethyl carbonate. The mass percentage of the second solvent in the coagulating solution may be in a range from 20% to 60%. The average pore size and porosity of the porous layer can be increased by decreasing the content of the second solvent in the coagulating solution. However, if the content of the second solvent is too low, a dense surface film may be formed on the surface of the porous layer that is away from the porous substrate, resulting in deterioration of the gas permeability of the porous layer. If the content of the second solvent is too high, complete pores cannot be formed, or the formed porous layer has a very low average pore size. The temperature of the coagulating solution may be in a range from 15 degrees Celsius to 30 degrees Celsius. The period for phase transformation may be in a range from 10 s to 90 s.

Finally, after the completion of the phase transformation, the wet film is dried to obtain a separator, wherein a porous layer is arranged on the surface of the porous substrate, and inorganic particles are distributed in the pores of the porous layer. The drying temperature may be in a range from 60 degrees Celsius to 70 degrees Celsius, and the drying period may be in a range from 10 minutes to 40 minutes.

ATL_COSMX_0075695

According to some examples of the present application, a porous layer is prepared based on a phase transformation (i.e., non-solvent induced phase separation, NIPS) principle, wherein the first solvent in the coating solution is an organic solvent, and the binder (such as PVDF) can be dissolved in the first solvent. The coagulating solution contains a third solvent (deionized water), and the binder is insoluble in the third solvent (deionized water). Therefore, after the coating solution is coated on the porous substrate and then immersed into the coagulating solution, the first solvent in the coating solution is extracted into the third solvent (deionized water) in the coagulating solution, and the binder in the coating solution is solidified and precipitate to form a porous layer.

An energy storage device including the above-described separator is further provided according to the present application, such as a lithium-ion battery. In the application, the lithium-ion battery is only an illustrative example of the energy storage device, and the energy storage device may also comprise other suitable devices. The lithium-ion battery further comprises a positive electrode, a negative electrode, and an electrolyte, and the separator of the present application is placed between the positive electrode and the negative electrode. The positive current collector may be aluminum foil or nickel foil, and the negative current collector may be copper foil or nickel foil.

In the lithium-ion battery described above, the positive electrode comprises a positive electrode material capable of intercalation and deintercalation of lithium (Li) (hereinafter sometimes referred to as "positive electrode material capable of intercalation/deintercalation of lithium (Li)"). Examples of the positive electrode material capable of intercalation/deintercalation of lithium (Li) may include one or more of lithium cobaltate, lithium nickel cobalt manganate, lithium nickel cobalt aluminate, lithium manganate, lithium iron manganese phosphate, lithium vanadium phosphate, lithium vanadium oxide phosphate, lithium iron phosphate, lithium titanate, and lithium-rich manganese-based materials.

In the above-mentioned positive electrode material, the chemical formula of lithium cobaltate may be expressed as $Li_xCo_aM1_bO_{2-c}$, wherein M1 represents at least one selected from the group consisting of nickel (Ni), manganese (Mn), magnesium (Mg), aluminum (Al), boron (B), titanium (Ti), vanadium (V), chromium (Cr), ferrum (Fe), copper (Cu), zinc (Zn), molybdenum (Mo), tin (Sn), calcium (Ca), strontium (Sr), tungsten (W), yttrium (Y), lanthanum (La), zirconium (Zr), and silicon (Si), and the values of x, a, b, and c are respectively within the following ranges: $0.8 \leq x \leq 1.2$, $0.8 \leq a \leq 1$, $0 \leq b \leq 0.2$, $-0.1 \leq c \leq 0.2$.

In the above-mentioned positive electrode material, the chemical formula of lithium nickel cobalt manganate or lithium nickel cobalt aluminate may be expressed as $Li_yNi_dM2_eO_{2-f}$, wherein M2 represents at least one selected from the group consisting of cobalt (Co), manganese (Mn), magnesium (Mg), aluminum (Al), boron (B), titanium (Ti), vanadium (V), chromium (Cr), ferrum (Fe), copper (Cu), zinc (Zn), molybdenum (Mo), tin (Sn), calcium (Ca), yttrium (Sr), tungsten (W), zirconium (Zr), and silicon (Si), and the values of y, d, e, and f are respectively within the following ranges: $0.8 \leq y \leq 1.2$, $0.3 \leq d \leq 0.98$, $0.02 \leq e \leq 0.7$, $-0.1 \leq f \leq 0.2$.

In the above-mentioned positive electrode material, the chemical formula of lithium manganate is expressed as $Li_zMn_{2-g}M3_gO_{4-h}$, wherein M3 represents at least one selected from the group consisting of cobalt (Co), nickel (Ni), magnesium (Mg), aluminum (Al), boron (B), titanium (Ti), vanadium (V), chromium (Cr), ferrum (Fe), copper

(Cu), zinc (Zn), molybdenum (Mo), tin (Sn), calcium (Ca), strontium (Sr), and tungsten (W), and the values of z, g and h are respectively within the following ranges: $0.8 \leq z \leq 1.2$, $0 \leq g \leq 1.0$, and $-0.2 \leq h \leq 0.2$.

The negative electrode comprises a negative electrode material capable of intercalation and deintercalation of lithium (Li) (hereinafter, sometimes referred to as "negative electrode material capable of intercalation/deintercalation of lithium (Li)"). Examples of the negative electrode material capable of intercalation/deintercalation of lithium (Li) may include a carbon material, a metal compound, an oxide, a sulfide, a nitride of lithium such as $LiN_3$, lithium metal, a metal which formed an alloy with lithium, and a polymer material.

Examples of carbon materials may include low graphitized carbon, easily graphitized carbon, artificial graphite, natural graphite, mesocarbon microbeads, soft carbon, hard carbon, pyrolytic carbon, coke, glassy carbon, organic polymer compound sintered body, carbon fiber and active carbon. Coke may include pitch coke, needle coke, and petroleum coke. The organic polymer compound sintered body refers to materials obtained by calcining and carbonizing a polymer material such as a phenol plastic or a furan resin at a suitable temperature and, and some of these materials are classified into low graphitized carbon or easily graphitized carbon. Examples of polymeric materials may include polyacetylene and polypyrrole.

Among these negative electrode materials capable of intercalation/deintercalation of lithium (Li), further, materials whose charge and discharge voltages are close to the charge and discharge voltages of lithium metal are selected. This is because of the fact that the lower the charge and discharge voltages of the negative electrode material are, the more easily the battery can have a higher energy density. The carbon material can be selected as the negative electrode material, since the crystal structure of the carbon material has only small changes during charging and discharging. Therefore, good cycle characteristics and high charge and discharge capacities can be obtained. In particular, graphite can be selected, since it can provide a high electrochemical equivalent and energy density.

In addition, the negative electrode material capable of intercalation/deintercalation of lithium (Li) may include elemental lithium metal, metal elements and semi-metal elements capable of forming an alloy together with lithium (Li), alloys and compounds including such elements, etc. In particular, they are used together with the carbon material, since good cycle characteristics and high energy density can be obtained in this case. In addition to alloys comprising two or more metal elements, alloys used herein further include alloys comprising one or more metal elements and one or more semi-metal elements. The alloys may be in the following forms of solid solutions, eutectic crystals (eutectic mixtures), intermetallic compounds, and mixtures thereof.

Examples of metal elements and semi-metal elements may include tin (Sn), lead (Pb), aluminum (Al), indium (In), silicon (Si), zinc (Zn), antimony (Sb), bismuth (Bi), cadmium (Cd), magnesium (Mg), boron (B), gallium (Ga), germanium (Ge), arsenic (As), silver (Ag), zirconium (Zr), yttrium (Y), and hafnium (Hf). Examples of the above-described alloys and compounds may include a material expressed as a chemical formula: $Ma_sMb_tLi_u$ and a material expressed as a chemical formula: $Ma_pMc_qMd_r$. In these chemical formulas, Ma represents at least one of metal elements and semi-metal elements capable of forming alloys with lithium, Mb represents at least one of these metal elements and semi-metal elements other than lithium and

Ma, Mc represents at least one of the non-metal elements, Md represents at least one of these metal elements and semi-metal elements other than Ma, and s, t, u, p, q, and r satisfy s>0, t≥0, u≥0, p>0, q>0, and r≥0, respectively.

In addition, an inorganic compound that does not include lithium (Li) may be used in the negative electrode, such as $MnO_2$, $V_2O_5$, $V_6O_{13}$, NiS, and MoS.

The lithium-ion battery described above further comprises an electrolyte, which may be one or more of a gel electrolyte, a solid electrolyte, and an electrolyte. The electrolyte comprises a lithium salt and a non-aqueous solvent.

The lithium salt is one or more selected from the group consisting of $LiPF_6$, $LiBF_4$, $LiAsF_6$, $LiClO_4$, $LiB(C_6H_5)_4$, $LiCH_3SO_3$, $LiCF_3SO_3$, $LiN(SO_2CF_3)_2$, $LiC(SO_2CF_3)_3$, $LiSiF_6$, LiBOB, and lithium difluoborate. For example, $LiPF_6$ is used as a lithium salt, since it can provide high ionic conductivity and improve cycle performance.

The non-aqueous solvent may be a carbonate compound, a carboxylic acid ester compound, an ether compound, other organic solvents or combinations thereof.

The carbonate compound may be a chain carbonate compound, a cyclic carbonate compound, a fluorinated carbonate compound or combinations thereof.

Examples of chain carbonate compounds include diethyl carbonate (DEC), dimethyl carbonate (DMC), dipropyl carbonate (DPC), methylpropyl carbonate (MPC), ethyl propyl carbonate (EPC), methyl ethyl carbonate (MEC) and combinations thereof. Examples of the cyclic carbonate compounds include ethylene carbonate (EC), propylene carbonate (PC), butylene carbonate (BC), vinyl ethylene carbonate (VEC), and combinations thereof. Examples of the fluorocarbonate compound include fluoroethylene carbonate (FEC), 1,2-difluoroethylene carbonate, 1,1-difluoroethylene carbonate, 1,1,2-trifluoroethylene carbonate, 1,1,2,2-tetrafluoroethylene carbonate, 1-fluoro-2-methylethyl carbonate, 1-fluoro-1-methyl-ethylene carbonate, 1,2-difluoro-1-methylethylene carbonate, 1,1,2-trifluoro-2-methylethyl carbonate, trifluoromethyl ethylene carbonate, and combinations thereof.

Examples of carboxylic acid ester compounds include methyl acetate, ethyl acetate, n-propyl acetate, tert-butyl acetate, methyl propionate, ethyl propionate, γ-butyrolactone, decanolactone, valerolactone, mevalonolactone, caprolactone, methyl formate, and combinations thereof.

Examples of ether compounds include dibutyl ether, tetraethylene glycol dimethyl ether, diethylene glycol dimethyl ether, 1,2-dimethoxyethane, 1,2-diethoxyethane, ethoxy methoxy ethane, 2-methyltetrahydrofuran, tetrahydrofuran, and combinations thereof.

Examples of other organic solvents include dimethyl sulfoxide, 1,2-dioxolane, sulfolane, methyl sulfolane, 1,3-dimethyl-2-imidazolidinone, N-methyl-2-pyrrolidone, formamide, dimethylformamide, acetonitrile, trimethyl phosphate, triethyl phosphate, trioctyl phosphate, phosphate esters, and combinations thereof.

The positive electrode, the separator and the negative electrode are sequentially wound, stacked or folded into an electrode assembly, which is then placed into a packaging shell (for example, an aluminum plastic film), an electrolyte is injected, and the chemical conversion and packaging processes are performed to prepare a lithium-ion battery.

It should be understood by those skilled in the art that the above-described method for preparing a lithium-ion battery is only an example. Other methods commonly used in the art can be used without departing from the disclosure of the present application.

Since the separator is wound or stacked together with the positive electrode and the negative electrode, in a case that the above-described porous layer is formed on the surface of the positive electrode or the negative electrode, a corresponding technical effect can also be achieved.

Some specific examples and comparable examples are listed below to better illustrate this application. In the following examples, reagents, materials, and instruments used are commercially available unless otherwise specified. Some of the parameters used in the examples and comparative examples are shown in Table 1 below.

Comparative Example 1

(1) Preparation of Negative Electrode

The negative electrode active material (artificial graphite), the binder (styrene butadiene rubber), and the conductive agent (conductive carbon black (Super P)) are mixed uniformly with the solvent (deionized water) at a mass ratio of 92:3:5 to prepare a negative electrode slurry, then the negative electrode slurry is coated uniformly on both sides of the negative electrode current collector (copper foil), then a negative electrode active material layer is formed by drying the coated negative electrode current collector (copper foil) at 85 degrees Celsius, then cold pressing, slitting and cutting processes are performed and a negative electrode tab is welded so as to obtain a negative electrode.

(2) Preparation of Positive Electrode

The positive electrode active material (lithium cobaltate ($LiCoO_2$)), the binder (polyvinylidene fluoride (PVDF)), the conductive agent (conductive carbon black (Super P)) are dissolved in the solvent N-methylpyrrolidone (NMP) in a mass ratio of 97:1.5:1.5. A positive electrode slurry is prepared by uniformly stirring the mixture, then the positive electrode slurry is coated uniformly on both sides of the positive electrode current collector (aluminum foil), then a positive electrode active material layer is formed by drying the coated positive electrode current collector (aluminum foil) at 85 degrees Celsius, and then cold pressing, slitting, cutting processes are performed and a positive electrode tab is welded so as to obtain a positive electrode.

(3) Preparation of Separator

Boehmite is mixed with the binder (polyvinylidene fluoride), then the solvent N-methylpyrrolidone is added and the mixture is uniformly stirred to obtain a coating solution, and the volume ratio of the inorganic particles to the binder is 0.8. The coating solution is coated on the porous substrate (polyethylene) by means of dip coating to form a wet film. The porous substrate (polyethylene) with the wet film is immersed into the coagulating solution containing deionized water (third solvent) and N-methylpyrrolidone (second solvent) for phase transformation, with both the coating solution and the coagulating solution being at a temperature of 25 degrees Celsius. After being immersed in the coagulating solution for 30 seconds, the porous substrate (polyethylene) with the wet film is dried in an oven at 60 degrees Celsius to obtain a separator with a porous layer. The mass content of N-methylpyrrolidone (second solvent) in the coagulating solution is 40%. The ratio of Dv90 of the inorganic particles in the porous layer to the thickness of the porous layer is 0.2.

(4) Preparation of Electrolyte

A solution prepared with lithium salt $LiPF_6$ and a non-aqueous organic solvent (ethylene carbonate (EC):diethyl carbonate (DEC):ethyl methyl carbonate (EMC):vinylene carbonate (VC)=8:85:5:2, by a mass ratio) by a mass ratio of 8:92 is used as the electrolyte of the lithium-ion battery.

ATL_COSMX_0075697

(5) Preparation of Lithium-Ion Battery

An electrode assembly is obtained by winding the positive electrode, the separator, and the negative electrode, and then sealing, injection of the electrolyte, forming, and suction molding processes are performed to obtain the lithium-ion battery.

## Comparative Example 2

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 3.2 in comparative example 2. As can be seen in FIGS. **3-4**, FIG. **3** is an electronic microscope image (3000 times magnification) of pores of a lower surface of the porous layer in comparative example 2, FIG. **4** is an electronic microscope image (10,000 times magnification) of the cross section of the porous layer in the thickness direction in comparative example 2.

## Example 1

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.3 in Example 1.

## Example 2

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.5 in Example 2.

## Example 3

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8 in Example 3. As can be seen in FIGS. **1-2**, FIG. **1** is an electronic microscope image (3000 times magnification) of pores of a lower surface of the porous layer in example 3, FIG. **2** is an electronic microscope image (10,000 times magnification) of the cross section of the porous layer in the thickness direction in example 3.

## Example 4

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 1.0 in Example 4.

## Example 5

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 1.5 in Example 5.

## Example 6

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 2.0 in Example 6.

## Example 7

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 3.0 in Example 7.

## Example 8

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8, and the volume ratio of the inorganic particles to the binder is 0.2 in Example 8.

## Example 9

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8, and the volume ratio of the inorganic particles to the binder is 0.5 in Example 9.

## Example 10

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8, and the volume ratio of the inorganic particles to the binder is 1.2 in Example 10.

## Example 11

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8, and the volume ratio of the inorganic particles to the binder is 2 in Example 11.

## Example 12

The preparation method is the same as that of comparative example 1, except that the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8, and the volume ratio of the inorganic particles to the binder is 3 in Example 12.

## Example 13

The preparation method is the same as that of comparative example 1, except that the inorganic particles used in Example 13 are alumina, and the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8 in Example 13.

## Example 14

The preparation method is the same as that of comparative example 1, except that the inorganic particles used in Example 14 are magnesium hydroxide, and the ratio of the $Dv90$ of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8 in Example 14.

## Example 15

The preparation method is the same as that of comparative example 1, except that the inorganic particles used in

ATL_COSMX_0075698

Example 15 are titanium oxide, and the ratio of the Dv90 of the inorganic particles in the porous layer to the thickness of the porous layer is 0.8 in Example 15.

is measured. Then, the true volume V2 of the porous layer is equal to V2=V20−V0, and the porosity of the porous layer is equal to 1-V2/V1.

TABLE 1

| | Solid content in the coating solution | Types of inorganic particles | Ratio of the Dv90 of the inorganic particles to the thickness of the porous layer | Volume ratio of the inorganic particles to the binder | Coagulating solution | |
|---|---|---|---|---|---|---|
| | | | | | second solvent | content of second solvent |
| Example 1 | 15% | boehmite | 0.3 | 0.8 | NMP | 40% |
| Example 2 | 15% | boehmite | 0.5 | 0.8 | NMP | 40% |
| Example 3 | 15% | boehmite | 0.8 | 0.8 | NMP | 40% |
| Example 4 | 15% | boehmite | 1.0 | 0.8 | NMP | 40% |
| Example 5 | 15% | boehmite | 1.5 | 0.8 | NMP | 40% |
| Example 6 | 15% | boehmite | 2.0 | 0.8 | NMP | 40% |
| Example 7 | 15% | boehmite | 3.0 | 0.8 | NMP | 40% |
| Example 8 | 15% | boehmite | 0.8 | 0.2 | NMP | 40% |
| Example 9 | 15% | boehmite | 0.8 | 0.5 | NMP | 40% |
| Example 3 | 15% | boehmite | 0.8 | 0.8 | NMP | 40% |
| Example 10 | 15% | boehmite | 0.8 | 1.2 | NMP | 40% |
| Example 11 | 15% | boehmite | 0.8 | 2 | NMP | 40% |
| Example 12 | 15% | boehmite | 0.8 | 3 | NMP | 40% |
| Example 3 | 15% | boehmite | 0.8 | 0.8 | NMP | 40% |
| Example 13 | 15% | alumina | 0.8 | 0.8 | NMP | 40% |
| Example 14 | 15% | magnesium hydroxide | 0.8 | 0.8 | NMP | 40% |
| Example 15 | 15% | titanium oxide | 0.8 | 0.8 | NMP | 40% |
| Comparative Example 1 | 15% | boehmite | 0.2 | 0.8 | NMP | 40% |
| Comparative Example 2 | 15% | boehmite | 3.2 | 0.8 | NMP | 40% |

Next, the performances of separator and lithium-ion battery are tested.

(1) Thickness Test of Porous Layer

Separator samples are placed on a thickness gage (Model VL-50 LITEMATIC from Naitutoyo company) using a 5 mm flat bottom probe with a speed of 50 mm/min and a pressure of 0.01N. Each of the separator samples provided with a porous layer is measured for 60 thickness points, and the average thickness is taken as the measured value. The thickness of the porous layer is equal to the thickness of the separator minus the thickness of the porous substrate. In a case that there are two porous films, the thickness is divided by 2 to obtain the thickness of each porous layer.

(2) Gas Permeability Test of Porous Layer

A 100 mm×100 mm separator sample provided with a porous layer is cut and tested using a US Gurley 4110N Densometers with 100 cc test gas, and the period that the test gas passes completely through the separator sample provided with the porous layer is recorded as a Gurley value. The Gurley value of the porous layer is equal to the Gurley value of the separator provided with the porous layer minus the Gurley value of the separator without the porous layer (i.e., a pure porous substrate).

(3) Porosity Test of Porous Layer

The length, width, and thickness of a separator sample provided with a porous layer are measured, and the thickness of the porous layer is obtained by subtracting the thickness of the porous substrate (polyethylene) from the thickness of the separator, and the apparent volume V1 of the porous layer is obtained by calculation. The true volume V20 of the separator sample provided with the porous layer is measured using a true density meter (AccuPyc II Model 1340 Gas Pycnometer, Micromeritics Company), and the true volume VO of the porous substrate (polyethylene) of the same area

(4) Rate Performance Test of Lithium-Ion Battery

At 25 degrees Celsius, the lithium-ion battery is discharged to 3.0 V at a constant current of 0.2 C, rested for 10 minutes, then is charged to 4.4 V at a constant current of 0.7 C, then is charged to 0.02 C at a constant voltage of 4.4 V, rested for 10 min, and is further discharged at a constant current of 0.2 C until the voltage reaches 3.0 V. The discharge capacity at this time is measured and recorded as Q1. Then, the lithium-ion battery is charged to 4.4V at a constant current of 0.7 C, and then charged to 0.02 C at a constant voltage of 4.4 V, rested for 10 minutes, and then is discharged at a constant current of 2 C until the voltage is 3.0 V. The discharge capacity at this time is measured and recorded as Q2.

2 C/0.2 C rate performance (%) of the lithium-ion battery is equal to Q2/Q1×100%.

(5) Cycle Performance Test of Lithium-Ion Battery

At 25 degrees Celsius, the lithium-ion battery is charged to 4.4 V at a constant current of 0.7 C, then charged to 0.02 C at a constant voltage of 4.4 V, rested for 10 minutes, and discharged to 3.0 V at a constant current of 1 C, rested for 10 minutes. The discharge capacity at this time is measured and recorded as Q3. The above-described steps are regarded as one cycle of charge and discharge. 200 cycles are performed, and the discharge capacity after 200 cycles is recorded as Q4.

The capacity retention rate (%) of the lithium-ion battery after 200 cycles is equal to Q4/Q3×100%.

The test results of examples and comparative examples are shown in Table 2 below.

ATL_COSMX_0075699

15

## TABLE 2

| | Porosity of porous layer | Gurley value of porous layer (s/100 cc) | Thickness of porous layer (µm) | 2 C/0.2 C rate performance | Capacity retention rate after 200 cycles |
|---|---|---|---|---|---|
| Example 1 | 48% | 53 | 2 | 79.50% | 85.70% |
| Example 2 | 50% | 42 | 2 | 83.70% | 92.80% |
| Example 3 | 52% | 30 | 2 | 87.50% | 95.60% |
| Example 4 | 53% | 28 | 2 | 84.60% | 93.10% |
| Example 5 | 54% | 25 | 2 | 82.50% | 91.20% |
| Example 6 | 56% | 20 | 2 | 81.70% | 85.20% |
| Example 7 | 57% | 18 | 2 | 80.40% | 82.70% |
| Example 8 | 46% | 57 | 2 | 81.10% | 87.20% |
| Example 9 | 49% | 43 | 2 | 82.80% | 91.70% |
| Example 3 | 52% | 30 | 2 | 87.50% | 95.60% |
| Example 10 | 54% | 25 | 2 | 83.10% | 91.30% |
| Example 11 | 56% | 21 | 2 | 81.50% | 88.80% |
| Example 12 | 59% | 16 | 2 | 79.70% | 83.80% |
| Example 3 | 52% | 30 | 2 | 87.50% | 95.60% |
| Example 13 | 50% | 43 | 2 | 84.40% | 92.90% |
| Example 14 | 52% | 31 | 2 | 86.90% | 94.30% |
| Example 15 | 51% | 36 | 2 | 84.10% | 91.30% |
| Comparative Example 1 | 45% | 70 | 2 | 69.80% | 70.50% |
| Comparative Example 2 | 60% | 16 | 2 | 71.30% | 72.60% |

As can be seen from a comparison among examples 1-7 and comparative examples 1-2, the ratio of Dv90 of the inorganic particles to the thickness of the porous layer has an effect on the rate performance and cycle performance of the lithium-ion battery, and the probability of pore blockage due to compression swelling in the porous layer can be reduced effectively by controlling the ratio of the Dv90 of the inorganic particles to the thickness of the porous layer to be in a range from 0.3 to 3.0, so that the rate performance and cycle performance of the lithium-ion battery can be effectively improved. If the ratio of Dv90 of the inorganic particles to the thickness of the porous layer is too high (for example, comparative example 2), the pore size distribution of the porous layer tends to be non-uniform, the surface of the porous layer is heterogeneous, the porous layer is easily detached from the surface of the porous substrate, and defects are formed in the energy storage device (such as a lithium-ion battery), which is not advantageous for the improvement on rate performance and cycle performance. In addition, if the ratio of Dv90 of the inorganic particles to the thickness of the porous layer is too high, the adhesive force of the porous layer is reduced relatively, affecting the safety performance of the energy storage device (such as a lithium-ion battery). If the ratio of Dv90 of the inorganic particles to the thickness of the porous layer is too low (for example, comparative example 1), the inorganic particles cannot be effectively exposed on the surface of the porous layer, which does not facilitate an exchange of the first solvent in the coating solution and the third solvent in the coagulating solution in the preparation process of the porous layer, cannot enhance diffusion, is not advantageous for the development of the pores, and is also not advantageous for the improvement of the rate performance and cycle performance.

As can be seen from the comparison among Example 3 and Examples 8-12, the volume ratio of inorganic particles to the binder has an effect on the rate performance and cycle performance of the lithium-ion battery. An increase of the volume ratio is advantageous for an exchange of the third solvent in the coagulating solution and the first solvent in the coating solution and the increase of the porosity of the porous layer. If the volume ratio of inorganic particles to the

16

binder is too low, the porosity of the porous layer is decreased, the gas permeability of the separator deteriorates, and the rate performance of the lithium-ion battery is not significantly improved, which is not advantageous for the improvement of the rate performance and cycle performance. If the ratio of the volume ratio of the inorganic particles to the binder is too high, the adhesive force of the porous layer is reduced, gaps are easily formed between the separator and the electrodes, the hardness of the lithium-ion battery is reduced, and thus the rate performance and the cycle performance are not significantly improved.

As can be seen from the comparison among Example 3 and Examples 13-15, the use of various inorganic particles can improve the rate performance and cycle performance of the lithium-ion battery, and the types of inorganic particles used have less effect on the rate performance and cycle performance of the lithium-ion battery.

It should be understood by those skilled in the art that the above-described examples are only illustrative examples and should not be construed limiting the application. The various changes, substitutions, and alterations could be made to the application without departing from the spirit and scope of the application.

What is claimed is:

1. A separator, comprising: a porous substrate; and
   a porous layer arranged on a surface of the porous substrate, wherein the porous layer comprises inorganic particles and a binder, and a ratio of Dv90 of the inorganic particles to the thickness of the porous layer is in a range from 0.3 to 3.0.

2. The separator according to claim 1, wherein the porous layer has a thickness of 0.2 µm to 10 µm.

3. The separator according to claim 1, wherein the pores have an average pore size of 0.3 µm to 20 µm.

4. The separator according to claim 1, wherein a volume ratio of the inorganic particles to the binder is in a range from 0.2 to 3.0.

5. The separator according to claim 1, wherein the porous layer has a porosity of 20% to 90%.

6. The separator according to claim 1, wherein the inorganic particles are one or more selected from the group consisting of alumina, silica, magnesia, titanium oxide, hafnium dioxide, tin oxide, zirconia, cerium dioxide, nickel oxide, zinc oxide, calcium oxide, boehmite, aluminum hydroxide, magnesium hydroxide, calcium hydroxide, and barium sulfate.

7. The separator according to claim 1, wherein the binder is one or more selected from the group consisting of polyvinylidene fluoride, vinylidene fluoride-hexafluoropropylene copolymer, polyamide, polyacrylonitrile, polyacrylate, polyacrylic acid, polyacrylates, sodium carboxymethylcellulose, polyvinylpyrrolidone, polyvinyl ether, polymethyl methacrylate, polytetrafluoroethylene and polyhexafluoropropylene.

8. An energy storage device, comprising the separator according to claim 1.

9. The energy storage device according to claim 8, wherein the energy storage device is a lithium-ion battery.

10. A method for preparing the separator of claim 1, wherein the method comprises steps of:
    mixing inorganic particles with a binder to generate a mixture;
    adding a first solvent into the mixture;
    stirring the mixture with the first solvent to obtain a uniform coating solution; coating
    the uniform coating solution onto a surface of a porous substrate to form a wet film;

ATL_COSMX_0075700

the coating solution is in a range from 7% to 25%; and

wherein a ratio of Dv90 of the inorganic particles to the thickness of the porous layer is in a range from 0.3 to 3.0.

11. The method according to claim 10, wherein the solid content in the coating solution is in a range from 7% to 25%.

12. The method according to claim 10, wherein the coagulating solution comprises a second solvent and a third solvent, and the second solvent has a mass percentage of 20% to 60%.

13. The method according to claim 10, wherein the first solvent is one or more independently selected from the group consisting of N-methylpyrrolidone , dimethylacetamide and dimethylformamide.

14. The method according to claim 10, wherein the porous substrate comprises a polymer film, a multilayer polymer film, or a non-woven fabric formed by any one or more of the following polymers: polyethylene, polypropylene, polyethylene terephthalate, polyphthaloyl diamine, polybutylene terephthalate, polyester, polyacetal, polyamide, polyimide, polyetheretherketone , polyaryletherketone, polyetherimide, polyamide imide, polybenzimidazole, polyethersulfone, polyphenylene oxide, cycloolefin copolymer, polyphenylene sulfide, and polyethylene naphthalene.

15. The method according to claim 14, wherein the polyethylene is at least one selected from the group consisting of high density polyethylene, low density polyethylene, and ultrahigh molecular weight polyethylene.

16. The method according to claim 12, wherein the second solvent is one or more independently selected from the group consisting of N-methylpyrrolidone, dimethylacetamide and dimethylformamide, and the third solvent is one or more selected from the group consisting of deionized water, ethanol, propanol, acetone, dimethyl carbonate and diethyl carbonate.

17. The separator according to claim 1, wherein the porous layer has pores formed by the binder, at least a part of the inorganic particles are embedded in the pores.

* * * * *

ATL_COSMX_0075701